## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YOGAWORKS, INC., et al., | Case No.  20-12599 - KBO |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF DEBTORS PURSUANT TO SECTIONS 105, 361, 362, 363, 364, AND 507 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 4001, AND LOCAL RULE 4001-2, FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL;  (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; (IV) APPROVING DEBTORS' ASSUMPTION OF AND ENTRY INTO THE RESTRUCTURING SUPPORT AGREEMENT; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned counsel, hereby file this motion (the "Motion") for the entry of an interim order (the "Interim Order") and a final order (the "Final Order") authorizing the Debtors to obtain postpetition financing in accordance with the Debtor-In-Possession Loan and Security Agreement between the Debtors, on one hand, and Serene Investment Management, LLC and its affiliates including without limitation Yogaworks Investment Fund, LLC ("Serene" or "DIP Lender"), on the other, a copy of which is attached to the Motion as Exhibit "1" (the "DIP Agreement" and, with related documents, the "DIP Documents") in the principal amount of $3,350,000, pursuant to sections 105(a), 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (a) to obtain postpetition financing in the form of the DIP Credit Facility (defined below), as such relief is more particularly described herein, (b) to

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number is (1) YogaWorks, Inc., a Delaware corporation (9105); and (2) Yoga Works, Inc., a California corporation (0457).

use cash collateral as such term is defined in 11 U.S.C. §363 ("Cash Collateral") pursuant to sections 362 and 363, (c) modifying the automatic stay, (d) approving Debtors' assumption of and entry into the Restructuring Support Agreement ("RSA"), (e) scheduling a final hearing, and (f) granting related relief.

In support of this Motion, the Debtors rely upon, and incorporate by reference, the First Day Declaration of Brian Cooper (the "First Day Declaration") and the Declaration of Adam Meislik in support of this Motion ("Meislik Declaration" and collectively, the "First Day Declarations") in support of the Debtors' voluntary petitions (the "Chapter 11 Petitions") for chapter 11 relief, commencing the above-captioned chapter 11 cases (the "Cases") and the first day pleadings and applications (the "First Day Pleadings"), filed concurrently herewith, each of which is incorporated by reference as if set forth herein, and in further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Rule 4001-2.

## BACKGROUND

### A.    Summary of the Debtors' Business and Events Leading to Bankruptcy

5.    The Debtors operated a yoga business with over sixty (60) studio locations across the United States in Los Angeles, Orange County, Northern California, New York City, Boston, Baltimore, the Washington, D.C. area, Houston and Atlanta until March 2020 when the Debtors closed all of their storefront locations in response to the operating restrictions tied to the COVID-19 pandemic.  While a few of the stores reopened for a short period of time, the Debtors closed all of their studios indefinitely in September 2020.  The Debtors' corporate headquarters was located in Culver City, California until mid-2020 when it was moved to Santa Monica, California.

6.    The company was founded in 1987 with one studio in Santa Monica, California and grew significantly over the years to over seventy (70) studios at one time.  The Debtors also expanded their business model to include teacher training and in 2013, began offering pre-recorded classes digitally.

7.    The Debtors continued expanding and YogaWorks went public in 2017 (they voluntarily de-listed from the NASDAQ in early 2020).  Unfortunately, the Debtors were too focused on expansion and failed to successfully integrate acquired studios with existing operations, and as a result the enterprise was faltering.  As a result, the Debtors started to lose money.

8.    During the first half of 2019, the Debtors attempted to find a buyer using investment banker Guggenheim Securities ("Guggenheim") but those efforts were unsuccessful.  The Debtors were trying to improve their finances when COVID-19 hit and the Debtors were forced to close all of their studios.  The closure of the studios left the Debtors with significantly decreased revenue.

9.    Fortunately, the Debtors quickly developed a robust and successful live streaming digital platform that has allowed it to survive and find a buyer for substantially all of its assets.

10.    In approximately May 2020, the Debtors re-engaged Guggenheim as well as Force Ten Partners, LLC ("Force 10"), an advisory firm specializing in business restructuring and sourcing buyers for distressed businesses, to help them find a buyer for the business.  Guggenheim approached at least twenty (20) private equity firms and other potential bidders who participated

in the out-of-court financing solicitation, to discuss interest in a restructuring.  At the same time, Force 10 approached approximately thirty-five (35) parties.  Through those discussions, the Company, in its business judgment, agreed to terms with Serene (collectively, the "Stalking Horse") regarding a "stalking horse" bid to purchase the Company's assets.  The Stalking Horse has agreed to purchase certain of the Company's assets, including the Company's brand and intellectual property (collectively, the "Purchased Assets").

11.     The Debtors filed these Cases to complete the open and competitive process begun more than three (3) months ago, in order to sell substantially all of their assets, with Serene acting as the stalking horse for the Purchased Assets.  The Debtors intend to maintain their current operations of offering live stream and on-demand classes through YogaWorks Live and My YogaWorks while this sale process is ongoing with the goal of selling part or all of their businesses as a going concern and thereafter intend to discontinue operations, liquidate any remaining unsold assets and wind up their estates.

12.     A more thorough and complete discussion of the Debtors' history, their operations and efforts surrounding the marketing of the Debtors' businesses is set forth in the First Day Declarations, which are incorporated herein.

## B.     The Debtors' Prepetition Indebtedness

13.     Prior to the Petition Date, the Debtors had outstanding funded debt in the principal amount of $10.0 million with Avidbank.  The Credit Agreement and related documents were subsequently assigned by Avidbank to Great Hill Equity Partners V, LP ("GHP") and then assigned prior to the Petition Date by GHP to Serene (the "GHP Loan").  The GHP Loan is secured by a senior lien on substantially all of the assets of YogaWorks and Yoga Works.  As of the Petition Date, $10.0 million remains outstanding under the GHP Loan, plus accrued and unpaid interest, fees and expenses.

14.     Serene has now agreed to provide the Debtors a Credit Facility in the principal amount of $3,350,000 pursuant to the terms of the DIP Credit Agreement ("the "DIP Credit Facility").

15.     The Debtors owe material amounts, on an unsecured basis, to their landlords, totaling at least $5.4 million.  The Debtors owe other unsecured debts to trade vendors and the like of approximately $2 million, plus $1 million in a wage and hour litigation settlement, and another approximately $800,000 for taxes, wages and other debts likely entitled to priority status.

**C.      Equity Ownership of the Debtors**

16.     Currently, GHP owns about 70% of the common stock of YogaWorks and the other 30% is owned by employees and other public shareholders.  As of the Petition Date, the number of shares of YogaWorks outstanding totaled 17,154,471 shares.

17.     Yoga Works is owned 100% by YogaWorks.

18.     As noted in the First Day Declarations, the Debtors are experiencing a liquidity crisis and the DIP Credit Facility provides financing for a limited period of time.

**D.      Filing of the Bankruptcy Case**

19.     The Debtors are authorized to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

20.     No official committee has been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

**E.      The Restructuring Support Agreement and DIP Agreement**

21.     Pursuant to the RSA, a true and correct copy of which is attached to the Motion as Exhibit "2," the Debtors contemplate that they will effectuate a sale (the "Asset Sale") of substantially all of their assets pursuant to section 363 of the Bankruptcy Code to the DIP Lender or such higher and better bidder pursuant to bidding procedures to be agreed upon by the parties to the RSA and approved by the Bankruptcy Court and a restructuring through a liquidating chapter 11 plan of reorganization.  The RSA also provides for the sale of the GHP Loan to Serene with a portion of the purchase price being used to fund the DIP Facility. To that end, the RSA provides for the provision of $3,350,000.00 in debtor-in-possession financing from Serene (approval of which is requested by way of this Motion), as well as the provision for Plan funding by way of a final DIP draw in an amount necessary to fund payments, as set forth in the DIP Budget, required

to be made pursuant to the Plan, as well as the provision of a break-up fee ("Break-Up Fee") of three percent (3%) of the sale price.  In addition, the RSA provides that in exchange for GHP agreeing to allow a portion of Serene's purchase price for the GHP Loan to be used to fund the DIP Facility, the Interim and Final Orders on this Motion, as well as the Plan, shall include releases of GHP and its affiliates and others.

22.    Accordingly, the Debtors request approval of their entry into the RSA by way of the Final Order.

## **RELIEF REQUESTED**

23.    The Debtors have determined that, in order for each to operate their businesses during these chapter 11 cases, the Debtors will need more cash over the next approximately thirteen weeks (or until the closing of a sale of the Debtors' assets, which is anticipated to close within the next sixty to ninety days) than the Debtors can reasonably expect to be generated from their business operations.  The Debtors have undertaken an analysis of the minimum funding necessary to maintain their business operations and has limited the amount of the postpetition loan to such amount.  To obtain the use of the necessary funds, the Debtors have negotiated with the DIP Lender with respect to it providing the necessary funds in the form of the DIP Credit Facility.  The Debtors and the DIP Lender have reached an agreement on the terms of the DIP Credit Facility, as set forth herein.

24.    The Debtors seek, pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the following:

(i)    the entry of an interim order authorizing the Debtors to obtain postpetition financing, on an interim basis, in the amount of  $1,000,000 Dollars (the "Interim Order");

(ii)    setting a final hearing for approval of the Debtors to borrow, based upon the DIP Credit Facility, $2,350,000 Dollars (the "Final Order") with $1,200,000 Dollars to be distributed to the Debtors and $1,150,000 Dollars (the "Plan Funding Advance") to be held in an escrow

account maintained by external legal counsel to the Debtors and released to Debtors seven (7) days

prior to the hearing on confirmation of the Debtors' plan with the consent of GHP;

(iii)    entry of the Final Order;

(iv)    a finding that the Debtors are authorized to utilize Cash Collateral pursuant to

sections 362 and 363 of the Bankruptcy Code, upon the terms and conditions set forth therein;

(v)    a finding that the Debtors are authorized to execute and enter into the DIP

Documents and to perform such other and further acts as may be necessary or appropriate in

connection therewith;

(vi)    a finding that the Debtors are authorized to use the proceeds of the DIP Credit

Facility for working capital and general corporate purposes in accordance with the Budget, as that

term is used and defined within the DIP Agreement;

(vii)    granting the DIP Lender superpriority administrative claims, as set forth in the DIP

Agreement;

(viii)    modifying the automatic stay, set forth in section 362 of the Bankruptcy Code, to

the extent necessary to implement and effectuate the terms of the DIP Agreement, including a

waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim

Order and the Final Order (including under Bankruptcy Rule 6004);

(ix)    approving the assumption of and entry into the RSA between and among the

Debtors, Serene, and GHP, dated October 9, 2020, a copy of which is attached to the Motion as

Exhibit "2;" and

(x)    such other relief as the Bankruptcy Court may find just and proper.

25.    The relief sought herein is the product of good faith, arms' length negotiations by

and between the Debtors, the DIP Lender, and GHP.  Approval of the Motion is necessary because,

without the ability to borrow funds from the DIP Lender, the Debtors will lack the cash to operate their businesses during the pendency of the Cases.

## **MATERIAL TERMS OF THE DIP CREDIT FACILITY**

26.     Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Bankruptcy Rule ("Local Rule") 4001-2, the material provisions of the DIP Credit Facility, and the location of such provisions in the relevant source documents, are as follows:

| | |
|---|---|
| **Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, p.1 | The Debtors, YogaWorks, Inc. and Yoga Works, Inc. |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, p. 1 | Serene Investment Management, LLC and its affiliates including without limitation Yogaworks Investment Fund, LLC |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 2.1<br><br>Interim Order, ¶2(b) | Total of $3,350,000 in two draws: $1,000,000 upon entry of the Interim DIP Order and $2,350,000 upon entry of the Final DIP Order with $1,200,000 to be distributed to the Debtors and $1,150,000 to be held in an escrow account maintained by externa legal counsel to the Debtors and released to Debtors seven (7) days prior to the hearing on confirmation of the Debtors' plan with the consent of GHP. |
| **Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, ¶6.14 | The Debtors shall conduct a sale of substantially all of the assets of the Debtors in accordance with following Milestones, subject to extension as agreed upon with the consent of the DIP Lender: (i) file the motion to approve the sale of the Debtors' assets on or before the date that is five (5) calendar days after the Petition Date; (ii) obtain entry of the Interim Order by the Bankruptcy Court on or before the date that is five (5) calendar days after the Petition Date; (iii) obtain entry of the order approving the bidding procedures on or before the date that is thirty (30) calendar days after the Petition Date; (iv) obtain entry of the Final Order by the Bankruptcy Court on or |

| | |
|---|---|
| | before the date that is thirty (30) calendar days after the Petition Date; (v) obtain entry of the order approving the sale of the Debtors' assets on or before the date that is sixty (60) calendar days after the Petition Date; (vi) file the plan and disclosure statement on or before fifteen (15) days after entry of an order approving the sale of the Debtors' assets; (vii) obtain entry of an order approving the disclosure statement on or before the date that is sixty (60) calendar days after entry of the order approving the sale of the Debtors' assets; (viii) obtain entry of the order confirming the plan on or before the date that is ninety (90) calendar days after entry of the order approving the sale of the Debtors' assets; and (ix) have the effective date of the plan be on or before the date that is one hundred (100) calendar days after entry of the order approving the sale of the Debtors' assets. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c) | Not applicable.  The DIP Credit Facility is interest free. |
| **Term/Maturity**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶2.7 and p. 5<br><br>Interim Order, ¶11 | <u>Term:</u><br><br>The DIP Agreement shall become effective on the Closing Date and, subject to Section 12.8, shall continue in full force and effect for so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions under the DIP Agreement. Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Credit Extensions under the DIP Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default. Notwithstanding termination, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.<br><br><u>Maturity Date:</u><br><br>If the DIP Lender is not the successful bidder at the Asset Sale, the Maturity Date is the earlier of (i) the closing of the Bankruptcy Sale to any purchaser other than the Stalking Horse Purchaser; (ii) the effective date of the Debtors' chapter 11 plan; (iii) entry of an |

| | order by the Bankruptcy Court converting the Cases to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (iv) entry of a final order by the Bankruptcy Court dismissing the Cases; or (v) the date of termination of the DIP Credit Facility and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of the DIP Agreement. |
|---|---|
| **Use of DIP Credit Facility; Refinancing**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 5.18<br><br>Interim Order, ¶ 4, 19 | The Debtors shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):<br><br>(a) to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and<br><br>(b) to fund working capital and other needs of the Debtors in accordance with the Budget (subject to any Permitted Budget Variance).<br><br>Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine (i) the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, or (ii) the validity, perfection, enforceability of the GHP Loan, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to commence, prosecute or defend any claim or proceeding or cause of action of any kind or nature to disallow or challenge the GHP Loan, any loan documents relating thereto, or any other Loan Document, or (d) to fund |

| | |
|---|---|
| | acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the DIP Lender, provided that a Committee and its professionals shall be permitted to investigate the liens, claims, and potential causes of action against the DIP Lender in connection with the GHP Loan in an amount not to exceed $25,000 and any amount spent in excess of such amount shall not constitute administrative expenses of the Cases. Notwithstanding the foregoing, nothing in the Loan Agreement shall prohibit the Debtors from disputing the alleged occurrence of a default or Event of Default under the DIP Agreement. |
| **Borrowing Limits**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, ¶ 2.1(b) | Subject to and upon the terms and conditions of the DIP Credit Facility (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2 of the DIP Agreement), the DIP Lender agrees to distribute the total principal amount of $3,350,000 in two distributions. Amounts borrowed under Section 2.1(a) may not be reborrowed once repaid. |
| **Borrowing Conditions**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 3.1 and 3.2 | The obligation of Lender to make the initial Credit Extension is subject to the satisfaction of the following conditions precedent: (a) Lender shall have received, in form and substance satisfactory to Lender, the following: (i) executed copies of this Agreement and the other Loan Documents; (ii) evidence satisfactory to Lender that the insurance policies required by Section 6.6 of the DIP Agreement are in full force and effect;(iii) true, accurate and complete copies of all documents evidencing any the Prepetition Indebtedness in existence as of the Closing Date; (iv) the initial Advance Request; (v) the Perfection Certificate; and (vi) such other documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate; (b) the Debtors shall have delivered to Lender the initial Budget, which Budget shall be in form and substance satisfactory to Lender; (c) the Interim Order |

| | |
|---|---|
| | Entry Date shall have occurred not later than five (5) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Lender and shall not be subject to a stay; (d) the Petition Date shall have occurred and each Debtor shall be a debtor and debtor-in-possession in the Cases; and (e) the "first day orders" sought by the Debtors shall be reasonably satisfactory in form and substance to the DIP Lender. |
| | The obligation of Lender to make each Credit Extension, including the initial Credit Extension, is further subject to the following conditions: (a) the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of the Debtors' request for a Credit Extension and on the effective date of each Credit Extension as though made at and as of each such date; (b) no Default or Event of Default shall be continuing or would exist after giving effect to such Credit Extension; (c) the Cases of any of the Debtors shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; and (d) no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed. |
| **Interest and Fees**<br><br>Bankruptcy Rule(c)(1)(B) | Not applicable.  No interest or fees to be paid. |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, ¶ 6.16<br><br>Interim Order, ¶2, 4 | "Budget" means a cash flow projection and debtor-in-possession budget in form and substance reasonably acceptable to the DIP Lender and GHP; provided that, with the consent of the DIP Lender and GHP, such consent not be unreasonably withheld, the budget may be updated in accordance with Section 6.16 of the DIP Agreement.<br>A copy of the Budget is submitted at **Exhibit B** to the Proposed Interim Order in connection with this Motion. Furthermore, the Budget is subject to the Permitted Budget Variances, as |

| | |
|---|---|
| | that defined term is used and described in Section 6.16 of the DIP Agreement. |
| **Other Covenants**<br><br>DIP Credit Agreement, Sections 6 and 7 | The DIP Agreement contains usual and customary affirmative and negative covenants. *See* <u>DIP Agreement</u>, Sections 6 and 7.<br><br>The RSA also requires that any chapter 11 plan submitted by the Debtors will include a release of Serene, GHP and their affiliates, officers, directors and employees, etc., to the maximum extent permitted by law. |
| **Liens and Superpriority Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), (xi); Local Rule 4001-2(c)<br><br>DIP Credit Agreement ¶ 4.1<br><br>Interim Order ¶ 3 | <u>Liens</u>:  The Debtors grant Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens as set forth herein). Such security interest shall constitute:<br><br>(a) a valid, perfected first priority Lien  on Collateral that is not subject to valid, perfected, and non-avoidable Liens as of the Petition Date, other than Permitted Liens, including, without limitation, in Collateral acquired after the Petition Date; and<br><br>(b) a valid, perfected second priority Lien on Collateral that is subject to valid, perfected, and non-avoidable Liens in favor of third parties in existence as of the Petition Date, or to valid liens in existence as of the Petition Date that are (i) perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the DIP Lender in its sole and absolute discretion.<br><br><u>Superpriority Claims</u>: The Obligations are entitled to Superpriority Claim status in the chapter 11 cases pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code. |

| | |
|---|---|
| **Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶5.18<br><br>Interim Order, ¶ 4 | Subject to the limitations set forth in Section 5.18 of the DIP Credit Agreement, the Debtors are authorized to use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order): (a) to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and (b) to fund working capital and other needs of the Debtors in accordance with the Budget (subject to any Permitted Budget Variance). |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv); Local Rule 4001-2(c)<br><br>Interim Order, ¶ 9 | As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superiority Claim, and the Carve-Out and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition Lender is granted (in each case subject only to the DIP Liens, the DIP Superiority Claim, and prior payment of the Carve-Out) the following adequate protection, valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens and (ii) prior payment of the Carve-Out. |
| **Carve-Out**<br><br>Local Rule 4001-2(b)(6) and (c)<br><br>Interim Order ¶ 7 | Subject and subordinate to the Carve-Out (as defined below) in all respects, the DIP Obligations shall constitute allowed superpriority administrative expense claims and shall have priority over all other allowed Chapter 11 and Chapter 7 administrative expense claims, including expenses of a chapter 11 and chapter 7 trustee, under sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code. |

"Carve-Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code (without regard to the notice set forth in (ii) below) (the "U.S. Trustee Fees"); (ii) all reasonable fees and expenses, up to $10,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Fees"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court and to the extent consistent with the Budget, all unpaid fees (including, without limitation, transaction fees paid upon the closing of the respective transaction but excluding success fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Professionals") and any Committee professionals (the "Committee Professionals" and, together with the Professionals, the "Professional Persons") employed by the Committee, if the Committee professional is appointed in the Chapter 11 Case pursuant to sections 328 or 1103 of the Bankruptcy Code at any time on or prior to delivery by or on behalf of the DIP Lender of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) the Professional Fees in an aggregate amount not to exceed $50,000 for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").

"Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) to the Debtors and their counsel, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an event of default under the DIP Documents, stating that the Post-Carve-Out Trigger Notice Cap has been invoked, the DIP Loans have been accelerated, and the DIP Lender does not intend to fund further

| | |
|---|---|
| | advances under the DIP Loans, or consent to further use of Cash Collateral.  No portion of the Carve-Out, or proceeds of the DIP Credit Facility may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the challenge of, (i) the liens and/or claims of the DIP Lender, or the initiation or prosecution of any claim or action against the DIP Lender, including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, and any other federal, state or foreign law, in respect of the DIP Documents or (ii) any claims or causes of actions against the DIP Lender under the DIP Documents, their advisors, professionals, agents and sub-agents, including formal discovery proceedings in anticipation thereof. |
| **Section 506(c) and 552(b) Waivers**<br><br>Interim Order ¶ 9 | Subject to the entry of the Final Order, the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under the Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived. |
| **Determination Regarding Prepetition Claim; Stipulations of the Debtors, Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)<br><br>DIP Credit Agreement, ¶ 5.10 | The Debtors acknowledge that as of the Petition Date, the Debtors are indebted to Lender on account of the GHP Loan in the outstanding principal balance of $10,000,000. The Debtors acknowledge that the GHP Loan is in full force and effect, and hereby ratifies and reaffirms all of its payment and performance obligations (including indemnification obligations) thereunder, and that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by the Debtors. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Interim Order ¶ 18 | Forty-five (45) calendar days from date of the formation of a Committee for actions brought by a Creditor's Committee, or (y) sixty (60) calendar days following the date of entry of the Interim Order for any party other than a Committee (such time period established by clauses (x) and (y), shall be referred to as the "Challenge Period," and the date that is the |

| | |
|---|---|
| | next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly and timely file a Challenge and only for the matters specifically set forth in such Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"). |
| **Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>DIP Credit Agreement, ¶ 8.14<br><br>Interim Order, ¶ 5 | The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole).<br><br>The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, at is discretion, file financing statements, without notice to the Debtors, with all appropriate jurisdictions to perfect or protect the DIP Lender's interest or rights under the DIP Agreement, including a notice that any disposition of the Collateral, by any of the Debtors or any other Person, shall be deemed to violate the rights of the DIP Lender under the California Uniform Commercial Code. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the DIP Lender's discretion, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and any |

| | |
|---|---|
| | and all of such financing statements, mortgages, notices of lien and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases. |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii); Local Rule 4001-2(b)(3)<br><br>DIP Credit Agreement, ¶ 9.1(b), 9.7, 9.8, 11<br><br>Interim Order, ¶ 13(b), 15 | Except as otherwise provided for in the DIP Agreement or by applicable law, the Debtors waive:<br><br>(a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of1 any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever the DIP Lender may do in this regard;<br><br>(b) all rights to notice and a hearing prior to the DIP Lender's taking possession or control of, or to the DIP Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the DIP Lender to exercise any of its remedies; and<br><br>(c) the benefit of all valuation, appraisal, marshaling and exemption laws.<br><br>The Debtors waive their right to a jury trial. The Debtors also waive their right to demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtors may in any way be liable.<br><br>Furthermore, the Debtors waive:<br><br>(a) any suretyship defenses available to them under the California Uniform Commercial Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, |

| | |
|---|---|
| | 2810, 2819, 2839, 2845, 2847, 2848, 2849, 2850, and 2899 and 3433; and<br><br>(b) any right to require the DIP Lender to:  (1) proceed against any one of the Debtors or any other person; (2) proceed against or exhaust any security; or (3) pursue any other remedy. The DIP Lender may exercise or not exercise any right or remedy it has against any of the Debtors or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability.  Notwithstanding any other provision of the DIP Agreement or other related document, each one of the Debtors irrevocably waive all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of the DIP Lender under the DIP Agreement) to seek contribution, indemnification or any other form of reimbursement from any other one of the Debtors, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise. |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, Section 8<br><br>Interim Order, ¶ 12 | The DIP Agreement, the Interim Order and the Final Order contain usual and customary Events of Default, including non-performance of the terms thereof. *See* <u>DIP Agreement</u>, Section 8. |
| **Remedies**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, Section 9.1<br><br>Interim Order, ¶ 13 | Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Debtors, Lender may seek an order from the Bankruptcy Court on a shortened time basis  to do any of the following: (i) terminate the DIP Loan Facility with respect to further Advances; (ii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith |

due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Debtors; or (iii) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under the DIP Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of the Debtors in the Collateral only upon five (5) Business Days' prior written notice to the Debtors, counsel approved by the Bankruptcy Court for the Committee and the U.S. Trustee and as set forth in the Interim Order or Final Order (when applicable).

Waivers by the Debtors. Except as otherwise provided for in the DIP Agreement or by applicable law, the Debtors waive: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

| | |
|---|---|
| **Indemnification; Exculpation**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>DIP Credit Agreement, ¶12.2<br><br>Interim Order ¶ 17 | The Debtors shall defend, indemnify and hold harmless the DIP Lender and its officers, employees, and agents (each an "<u>Indemnified Party</u>") against:<br><br>(a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by the DIP Agreement; and (b) all losses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Debtors whether under this Agreement, the DIP Loan Facility, the Cases, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by an Indemnified Party's gross negligence or willful misconduct.  The indemnification provided in Section 12.2 shall not apply to Taxes. |

27.    Further, in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the DIP Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Debtors give the DIP Lender the power and right to "credit bid" the full amount of all Obligations, except that Serene shall not credit bid any portion of its DIP Facility claims, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral. The DIP Lender may also credit bid all obligations owing under the GHP Loan.  *See* DIP Credit Agreement, ¶ 2.8.

28.    Also, in the event that the Asset Purchase Agreement contemplated by the DIP Agreement is terminated by its terms and a Bankruptcy Sale Order is not entered in connection with a Bankruptcy Sale within five (5) Business Days thereafter, (b) the allowance of any claim or

claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under Section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (c) any Person attempts to apply the doctrine of marshalling with respect to the DIP Lender, which shall be waived (subject only to and effective upon entry of the Final Order) or (d) any Person attempts to apply the "equities of the case" exception set forth in Section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order).  *See* DIP Credit Agreement, ¶ 8.5.

## BASIS FOR RELIEF REQUESTED

**E.**     **The Bankruptcy Court May Approve Postpetition Financing**

29.     Bankruptcy Code section 364(c) provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

30.     Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g. In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *In re Simasko Production Co*., 47 B.R.

444, 448-49 (Bankr. D. Colo. 1985) (authorizing financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

31.    The Debtors are in need of an immediate additional infusion of liquidity to, among other things, pay employee wages and benefits, fund certain operational expenses, maintain ordinary course relationships with vendors, suppliers, and customers, and satisfy working capital needs in the ordinary course.  As of the Petition Date, the Debtors only have approximately $100,000 in cash on hand with which to operate their businesses and fund the Cases.  Therefore, together with their advisors, the Debtors undertook an analysis of the incremental liquidity that would be necessary to maintain operations in connection with the filing of the Cases.  Based on the Debtors' 13-week cash flow forecast, the Debtors determined that they will have additional net cash needs of approximately $2,200,000 in the first 13-weeks of the Cases.

32.    The Debtors require the financing provided under the DIP Credit Facility for the operation of their businesses, to preserve their going concern value, to pay vendors, suppliers and customers, to satisfy payroll obligations, to pay for certain costs and expenses related to the Cases and to satisfy the Debtors' other working capital needs.  Access to sufficient working capital and liquidity made available through the DIP Credit Facility, as requested by this Motion, is vital to the preservation and maintenance of the Debtors' going concern value and to the Debtors' ultimate goal of selling substantially all of their assets, as detailed in the Sale Motion.

33.    As discussed below, section 364 is satisfied because the Debtors cannot sustain operations if they cannot obtain postpetition funds by way of a debtor-in-possession loan.  In order to do so, the Debtors must obtain financing from the DIP Lender, however, the only way to obtain such financing is to grant to the DIP Lender the protections provided in the Interim Order, Final Order, the RSA, and in the DIP Agreement.

34.    In this case, substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors, working capital for the Cases was not available absent the proposed DIP Loan.  Accordingly, the Debtors believe they are required to obtain financing under sections 364(c) and (d) of the Bankruptcy Code and, accordingly, the DIP Credit Facility reflects the

exercise of the Debtors' sound business judgment.  The DIP Lender was unwilling to extend financing on terms more favorable to the Debtors, and the Debtors were not able to obtain alternative sources of financing upon more favorable terms.  The Debtors' ability to continue to operate their business pending a sale pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders depends upon their ability to obtain the DIP Credit Facility. Without the proposed financing, the Debtors would not have sufficient funds to operate, jeopardizing the successful sale of substantially all of their assets, thereby diminishing recoveries for their stakeholders.

**B.      Authority to Grant Superpriority Claims in Connection with the DIP Credit Facility Should be Provided**

35.      The DIP Credit Facility requires the Debtors to provide the DIP Liens, including the DIP Superpriority Claims pursuant to section 364(c) and (d) of the Bankruptcy Code.  Section 364(c) of the Bankruptcy Code provides, among other things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

36.      As discussed above and in the First Day Declaration, as well as in the Declaration of Adam Meislik, despite the efforts of the Debtors and their advisors, the Debtors have been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a) or (b); or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

37.      Having determined that financing is available only under section 364(c) of the Bankruptcy Code, the Debtors commenced arms'-length negotiations with GHP and the DIP

Lender regarding the DIP Credit Facility. The DIP Lender was only willing to provide the DIP Credit Facility, if, among other things, it was granted the DIP Liens and Superpriority Claims.

38.     Further, as indicated above, section 364(c) of the Bankruptcy Code enumerates certain incentives that a bankruptcy court may grant to postpetition lenders. Such incentives are not exhaustive. Bankruptcy courts frequently have authorized the use of inducements not specified in the statute. See e.g. *In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order that prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to postpetition lender), aff'd, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ("[b]ankruptcy courts…have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); *In re Antico Mfg. Co.*, 31 B.R. 103 (Bankr. E.D.N.Y. 1983)(authorizing lien on prepetition collateral to secure postpetition indebtedness).

39.     Section 364 of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *L.A. Dodgers*, 457 B.R. at 313 citing *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position").

40.     In this case, substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors, working capital for the Cases was not available absent the proposed DIP Liens and DIP Superpriority Claims. Accordingly, the Debtors believe they are required to obtain financing under section 364(c) of the Bankruptcy Code and, accordingly, the DIP Credit

Facility reflects the exercise of the Debtors' sound business judgment.  The DIP Lender was unwilling to extend financing on terms more favorable to the Debtors, and the Debtors were not able to obtain alternative sources of financing upon more favorable terms.  The Debtors' ability to continue to operate their businesses pending a sale pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders depends upon their ability to obtain the DIP Credit Facility.  Without the proposed financing, the Debtors would not have sufficient funds to operate, jeopardizing the successful sale of substantially all of their assets, thereby diminishing recoveries for their stakeholders.

### C.    The Scope Of The Carve-Out Is Appropriate

41.    The proposed DIP Credit Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out.  Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  See *Ames Dep't Stores*, 115 B.R. at 40.  Neither the Final Order nor the Interim Order directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *Id*. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  In addition, subject to the Budget, the Carve-Out ensures that proceeds of the DIP Credit Facility and Cash Collateral may be used for the payment of U.S. Trustee fees and professional fees of the Debtors and any future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Credit Facility.

42.    Accordingly, the Debtors submit the proposed Carve-Out, as agreed to by the DIP Lender, is appropriate.

**F.**      **The DIP Lender Is Entitled to the Protections Afforded to a Good Faith Lender Under Section 364(e)**

43.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

44.      In this case, the DIP Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms available on which to obtain needed postpetition financing, and (ii) are the product of extended arms'-length, good faith negotiations between and among the Debtors and the DIP Lender.  The terms and conditions of the DIP Documents are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtors, their estates and creditors.  The proceeds under the DIP Credit Facility will be used only for purposes that are permissible under the Bankruptcy Code, no consideration is being provided to any party to the DIP Documents other than as described herein (such as the releases to GHP) and the DIP Lender extended the DIP Credit Facility in reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  Section 364(e) provides a lender with a presumption of good faith.  *Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC),* 424 F.3d 963, 969 (9th Cir. 2005).

45.     Accordingly, the Debtors request that the Court find that the DIP Lender has acted as a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

## G.     The Automatic Stay Should Be Modified on a Limited Basis

46.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to grant the security interests, liens and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.   In addition, the Final Order provides for the modification of the automatic stay to allow for the enforcement of rights and remedies by the DIP Lender under the DIP Documents upon the occurrence of an Event of Default.

47.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## H.     The Debtors' Proposed Use of Cash Collateral Should be Approved

48.     As noted above, Serene is the only secured creditor that holds an interest in the Debtors' Cash Collateral.   In relevant part, Bankruptcy Code section 363(c)(2) provides that the Debtors "may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless – (A) each entity that has an interest in such cash collateral consents."

49.     Section 363(e) of the Bankruptcy Code provides that on request by an entity that has an interest in property, the court, with or without a hearing, shall prohibit or condition the use, sale, or lease of such property as necessary to provide adequate protection of such interest.   The DIP Lender has indicated that it requires adequate protection of its interests in existing collateral as a condition to its consent to such use of cash collateral, and then only on the terms reflected in this Motion and in the proposed form of Interim Order.

50.     The Debtors' business judgment as to adequate protection here is evident in the terms of the Interim Order – all of which are customary in connection with the use of collateral in operating Chapter 11 cases of this scale and consistent with the broad flexibility inherent in the

concepts of adequate protection.  *See, e.g., In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("[a]dequate protection will take many forms, only some of which are set forth in section 361…"); *In re Reading Tube Indus.,* 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987) ("[t]he absence of a definition of adequate protection in the Code coupled with the 'flexibility' of Section 361(3) suggests that adequate protection may be shown in a variety of ways"); *In re Wilson*, 30 B.R. 371, 373 (Bankr. E.D. Pa. 1983) ("[w]hile 'adequate protection' is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equity principles").

51.     The Interim Order is otherwise authorized and warranted pursuant to Section 363(c)(2) of the Bankruptcy Code given the core function of adequate protection to protect secured parties against diminution or decrease as a result of the proposed use of their collateral. *See In re Gasel Transp. Lines, Inc.,* 326 B.R. 683 (6th Cir. B.A.P. 2005).

52.     Serene consents to the Debtors' proposed use of Cash Collateral and therefore, the Debtors respectfully request this Court to approve their proposed use of Cash Collateral.  For the foregoing reasons, granting the relief requested herein is appropriate and in the best interests of its estate.

## I.     The RSA is in the Best Interest of the Estates and Should Be Approved

53.     Approval of assumption and entry into the RSA  is also in the best interests of the estates and is supported by the Debtors' sound business judgment.

54.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Approval of a debtor's actions under section 363(b)(1) of the Bankruptcy Code requires the debtor to show that its decision was based on its business judgment. *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is

"good business reason"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.,* No. 06-11202, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (*quoting In re Exide Techs., Inc.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

55.     Likewise, section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts reviewing a debtor's decision to assume or reject an executory contract or unexpired lease apply a business judgment standard. *See In re Federated Dept. Stores, Inc.,* 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"). Debtors receive considerable discretion in determining whether to assume or reject an executory contract. *Stanziale v. Machtomi (In re Tower Air, Inc.),* 416 F.3d 229, 238 (3d Cir. 2005). Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

56.     Accordingly, so long as a debtor exercises "reasonable" business judgment, a court should approve the proposed assumption or rejection. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 318 U.S. 523, 550 (1943); *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993) ("This Court has broad discretion to approve a settlement or compromise, and it should do so unless the proposed settlement falls below the lowest point in the range of reasonableness.").

57.     Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of

the company." *In re Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted). The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" *In re Aerovox, Inc.,* 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234) (Bankr. E.D. Mo. 1991). "Courts are loathe to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence." *Integrated Res.,* 147 B.R. at 656.

58.     The RSA represents a major step toward the Debtors' intended chapter 11 liquidation plan. The terms of the RSA represent a sound and reasonable exercise of the Debtors' business judgment as it secures the financial support of the DIP Lender and GHP while the Debtors move toward a sale of their assets.

59.     Approval of the Debtors' assumption of and entry into the RSA will not only allow funding beyond the initial draw by way of the DIP Facility, but will otherwise enable the Debtors to move expeditiously toward confirmation and consummation of a Plan with the financial support to continue operations pending the sale.

60.     Accordingly, the Debtors submit it is appropriate and in their estates' best interests for the Court to authorize the Debtors to assume and enter into and act in accordance with the RSA in proposing and seeking approval of a plan in their chapter 11 cases.

61.     Based on the foregoing, the Debtors seek approval of the DIP Credit Facility, assumption of and entry into the RSA.

**J.**     **The Court Should Schedule a Final Hearing on This Motion as Soon as Possible in Accordance with the Requirements of the Bankruptcy Rules**

62.     By this Motion, the Debtors request that the Court schedule a final hearing on this Motion as soon as possible in accordance with the requirements of the Federal Rules of Bankruptcy Procedure.  Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure provides that the Court may commence a final hearing on this Motion no earlier than fourteen (14) days after service of the Motion.  The Debtors need to obtain as promptly as possible final authorization to obtain

postpetition financing consistent with the DIP Credit Facility in order to ensure the Debtors' employees and vendors that the Debtors will be able to pay, during the course of these cases, their ordinary operating expenses including, without limitation, payroll and the expenses of maintenance and operation of their business.

63.     Therefore, the Debtors respectfully submit that a final hearing on this Motion should be held as soon as possible after the expiration of the fourteen (14) day period provided for by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, in order to prevent the substantial damage to the Debtors' business which would result from any loss of support of the Debtors' customers, employees, and vendors.

**K.    Request for Immediate Relief and Waiver of Stay**

64.     Pending a final hearing, the Debtors require immediate financing and use of existing collateral. The Debtors' interim request represents the Debtors' good faith projection of the cash necessary to operate during the period prior to a final hearing.  It is essential that the Debtors maintain stability and continue paying ordinary operating expenses postpetition to facilitate the sale process and maximize the value of their assets.  Absent immediate financing and use of existing collateral, the Debtors will not have any funding to pay expenses and therefore will be unable to avoid an immediate liquidation pending a final hearing.

65.     Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b).  The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

66.     Bankruptcy Rule 4001 has the same standard, with respect to interim relief.  Fed. R. Bankr. P. 4001(b)(2); Fed. R. Bankr. P. 4001(c)(2) ("If the motion so requests, the court may conduct a hearing before such 14-day period [after service of the motion] expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and

irreparable harm to the estate pending a final hearing." The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, and that Bankruptcy Rules 6003 and 4001 have been satisfied.

67.     In addition, in order to implement the foregoing successfully, the Debtors respectfully request a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the operations, value, and ability of the Debtors to reorganize.

68.     Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## NOTICE

69.     Notice of the Interim Hearing and notice of the Motion has been given by the Debtors to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); (ii) counsel to the DIP Lender and its counsel; (iii) all known holders of liens upon the Debtors' assets; (iv) the attorneys general in the states in which the Debtors conduct their business; (v) the Internal Revenue Service; (vi) counsel to GHP and its counsel; and (vii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; by facsimile transmission, email, overnight courier and/or hand delivery.

70.     Further, as the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-l(m).

71.     The Debtors respectfully submit that, under the circumstances, such notice of the Interim Hearing and the Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 400, and the Local Rules, and in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

72.    The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated:  October 15, 2020

**COZEN O'CONNOR**

/s/ Thomas J. Francella, Jr.
Thomas J. Francella, Jr. (DE Bar No. 3835)
Thomas M. Horan (DE Bar No. 4641)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2000
Facsimile:   (302) 250-4495
E-mail: tfrancella@cozen.com
E-mail: thoran@cozen.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman, Esquire
Melissa Davis Lowe, Esquire
100 Spectrum Center Drive; Suite 600
Irvine, CA  92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
E-mail:  afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com

*Proposed Counsel to the  Debtors and Debtors in Possession*