## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **Debtor-in-Possession Loan And Security Agreement** is entered into as of October 14, 2020 (this "**Agreement**"), by and between Serene Investment Management, LLC ("**Lender**"), YogaWorks, Inc., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**YogaWorks**"), and Yoga Works, Inc. a California corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Yoga Works California**"), and together with YogaWorks, individually and collectively, "**Borrower**").

### Recitals

WHEREAS, on October 14, 2020 the "**Petition Date**"), the Borrower filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**" and each a "**Case**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrowers and AvidBank ("**Bank**") entered into that certain Credit Agreement dated as of January 23, 2020, which Credit Agreement and related documents have subsequently been assigned by Bank to Great Hill Equity Partners V, LP ("**GHP**") and then assigned prior to the Petition Date by GHP to YogaWorks Investment Fund LLC ("**YIF**"), an affiliate of Lender of which Lender is the manager (such loan, the "**GHP Loan**") pursuant to a debt purchase transaction (the "**Debt Purchase**");

WHEREAS, Borrower has requested that the Lender make available to the Borrower debtor-in-possession a term loan in the principal amount of Three Million Three Hundred Fifty Thousand Dollars ($3,350,000); and

WHEREAS, Lender is willing to make the Loan described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Borrower agree as follows:

1.    **DEFINITIONS AND CONSTRUCTION.**

    1.1    **Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

        "Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Borrower arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Borrower, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Borrower and Borrower's Books relating to any of the foregoing.

        "Advance" or "Advances" means a cash advance or cash advances under the DIP Loan Facility.

        "Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and partners.

"Asset Purchase Agreement" means that certain Asset Purchase Agreement to be dated on or around the Petition Date among the Loan Parties, as sellers, and Lender, as buyer, as such agreement may be amended, amended and restated, supplemented, or otherwise modified from time-to-time.

"Avoidance Action" means any claim and cause of action that constitutes an avoidance action under Sections 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code, state law or similar laws and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for Delaware or any court having jurisdiction over the Cases from time to time.

"Bankruptcy Sale" means a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all assets and other rights of the Loan Parties to the Stalking Horse Purchaser, or to another purchaser with a higher and better bid that is accepted in accordance with the terms of the Bidding Procedures Order, on substantially the terms set forth in the Asset Purchase Agreement or such other terms acceptable to Lender (it being agreed by Lender that in the event that Lender or an affiliate of Lender is not the winning bidder, Lender's consent shall be solely in its capacity as a lender hereunder and made in good faith and in the reasonable discretion of a secured lender).

"Bankruptcy Sale Motion" means a motion, in form and substance acceptable to Lender, seeking entry of the Bidding Procedures Order and the Bankruptcy Sale Order.

"Bankruptcy Sale Order" means an order of the Bankruptcy Court, in form and substance acceptable to Lender  approving and authorizing the Bankruptcy Sale.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance acceptable to Lender, approving (i) bidding procedures relating to the Bankruptcy Sale and procedures for assuming executory contracts and unexpired leases, (ii) authorizing the Borrower to enter into the Asset Purchase Agreement, and (iii) approving bid protections for the Stalking Horse Purchaser, in each case on terms acceptable to Lender and in all respects consistent with those terms set forth in the Asset Purchase Agreement.

"Board" means the board of directors of either of the Loan Parties, whether acting on its own or through a duly authorized committee, including their steering committees.

"Borrower's Books" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"Budget" means a 13-week cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender and GHP; provided that, with the consent of the Lender and GHP, such consent not to be unreasonably withheld, the budget may be updated in accordance with Section 6.16.

"Budget Variance Report" means a report provided by the Borrower to the Lender showing by line item and in the aggregate the actual cash disbursements of the Borrower for the period set forth in Section 6.16(b), comparing the actual cash receipts and disbursements (on a line item by line item basis) with the cumulative budgeted amounts for each such line item set forth in the Budget for such period, noting

therein all variances on a line-item and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct in all material respects by the Borrower's chief financial officer, chief restructuring officer, or chief executive officer.

"Carve Out" has the meaning assigned to such term in the applicable Order.

"Case" and "Cases" have the respective meanings set forth in the recitals.

"Closing Date" means the date on which the conditions specified in Section 3.1 are satisfied.

"Code" means the California Uniform Commercial Code.

"Collateral" means the property described on **Exhibit A** attached hereto.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"Credit Extension" means each Advance or any other extension of credit by Lender for the benefit of Borrower hereunder.

"Daily Balance" means the amount of the Obligations owed at the end of a given day.

"Debtor" has the meaning set forth in the recitals.

"Default" means any circumstance that, with the passage of time or giving of notice, would constitute an Event of Default.

"DIP Loan" has the meaning given to such term in Section 2.1(a) hereof.

"DIP Loan Commitment" means an aggregate amount not to exceed Three Million Three Hundred Fifty Thousand Dollars ($3,350,000).

"DIP Loan Facility" means this Loan facility.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrower has any interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Section 8.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are

Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA.  For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (or such other form acceptable to the Lender) authorizing the Loans .

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"GAAP" means generally accepted accounting principles as in effect from time to time.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Indebtedness" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, and (c) all capital lease obligations.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lender under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as Exhibit B, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the DIP Loan in such amounts as are contemplated by Section 2.1(b).

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Insolvency Proceeding" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law,

including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Intellectual Property" means all right, title, and interest owned by Borrower in and to the following:  Copyrights, Trademarks (excluding any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office, but only until such statement is accepted by the United States Patent and Trademark Office) and Patents; trade secrets, design rights, claims for damages by way of past, present and future infringement of any of the rights included above, and all license fees and royalties arising from licenses or rights to use such intellectual property rights; all amendments, renewals and extensions of any of such Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan" means the DIP Loans.

"Loan Documents" means, collectively, this Agreement, any note or notes or guaranties executed by Borrower, the Orders and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"Loan Party" means each of YogaWorks and Yoga Works California.

"Material Adverse Effect" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of Borrower or (ii) the value of the Collateral taken as a whole or priority of Lender's security interests in the Collateral; provided that the term "Material Adverse Effect" will not be deemed to exist as a result of the Cases or the circumstances and events leading up thereto.

"Maturity Date" means the earlier of (i) the closing of the Bankruptcy Sale to any purchaser other than the Stalking Horse Purchaser; (ii) the effective date of Borrower's chapter 11 plan;  (iii) entry of an order by the Bankruptcy Court converting the Cases to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (iv) entry of a final order by the Bankruptcy Court dismissing the Cases; or (v) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of this Agreement.

"Negotiable Collateral" means all letters of credit of which Borrower is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Borrower's Books relating to any of the foregoing.

"Obligations" means all debt, principal, and other amounts owed to Lender by Borrower pursuant to this Agreement.

"Orders" means collectively, the Interim Order and the Final Order.

"Other Connection Taxes" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Perfection Certificate" means that certain Perfection Certificate in the form provided by Lender dated the Closing Date and delivered by Borrower to Lender.

"Permitted Budget Variance" has the meaning given to it in Section 6.16.

"Permitted Discretion" means a determination made in good faith in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"Permitted Indebtedness" means:

(a)     Indebtedness of (i) Borrower in favor of Lender arising under this Agreement, any other Loan Document, or as set forth in the Perfection Certificate;

(b)     Indebtedness arising in connection with the Carve Out;

(c)     Indebtedness to trade creditors incurred in the ordinary course of business; and

(d)     Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

"Permitted Investment" means:

(a)     Investments existing on the Closing Date disclosed in the Perfection Certificate;

(b)     Investments held by Borrower in cash or (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, and (ii) money market accounts held at financial institutions reasonably acceptable to Lender in Lender's Permitted Discretion;

"Permitted Liens" means the following:

(a)     Any Liens existing on the Closing Date and disclosed in the Perfection Certificate, provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien, including, without limitation, (i) any Lien securing Prepetition Indebtedness

(b)     Any Liens arising under this Agreement or the other Loan Documents;

(c)     Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Lender's security interests;

(d)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) calendar days or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, or letters of credit or guarantees issued in respect thereof, other than any Lien imposed by ERISA;

(f)     any interest or title of a lessor under any lease entered into by Borrower in the ordinary course of its business and covering only the assets so leased and statutory and common law landlords' liens under leases to which Borrower is a party, provided that such landlord has executed a landlord waiver in form and substance acceptable to Lender in its Permitted Discretion;

(g)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.8 (judgments/settlements);

(h)     the filing of UCC financing statements solely as a precautionary measure in connection with operating leases and consignment arrangements;

(i)     Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with Borrower's deposit accounts held at such institutions to secured standard fees for deposit services charged by, but not financing made available by such institutions, provided that Lender has a perfected security interest in the amounts held in such deposit accounts;

(j)     Liens on cash securing letters of credit constituting Indebtedness permitted pursuant to clause (i) of the definition of Permitted Indebtedness;

(k)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (j) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase; and

(l)     to the extent constituting a Lien, the Carve Out.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Petition Date" has the meaning set forth in the recitals.

"Prepetition Indebtedness" means the Indebtedness of Borrower existing as of the Petition Date pursuant to YIF pursuant to the GHP Loan.

"Prepetition Loan Documentation" means the documentation governing any (or all) of the Prepetition Indebtedness.

"Responsible Officer" means each of the Chief Executive Officer and the General Counsel.

"Stalking Horse Purchaser" means Serene Investment Management, LLC, or its designated affiliate, appointed as the stalking horse purchaser with respect to the Bankruptcy Sale.

"Superpriority Claim" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower (other than superpriority claims granted to the Stalking Horse Purchaser under the Asset Purchase Agreement), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

"Tax" or "Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"U.S. Trustee" means the United States Trustee for the District of Delaware.

"US Withholding Tax Form" means whichever of the following that is relevant (including, in each case, any successor form):

(a)     IRS Form W-8BEN or W-8BEN-E,

(b)     IRS Form W-8IMY (with appropriate attachments),

(c)     IRS Form W-8ECI,

(d)     IRS Form W-8EXP,

(e)     any other IRS form by which a person may claim complete exemption from, or reduction in the rate of, withholding (including backup withholding) of US federal income tax on interest and other payments to that person.

**1.2    Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and all calculations made hereunder shall be made in accordance with GAAP.  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

**2.     LOAN AND TERMS OF PAYMENT.**

**2.1    Credit Extensions.**  Borrower promises to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower hereunder.

(a)    **Term Loan**. Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2), Lender agrees to make two (2) distributions of the DIP Loan Commitment ("**DIP Loan**") as follows: $1,000,000 within one (1) business day of the entry of the Interim Order and $2,350,000 within (1) business day of the entry of the Final Order (the ("Final DIP Draw").  Of the proceeds of the Final DIP Draw, $1,200,000.00 will be distributed to Borrower and $1,150,000.00 (the "**Plan Funding Advance**") shall be deposited with bankruptcy counsel for the Borrower. Counsel  shall only release the Plan Funding Advance upon 1) receipt of a written request from Borrower and 2) the determination of the amount set forth in Section 2.2, and in no event any earlier than seven (7) days prior to the Effective Date.  Amounts borrowed under this Section 2.1(a) may not be reborrowed once repaid.

(b)    This Loan shall not accrue interest  and shall be repaid in full by Borrower on the Maturity Date, unless repayment is waived by Lender.

**2.2    Return of Unused Portion of DIP Loan** At the request of GHP, any unused portion of the DIP Loan as of the date immediately prior to the effective date of the Borrower's plan, less the amount necessary, as agreed by and between Borrower, Lender and GHP, to fund the wind-down of the Cases including without limitation professional fees, shall be returned to Lender who, on behalf of YIF, shall promptly remit same to GHP as consideration for the Debt Purchase.  For the avoidance of doubt, nothing in this Section 2.2 or elsewhere in this Agreement shall obligate Lender to fund any advances in excess of the DIP Loan Commitment.

**2.3    Forgiveness of DIP Loan.**  In the event Borrower's assets are sold to the Stalking Horse Purchaser, the DIP Loan shall be forgiven on the effective date of Borrower's plan.

**2.4    Crediting Payments**. Prior to the occurrence of an Event of Default, Lender shall credit a wire transfer of funds, check or other item of payment to the Obligations, to the outstanding principal balance.  After the occurrence of an Event of Default, the receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 12:00 p.m. Pacific Time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day.

**2.5    Withholding.**

(a)    Payments received by Lender from Borrower under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of Borrower) requires Borrower to make any withholding or deduction of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required.

(b)     Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law and Borrower will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that Borrower has made such withholding payment.

(c)     Notwithstanding anything to the contrary in this Section 2.5, Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by Borrower.  The agreements and obligations of Borrower contained in this Section shall survive the termination of this Agreement.

(d)     Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(e)     If Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made by Borrower under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that Borrower, upon the request of Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant taxing authority) to Lender in the event Lender is required to repay such refund to such taxing authority.

**2.6     No Fees, Interest or Expense Reimbursement.** Lender agrees for itself and on behalf of YIF that no fees or interest are payable by Borrower under either this Agreement, or from and after the date of the Debt Purchase, the GHP Loan.  Lender and Borrower shall each bear all their respective expenses in association with this documentation and administration of this Loan and the GHP Loan.

**2.7     Term**.  This Agreement shall become effective on the Closing Date and, subject to Section 12.8, shall continue in full force and effect for so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions under this Agreement.  Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default.  Notwithstanding termination, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.

**2.8     Right to Credit Bid**.  Subject to the Orders, in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, Borrower hereby gives Lender, on behalf of YIF, the power and right to "credit bid" the full amount of the GHP Loan set forth in Section 5.10 hereof in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

3.    **CONDITIONS OF LOANS.**

    **3.1    Conditions Precedent to Credit Extension**.  The obligation of Lender to make the initial Credit Extension is subject to the satisfaction of the following conditions precedent:

        (a)    Lender shall have received, in form and substance satisfactory to Lender, the following:

            (i)    executed copies of this Agreement and the other Loan Documents;

            (ii)    evidence satisfactory to Lender that the insurance policies required by Section 6.6 hereof are in full force and effect;

            (iii)    true, accurate and complete copies of all documents evidencing any the Prepetition Indebtedness in existence as of the Closing Date;

            (iv)    the Perfection Certificate; and

            (v)    such other documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate;

        (b)    the Borrower shall have delivered to Lender the initial Budget, which Budget shall be in form and substance satisfactory to Lender;

        (c)    the Interim Order Entry Date shall have occurred not later than five (5) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay;

        (d)    the Petition Date shall have occurred and each Borrower shall be a debtor and debtor-in-possession in the Cases; and

        (e)    the "first day orders" sought by the Borrower shall be reasonably satisfactory in form and substance to the Lender.

    **3.2    Conditions Precedent to the Credit Extension**.  The obligation of Lender to make each Credit Extension, including the initial Credit Extension, is further subject to the following conditions:

        (a)    the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of Borrower's request for a Credit Extension and on the effective date of each Credit Extension as though made at and as of each such date;

        (b)    no Default or Event of Default shall be continuing or would exist after giving effect to such Credit Extension;

        (c)    the Cases of any of the Borrower shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

        (d)    no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases; and

4.      **CREATION OF SECURITY INTEREST.**

        **4.1      Grant of Security Interest**.   To secure prompt repayment of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, Borrower grants Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens as set forth herein).   Such security interest shall constitute:

                (a)      a valid, perfected first priority Lien on Collateral that is not subject to valid, perfected, and non-avoidable Liens as of the Petition Date other than Permitted Liens, including, without limitation, in Collateral acquired after the Petition Date; and

                (b)      a valid, perfected second priority Lien on Collateral that is subject to valid, perfected, and non-avoidable Liens in favor of third parties in existence as of the Petition Date, or to valid liens in existence as of the Petition Date that are (i) perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the Lender in its sole and absolute discretion.

The Borrower agrees that the Obligations are entitled to Superpriority Claim status in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, subject only to the Carveout.

        **4.2      Delivery of Additional Documentation Required**.   Borrower shall from time to time execute and deliver to Lender, at the request of Lender, all Negotiable Collateral, all financing statements and other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.

        **4.3      Authorization to File Financing Statements**.   Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Lender under the Code. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

5.      **REPRESENTATIONS AND WARRANTIES.**

        Each Borrower represents and warrants as follows:

        **5.1      Due Organization and Qualification**.   Borrower is a corporation duly existing under the laws of its state of incorporation and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

        **5.2      Due Authorization; No Conflict**.   Subject to the entry of the Orders and the terms hereof, the execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained

in Borrower's Certificate of Incorporation or Bylaws, nor will they constitute an event of default under any material agreement to which Borrower is a party or by which Borrower is bound. Borrower is not in default under any agreement to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

       **5.3**    **No Prior Encumbrances**. Borrower has good and marketable title to its property, free and clear of Liens, except for Permitted Liens.

       **5.4**    **Bona Fide Accounts.** The Accounts are bona fide existing obligations. The property and services giving rise to such Accounts has been delivered or rendered to the account debtor or to the account debtor's agent for immediate and unconditional acceptance by the account debtor.

       **5.5**    **[Reserved]**.

       **5.6**    **Intellectual Property**. Borrower is the sole owner of the Intellectual Property, except for (a) licenses granted by Borrower in the ordinary course of business, (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, and (c) licenses relating to discreet geographical areas outside of the United States. For the avoidance of doubt and for sake of clarity, however, Borrower may enter into limited non-competition arrangements with its licensees and similar business partners in the ordinary course of business. To the best of Borrower's knowledge, each of the Patents is valid and enforceable, and no part of the Intellectual Property has been judged invalid or unenforceable, in whole or in part, and no claim has been made that any part of the Intellectual Property violates the rights of any third party (except to the extent such claim could not reasonably be expected to cause a Material Adverse Effect).

       **5.7**    **Name; Location of Chief Executive Office**. Borrower will advise Lender not less than ten (10) business days in advance of the relocation of the Chief Executive Office and any change in the business headquarters of Borrower. Except as disclosed in the Perfection Certificate, Borrower has not done business under any name other than that specified on the signature page hereof.

       **5.8**    **Litigation**. Except as disclosed in writing to Lender or as set forth in the Perfection Certificate, there are no actions or proceedings (other than the Cases) pending by or against Borrower before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

       **5.9**    **No Material Adverse Change in Financial Statements**. All consolidated and consolidating financial statements related to Borrower that Lender has received from Borrower fairly present in all material respects Borrower's financial condition as of the date thereof and Borrower's consolidated and consolidating results of operations for the period then ended and have been prepared in accordance with GAAP. There has not been a material adverse change in the consolidated or the consolidating financial condition of Borrower since the date of the most recent of such financial statements submitted to Lender (other than as a result of the Cases or the circumstances and events leading up thereto).

       **5.10**    **GHP Loan.** Borrower acknowledges that as of the Petition Date, the Borrower is indebted to YIF on account of the GHP Loan in the outstanding principal balance of $10,000,000. Borrower acknowledges that the GHP Loan is in full force and effect, and hereby ratifies and reaffirms all of its payment and performance obligations (including indemnification obligations) thereunder, and that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by Borrower.

**5.11    Regulatory Compliance**.  To the best of Borrower's knowledge, Borrower has met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from Borrower's failure to comply with ERISA that is reasonably likely to result in Borrower's incurring any liability that could reasonably be expected to have a Material Adverse Effect.  Borrower is not required to be registered as an "investment company" under the Investment Company Act of 1940.  Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).  To the best of Borrower's knowledge, Borrower has complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.  Borrower has not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

**5.12    Environmental Condition**.  Except as would not reasonably be expected to have a Material Adverse Effect, none of Borrower's properties or assets has ever been used by Borrower or to the best of Borrower's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law; to the best of Borrower's knowledge, none of Borrower's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by Borrower; and Borrower has not received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by Borrower resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

**5.13    Taxes**.  Borrower has filed or caused to be filed all material tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes for which filing is not yet due, or (ii) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP) by Borrower, or (iii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.14    Subsidiaries**.  Borrower does not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

**5.15    Government Consents**.  Borrower has obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of Borrower's business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.16    Deposit and Securities Accounts**.  Borrower maintains deposit or securities accounts only as set forth in the Perfection Certificate.  No amounts are on deposit other than in the account ending in 729 maintained with Wells Fargo Bank, N.A.

**5.17    Full Disclosure**.  No representation, warranty or other statement made by Borrower in any certificate or written statement furnished to Lender taken together with all such certificates and written statements and supplements furnished to Lender contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading when made, it being recognized by Lender that the projections and forecasts provided by Borrower in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or

periods covered by any such projections and forecasts may differ from the projected or forecasted results. No Loan Document has been amended. The Loan Documents (including all documents assigned by GHP to Lender pursuant to the Assignment Agreement) are each in full force and effect and are not subject to any offset, claim, counterclaim or defense in favor of Borrower.

        **5.18    Use of Proceeds**. The Borrower shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):

        (a)     [Reserved];

        (b)     to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and

        (c)     to fund working capital and other needs of the Borrower in accordance with the Budget (subject to any Permitted Budget Variance).

Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine (i) the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, or (ii) the validity, perfection, enforceability of the GHP Loan, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to commence, prosecute or defend any claim or proceeding or cause of action of any kind or nature to disallow or challenge the GHP Loan, any loan documents relating thereto, or any other Loan Document, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the Lender, provided that a Committee and its professionals shall be permitted to investigate the liens, claims, and potential causes of action against YIF in connection with the GHP Loan in an amount not to exceed $25,000, and any amount spent in excess of such amount shall not constitute administrative expenses of the Cases. Notwithstanding the foregoing, nothing herein shall prohibit the Borrower from disputing the alleged occurrence of a default or Event of Default hereunder.

        **5.19    Financial Information**. (a) On and as of the Closing Date, the Budget, copies of which have heretofore been furnished to the Lender and (b) following the Closing Date, any updated Budget delivered pursuant to Section 6.16, in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

        **5.20    Cases**. The Cases were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Interim Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

        **5.21    Orders**. The Interim Order and, after it has been entered, the Final Order are in full force and effect, and have not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Borrower is in material compliance with each Order.

6.      **AFFIRMATIVE COVENANTS.**

Each Borrower shall do all of the following:

    6.1      **Good Standing**.  Borrower shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect.  Borrower shall maintain in force all licenses, approvals and agreements, the loss of which could have a Material Adverse Effect.

    6.2      **Government Compliance**.  Borrower shall meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA.  Borrower shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

    6.3      **Financial Statements, Reports, Certificates**.  Borrower shall deliver the following to the Lender and GHP:

        (a)      copies of all SEC filings;

        (b)      commencing on November 15, and on the 15th of each month thereafter, a cash flow forecast in form and detail as prepared by Borrower in the ordinary course of business, covering all of the weeks through the Maturity Date; and (ii) every Friday, aged listings of accounts receivable and accounts payable;

        (c)      all reports filed, including monthly operating reports, filed with the Office of the United States Trustee;

        (d)      (i) together with the reports described in clause (e) below, a report of any legal actions (other than claims asserted in the Cases) for worker's compensation, unemployment or counter-claims in intellectual property infringement proceedings which are pending or threatened in writing against Borrower or any Subsidiary that could reasonably be expected to result in a Material Adverse Effect; and (ii) promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Cases) pending or threatened in writing against Borrower or any Subsidiary that could reasonably be expected to result in liability to Borrower or any Subsidiary of One Hundred Thousand Dollars ($100,000) or more, or (y) any commercial tort claim acquired by Borrower;

        (e)      commencing with the month ending October 31, 2020, within thirty (30) calendar days of the last day of each month, a report signed by Borrower, in form acceptable to Lender in its Permitted Discretion, listing any applications or registrations that Borrower has made or filed in respect of any Patents, Copyrights or Trademarks and the status of any outstanding applications or registrations, as well as any material change in Borrower's Intellectual Property along with an updated Perfection Certificate if any of the information contained in the Perfection Certificate delivered to the Lender on the Closing Date is no longer true and correct in all respects;

        (f)      written notice within five (5) Business Days' of the resignation from or termination of employment of any Responsible Officer;

        (g)      commencing on October 30, 2020, and thereafter on a weekly basis, on or before 11:59 p.m. Pacific time each Friday, a Budget Variance Report certified by a Responsible Officer, and any updates to the Budget that are approved by Lender in Lender's sole discretion; and

(h)     such other financial information as Lender may request from time to time in its Permitted Discretion.

**6.4     Right to Inspect**.  Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours and at Borrower's sole cost and expense, to inspect Borrower's Books and to make copies thereof, to audit Borrower's Accounts and to check, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral; provided that no notice is required if an Event of Default has occurred and is continuing.

**6.5     Taxes**.  Borrower shall make due and timely payment or deposit of all material Taxes required of it by law, provided that Borrower need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.6     Insurance.**

(a)     Borrower, at its expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks (including, but not limited to, insurance sufficient to cover personal injuries caused by Borrower's products in an amount not less than the Obligations), and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where Borrower's business is conducted on the date hereof.  Borrower shall also maintain insurance relating to Borrower's business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Borrower's.

(b)     All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender (it being hereby acknowledged by Lender that the insurance policies of Borrower in place on the Closing Date are satisfactory).  All such policies of property insurance shall contain a lender's loss payable endorsement showing Lender as an additional loss payee thereof, and all liability insurance policies shall show the Lender as an additional insured and Borrower shall use commercially reasonable efforts to have such policies specify that the insurer must give at least twenty (20) calendar days' notice to Lender before canceling its policy for any reason (or ten (10) calendar days for cancellation for nonpayment of premiums).  Upon Lender's request (which shall occur once per year excepting for following the occurrence and during the continuance of an Event of Default), Borrower shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor.  All proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.

**6.7     Accounts**.  Except as required under the Bankruptcy Code, rules or policies of the U.S. Trustee, and/or a Bankruptcy Court order, Borrower shall not establish any deposit or securities account after the Closing Date without the approval of the Lender and shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system.  Any material changes from such pre-petition cash management system must be acceptable to the Lender in its reasonable discretion.  The Interim Order and Final Order shall provide Lender with a valid and enforceable lien and security interest on the cash held in the Borrower bank accounts.  Borrower agrees to deposit all good faith deposits received from stalking horse bidders or other potential purchasers of the Borrower's assets into a deposit account that is subject to a Lien in favor of Lender.

**6.8     Bankruptcy Sale Process**.  The Borrower shall conduct a sale of substantially all of the assets of the Borrower in accordance with the Milestones defined below.  The management team of

the Borrower, including the Steering Committee of the Board of Directors shall oversee the sale process on behalf of the Borrower, including all activities of any advisors retained by the Borrower in connection with the sale process, shall at all times be entitled to take any action necessary or appropriate to conduct the sale process.

       6.9 **Bankruptcy Filings.**  Not less than one (1) Business Day prior to filing any motion requesting approval for debtor-in-possession financing, use of cash collateral, and approval of bidding procedures, Borrower shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender in Lender's Permitted Discretion.

       **6.10 Intellectual Property Rights.**

       (a) Borrower shall execute such documents as Lender may request in its Permitted Discretion for Lender to maintain its perfection in such intellectual property rights to be registered by Borrower, and upon the request of Lender in its Permitted Discretion, shall file such documents simultaneously with the filing of any such applications or registrations.

       (b) Lender may audit Borrower's Intellectual Property to confirm compliance with this Section.

       6.11 **Further Assurances**.  At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

       6.12 **Prepetition Loan Documents**.  No Loan Party shall amend, supplement, restate, otherwise modify the Prepetition Loan Documentation or enter into any new Prepetition Loan Documentation without the prior written consent of the Lender, unless such amendments or modifications are approved by the Bankruptcy Court.

       6.13 **Debtor-in-Possession Obligations**.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

       6.14 **Milestones**.  The Borrower shall achieve each of the following milestones (as the same may be extended from time to time with the consent of the Lender, collectively, the "**Milestones**"):

       1. the Interim Order has not been entered by the Bankruptcy Court by within five (5) calendar days after the Petition Date;

       2. the motion to approve the Bankruptcy Sale and the Bidding Procedures Order have not been filed with the Bankruptcy Court within five (5) calendar days after the Petition Date;

       3. the Final Order has not been entered by the Bankruptcy Court within thirty (30) calendar days after the Petition Date;

       4. the Bidding Procedures Order has not been entered by the Bankruptcy Court within thirty (30) calendar days after the Petition Date;

       5. the Bankruptcy Sale Order has not been entered by the Bankruptcy Court within sixty (60) calendar days after the Petition Date;

6.    the plan and disclosure statement have not been filed with the Bankruptcy Court within fifteen (15) calendar days after the Bankruptcy Sale Order;

7.    the order approving the disclosure statement has not been entered by the Bankruptcy Court within sixty (60) calendar days after the entry of the Bankruptcy Sale Order;

8.    the confirmation order has not been entered by the Bankruptcy Court within ninety (90) calendar days of entry of the Bankruptcy Sale Order; and

9.    the effective date of the Plan has not occurred within one hundred (100) calendar days following the entry of the Bankruptcy Sale Order.

**6.15    First Day Orders**.  The Borrower shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

### 6.16    Budget Compliance and Variances.

(a)    The Borrower will use the proceeds of the Loan solely to make disbursements for expenditures provided for in accordance with Section 5.18 and this Section 6.16.  The Borrower shall not pay any expenses (other than de minimis amounts) or other disbursements (other than de minimis disbursements) other than the type of expenses and disbursements set forth in the Budget.

(b)    Beginning on the Petition Date, the Borrower shall not cause expenses to vary from the applicable Budget by more than ten percent (10%) in excess of the aggregate budgeted amount for cash disbursements on a trailing four (4) week basis (collectively, the "**Permitted Budget Variances**"), provided that to the extent the actual cash receipts in any such period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the "Permitted Budget Variance" for such receipts or disbursements, as applicable, for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive periods to the extent such additional budgeted capacity is unused by Borrower).  In the event that actual amounts for total cash receipts and cash disbursements from operations line items and/or professional fees are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that the Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances.

(c)    If the Budget is updated, modified or supplemented by the Borrower, each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget.  Each Budget delivered to Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender.  Each Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

**6.17    Filing of Motions and Applications**.  Without the prior written consent of the Lender, the Borrower shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Orders, (b) refrain from taking any action that is required to be taken by the terms of any

of the Loan Documents or the Orders, or (c) permit any Indebtedness or Claim to be pari passu with or senior to any of the Loans, except as expressly stated in the Orders.

        **6.18**    **Superpriority Claim**.  No Loan Party shall incur, create, assume, suffer to exist or permit any other Superpriority Claim that is pari passu with or senior to the claims of the Lender against the Borrower, except for the Carve Out, and as otherwise expressly stated in the Orders.

## 7.    NEGATIVE COVENANTS.

    No Borrower shall do any of the following:

        **7.1**    **Dispositions**.  Other than in accordance with the Bankruptcy Sale Order, convey, sell, lease, transfer or otherwise dispose of (collectively, a "**Transfer**"), :  (i) Transfers of (a) non-exclusive licenses and similar arrangements for the use of the property (including Intellectual Property) of Borrower in the ordinary course of business, (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, and (c) licenses relating to discreet geographical areas outside of the United States (for the avoidance of doubt and for sake of clarity, however, Borrower may enter into limited non-competition arrangements with its licensees and similar business partners in the ordinary course of business); or (ii) Transfers of Equipment as prohibited by this Agreement or the order(s) of the Bankruptcy Court, or (iii) assignment of leases or subleases of real property.  To avoid any ambiguity cash may be used in the ordinary course of business, subject to the provisions of this Agreement and orders of the Bankruptcy Court.

        **7.2**    **Change in Business; Change in Executive Office**.  Engage in any business, other than the businesses currently engaged in by Borrower and any business substantially similar or related thereto (or incidental thereto), or cease to conduct business in the manner conducted by Borrower as of the Closing Date; or without thirty (30) calendar days prior written notification to Lender (a) relocate its chief executive office or state of incorporation or change its legal name; (b) add any new offices or business locations or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000) to a bailee other than to a bailee and at a location already disclosed in the Perfection Certificate, or (c) without Lender's prior written consent, change the date on which its fiscal year ends.

        **7.3**    **Mergers or Acquisitions**.  Merge, divide or consolidate,  with or into any other business organization, or acquire,  all or substantially all of the capital stock or property of another Person.

        **7.4**    **Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness,  other than Permitted Indebtedness.

        **7.5**    **Encumbrances**.  Create, incur, assume or suffer to exist any Lien with respect to any of its property, or assign or otherwise convey any right to receive income, including the sale of any Accounts,  except for Permitted Liens, or enter into any agreement with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property.

        **7.6**    **Distributions**.  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any equity interests, except that Borrower may repurchase equity interests from current or former employees,  directors, or consultants of Borrower in any amount where the consideration for the repurchase is solely the cancellation of indebtedness owed by such current or former employees, directors or consultants to Borrower regardless of whether an Event of Default exists.

**7.7    Investments**. Directly or indirectly acquire or own, or make any Investment in or to any Person,  other than Permitted Investments; or maintain or invest any of its property with a Person other than Lender unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender .

**7.8    Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

**7.9    Prepetition Indebtedness**. Make any payment in respect of any Prepetition Indebtedness, except in compliance with the terms of such Prepetition Indebtedness, or amend any provision contained in any documentation relating to the Prepetition Indebtedness except in compliance with the terms of the subordination agreement relating to such Prepetition Indebtedness, or amend any provision affecting Lender's rights contained in any documentation relating to the Prepetition Indebtedness without Lender's prior written consent.

**7.10    Compliance**. Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose. Fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, or fail to comply with the Federal Fair Labor Standards Act, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect.

## 8.    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an Event of Default by Borrower under this Agreement:

**8.1    Payment Default**. Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases after accounting for the relief provided in the Orders, if Borrower fails to pay, when due, any of the Obligations;

**8.2    Covenant Default.**

(a)    If Borrower violates or fails to perform any obligation under Sections 6.5, 6.6, 6.7, 6.8, 6.9, 6.12, 6.14, 6.15, 6.16(c), 6.17, 6.18 or Article 7;

(b)    If Borrower fails to perform any obligation under Section 6.3 within two (2) Business Days after the timeline set forth in Section 6.3 for such obligation;

(c)    If Borrower fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Lender and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within ten (10) calendar days after Borrower receives notice thereof or any officer of Borrower becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) calendar day period or cannot after diligent attempts by Borrower be cured within such ten (10) calendar day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional reasonable period (which shall not in any case exceed twenty (20) calendar days) to attempt to cure such default, and within such

reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made;

**8.3    Material Adverse Effect**.  If there occurs and is ongoing any circumstance or circumstances that could reasonably be expected to have a Material Adverse Effect, and, solely to the extent such circumstance can be cured, Borrower fails to effectuate such cure to Lender's reasonable satisfaction within five (5) days after receipt of notice from Lender;

**8.4    Attachment**.  Other than in connection with the Cases in each case, if any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) calendar days, or if Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten (10) calendar days after Borrower receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrower (provided that no Credit Extensions will be required to be made during such cure period);

**8.5    Assets.**  (a) the Asset Purchase Agreement is terminated by its terms and a Bankruptcy Sale Order is not entered in connection with a Bankruptcy Sale within five (5) Business Days thereafter, (b) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under Section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (c) any Person attempts to apply the doctrine of marshalling with respect to the Lender, which shall be waived (subject only to and effective upon entry of the Final Order) or (d) any Person attempts to apply the "equities of the case" exception set forth in Section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order);

**8.6    Other Agreements**.  Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Cases, if there is a default or other failure to perform in (a) any agreement to which Borrower is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000) or which could have a Material Adverse Effect or (b) any Prepetition Indebtedness;

**8.7    Prepetition Indebtedness**.  If the Obligations or the GHP Loan shall not have the priority contemplated by this Agreement or the Orders, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations or the GHP Loan;

**8.8    Judgments**.  If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (excluding amounts covered by insurance or third party indemnification) shall be rendered against Borrower and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of ten (10) calendar days (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

**8.9    Misrepresentations**.  If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any certificate delivered to

Lender by any Responsible Officer pursuant to this Agreement or to induce Lender to enter into this Agreement or any other Loan Document;

      **8.10**    **[Reserved]**;

      **8.11**    **Cases.**  Any of the Cases of the Borrower shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender;

      **8.12**    **Trustee.**  A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases;

      **8.13**    **Cash Collateral.**  An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Borrower;

      **8.14**    **Relief from Stay.**  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

      **8.15**    **Orders.**  The Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender;

      **8.16**    **Compliance with Orders.**  Any of the Borrower shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) in any material respect;

      **8.17**    **Other Financing.** (a) Except as permitted in the Interim Order or Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien pari passu with or senior to that granted to and/or for the benefit of the Lender hereunder, or (b) the Borrower shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than the Obligations under the DIP Loan Facility or GHP Loan, or other than in accordance with the Budget approved by the Lender; or

      **8.18**    **Avoidance.** (a) Any suit or action is commenced against the Lender by Borrower that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender, or (b) the Bankruptcy Court rules in favor of any Person in any suit or action commenced against the Lender by or on behalf of such Person (after the Bankruptcy Court has granted such Person standing to commence such suit or action).

      **9.**     **LENDER'S RIGHTS AND REMEDIES.**

      **9.1**    **Rights and Remedies**.  Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrower:

(a)    Lender may seek an order from the Bankruptcy Court on a shortened time basis  to do any of the following: (i) terminate the DIP Loan Facility with respect to further Advances; (ii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; or (iii) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon five (5) Business Days' prior written notice to Borrower, counsel approved by the Bankruptcy Court for the Committee and the U.S. Trustee and as set forth in the Interim Order or Final Order (when applicable).

(b)    Waivers by Borrower.  Except as otherwise provided for in this Agreement or by applicable law, Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

**9.2**    **[Reserved].**

**9.3**    **[Reserved].**

**9.4**    **[Reserved]**.

**9.5**    **Lender's Liability for Collateral**.  So long as Lender complies with reasonable commercial lending practices, Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

**9.6**    **Remedies Cumulative**.  Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.7**    **Demand; Protest**.  Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity,

release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

      **9.8**    **Borrower Liability.**  Each Borrower hereunder shall be jointly and severally obligated to repay all Credit Extensions made hereunder, regardless of which Borrower actually receives said Credit Extension, as if each Borrower hereunder directly received all Credit Extensions.  Each Borrower waives (a) any suretyship defenses available to it under the Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, 2810, 2819, 2839, 2845, 2847, 2848, 2849, 2850, and 2899 and 3433, and (b) any right to require Lender to:  (i) proceed against any Borrower or any other person; (ii) proceed against or exhaust any security; or (iii) pursue any other remedy.  Lender may exercise or not exercise any right or remedy it has against any Borrower or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any Borrower's liability.  Notwithstanding any other provision of this Agreement or other related document, each Borrower irrevocably waives all rights that it may have at law or in equity (including, without limitation, any law subrogating Borrower to the rights of Lender under this Agreement) to seek contribution, indemnification or any other form of reimbursement from any other Borrower, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by Borrower with respect to the Obligations in connection with this Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by Borrower with respect to the Obligations in connection with this Agreement or otherwise.  Any agreement providing for indemnification, reimbursement or any other arrangement prohibited under this Section 9.8 shall be null and void.  If any payment is made to a Borrower in contravention of this Section 9.8, such Borrower shall hold such payment in trust for Lender and such payment shall be promptly delivered to Lender for application to the Obligations, whether matured or unmatured.

      **9.9**    **Protective Payments**. If Borrower fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Lender will make reasonable efforts to provide Borrower with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

      **9.10**    **[Reserved]**.

      **9.11**    **[Reserved]**

    **10.**    **NOTICES.**

      All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below.  Lender or Borrower may change its mailing or

electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10:

|  |  |
|---|---|
| If to Borrower: | YogaWorks Inc.<br>Yoga Works Inc.<br>2215 Main Street<br>Santa Monica, CA 90405 |

With a copy to (which does not constitute notice):

Alan J. Friedman
Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Email:  afriedman@shbllp.com

|  |  |
|---|---|
| If to Lender: | Serene Investment Management, LLC<br>2148 Jimmy Durante Boulevard, Suite B<br>Del Mar, CA 92014<br>Attention: Charlie Monts<br>Email: charlie@sereneim.com |

With a copy to (which does not constitute notice):

Loeb & Loeb LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, CA 90067
Attention: Lance Jurich, Esq.
Email: ljurich@loeb.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE.**

Except as otherwise expressly provided in any of the Loan Documents, California law governs the Loan Documents without regard to principles of conflicts of law.  Borrower and Lender each submit to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Lender.  Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to Borrower at the address set forth in, or subsequently provided by Borrower in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) calendar days after deposit in the U.S. mails, proper postage prepaid.

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Los Angeles County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Los Angeles County, California; and the parties hereby submit to the jurisdiction of such court. The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure Sections 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Los Angeles County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure Section 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

This Section 11 shall survive the termination of this Agreement.

12.    **GENERAL PROVISIONS.**

12.1    **Successors and Assigns**. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by Borrower or, prior to the occurrence of an Event of Default, Lender, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion.

12.2    **Indemnification**. Borrower shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "**Indemnified Party**") against:  (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions

between Lender and Borrower whether under this Agreement, the DIP Loan Facility, the Cases, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by an Indemnified Party's gross negligence or willful misconduct.  This Section 12.2 shall not apply to Taxes.

**12.3    Time of Essence**.  Time is of the essence for the performance of all obligations set forth in this Agreement.

**12.4    Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**12.5    Amendments in Writing, Integration**.  Except as expressly set forth herein, all amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by each of the parties hereto.  All prior agreements, understandings, representations, warranties, and negotiations between any of the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**12.6    Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

**12.7    Electronic Execution of Documents.**  The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**12.8    Survival**.  All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to Borrower.  The obligations of Borrower to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**12.9    Confidentiality; Disclosure**.  In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to prospective transferees or purchasers of any interest in the loans, provided that they are similarly bound by confidentiality obligations, (ii) as required by law, regulations, rule or order, subpoena, judicial order or similar order (including in connection with the Cases), (iii) as may be required in connection with the examination, audit or similar investigation of Lender and (iv) as Lender may determine in connection with the enforcement of any remedies hereunder.  Confidential information hereunder shall not include information that either:  (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (b) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information.

Borrower authorizes Lender to disclose its relationship with Borrower, including use of Borrower's logo in Lender's promotional materials.

      **12.10    Patriot Act Notice**.  Lender notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies Borrower, which information includes names and addresses and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

      **12.11    Correction of Loan Documents**.  Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Borrower:**

**YOGAWORKS, INC., a Delaware corporation**

By: _____
Brian Cooper (Oct 15, 2020 10:25 EDT)
Name:   Brian Cooper
Title:
   CEO

**YOGA WORKS, INC., a California corporation**

By: _____
Brian Cooper (Oct 15, 2020 10:25 EDT)
Name:   Brian Cooper
Title:
   CEO

**Lenders:**

**SERENE INVESTMENT MANAGEMENT, LLC**

By:_____

Name:  Adam Phillips

Title:    Manager

:

**Exhibit A**

**COLLATERAL DESCRIPTION ATTACHMENT**
**TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

All personal property of Borrower (herein referred to as "**Borrower**" or "**Debtor**") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a)      all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles and software, and, with respect to intellectual property rights, solely the Intellectual Property), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records; and

(b)      any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.  All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time.

**Exhibit B**

**FORM OF INTERIM ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YOGAWORKS, INC., <u>et al.</u>, | Case No. |
| Debtors.[1] | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; (IV) APPROVING DEBTORS' ASSUMPTION OF AND ENTRY INTO THE RESTRUCTURING SUPPORT AGREEMENT; AND <u>(V) GRANTING RELATED RELIEF</u>**

Upon the motion (the "<u>Motion</u>") dated October __, 2020 of the above-captioned debtors and debtors-in-possession (individually "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (collectively, the "<u>Cases</u>"), pursuant to sections 105, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the corresponding local rules of this District (the "<u>Local Rules</u>"), requesting entry of an interim order ("<u>Interim Order</u>") and Final Order (as defined below) authorizing the Debtors to, among other things:

(i)    Obtain senior secured postpetition financing in an aggregate principal amount not to exceed $3,3350,000 (the "<u>DIP Credit Facility</u>", and the loans provided to the Debtors thereunder, the "<u>DIP Loans</u>"), pursuant to the terms and conditions of the DIP Documents (as defined below), this Interim Order, and the Final Order;

(ii)    Enter into (a) Debtor-In-Possession Loan and Security Agreement (the "<u>DIP Agreement</u>"), substantially in the form attached as <u>Exhibit A</u> hereto, by and among the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number is (1) YogaWorks, Inc., a Delaware corporation (9105); and (2) Yoga Works, Inc., a California corporation (0457).

Debtors and Serene Investment Management, LLC ("Serene" or "Lender") and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

(iii)    Execute and deliver the DIP Agreement and the other DIP Documents to the Lender pursuant thereto;

(iv)    Grant to the Lender the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Credit Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP Obligations"),

(v)    Use the proceeds of the DIP Credit Facility in accordance with the DIP Agreement, the DIP Documents and this Interim Order, in all cases in accordance with the Budget,[2] a copy of which is attached hereto as Exhibit B, and as otherwise provided in the DIP Documents;

(vi)    Use any Prepetition Collateral (as defined below), including the Cash Collateral, and provide adequate protection to those parties set forth herein that may have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution (as hereinafter defined);

(vii)    Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(viii)    Assume and enter into the Restructuring Support Agreement ("RSA") between and among the Debtors, Serene and its affiliates including without limitation Yogaworks Investment Fund, LLC, and Great Hill Equity Partners V, LLC ("GHP"), dated October 9, 2020, a copy of which is attached hereto as Exhibit C;

---

[2] All capitalized terms not otherwise defined in this Interim Order shall have the meaning ascribed to same in the DIP Agreement.

(ix)    Schedule a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(x)    Waive, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

The Court having considered the Motion, the Declaration of Brian Cooper in Support of Chapter 11 Petitions and First Day Relief (the "First Day Declaration"), the exhibits attached thereto, the Declaration of Adam Meislik, the proposed DIP Agreement, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (the "Interim Hearing"); and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the Motion on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' property; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

IT IS FOUND AND DETERMINED that[3]:

A.    Petition Date.    On October __, 2020 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with this Court.

---

[3] The findings and conclusions set forth herein constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     Jurisdiction and Venue.   This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, and over the persons and property affected hereby.   Venue for the Chapter 11 Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.   Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).   This Court may enter a final order consistent with Article III of the United States Constitution.

C.     Notice.   Notice of the Interim Hearing and notice of the Motion has been given by the Debtors to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); (ii) counsel to the Lender; (iii) all known holders of liens upon the Debtors' assets; (iv) the attorneys general in the states in which the Debtors conduct their business; (v) the Internal Revenue Service; (vi) counsel to GHP; (vii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; and (viii) the United States Trustee for the District of Delaware by facsimile transmission, email, overnight courier and/or hand delivery.   Under the circumstances, such notice of the Interim Hearing and the Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 400, and the Local Rules.

D.     Debtors' Acknowledgments and Stipulations.   In requesting the financing from Lender and in exchange for and as a material inducement to Lender to agree to provide the financing in accordance with the DIP Credit Facility, and to the Prepetition Lender (as defined below) in exchange for any potential Diminution (as defined below), the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the Challenge (as defined below) rights set forth in Paragraph 18 of this Interim Order, as follows:

4

(i)      As of the Petition Date, the Debtors have the following secured indebtedness: $10,000,000 in principal plus accrued and unpaid interest, fees and expenses owing under that certain Credit Agreement dated as of January 23, 2020 (the "Prepetition Loan Agreement") by and among the Debtors and YogaWorks Investment Fund LLC (as assignee of GHP) (in such capacity, the "Prepetition Secured Lender"), pursuant to which the Debtors reaffirmed the grant of liens on all or substantially all of their personal property (collectively, the "Prepetition Collateral"),

(ii)      as of the Petition Date: (A) the current outstanding principal balance of the Prepetition Secured Lender (exclusive of interest, fees, reimbursable expenses and other charges) is not less than $10,000,000 (inclusive of the amount proposed to be rolled up under the DIP Credit Facility) (collectively, the "Prepetition Obligation") is absolutely and unconditionally owed to the Prepetition Secured Lender; (B) the Prepetition Obligation constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code to the extent applicable); (C) no recoupments, offsets, defenses or counterclaims exist to the Prepetition Obligation; and (D) no portion of the Prepetition Obligation or any payments or other transfers made to the Prepetition Secured Lender or applied to the Prepetition Obligation prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, recoupment, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iii)      the liens of the Prepetition Secured Lender (the "Prepetition Liens") constitute valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and perfected liens with priority over any and all other liens

in the Prepetition Collateral (except as otherwise provided in the Prepetition Loan Documents and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, cross-claim or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iv)     the Debtors have waived, discharged and released any right they may have to challenge the Prepetition Obligation and the Prepetition Liens on the Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against any Prepetition Secured Lender with respect to the Prepetition Loan Documents, the Prepetition Obligation, the Prepetition Liens or the Prepetition Collateral;

(v)     any payments made on account of the Prepetition Obligation before the Petition Date were (A) payments out of the Prepetition Collateral and/or (B) made in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors;

(vi)     all of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below);

(vii)     the Lender is not a control person or insider (as defined in section 101(31) of the Bankruptcy Code) of any Debtor;

(viii)     until such time as all DIP Obligations are indefeasibly paid in full in cash or waived by the Lender, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the Lender by offering subsequent

lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral pursuant to section 364(d) of the Bankruptcy Code or otherwise;

(ix)    until such time as all DIP Obligations are indefeasibly paid in full in cash or waived by the Lender, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to the DIP Liens;

(x)    the Prepetition Secured Lender is entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of its interest in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), that may be caused by or arising as a result of (A) the incurrence and payment of the DIP Obligations, (B) the use of Prepetition Collateral (including Cash Collateral), and (C) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

E.    Cash Collateral. For purposes of this Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the Lender or the Prepetition Lender has a lien, security interest or any other interest (including, without limitation, any adequate protection liens or security interests), whether existing on the Petition Date, arising pursuant to this Order or otherwise, and shall include, without limitation:

(i)    all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the Lender or the Prepetition Secured Lender has a lien or a replacement lien, whether as part of the DIP Collateral or the

Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Cases, or arose or was generated thereafter;

(ii)    all of the respective deposits, refund claims and rights in retainers of the Debtors on which the Lender or the Prepetition Secured Lender holds a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)    the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral.

F.    <u>Adequate Protection</u>. The Prepetition Secured Lender is entitled, pursuant to sections 361, 363(e) and 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, to adequate protection of its interest in the Prepetition Collateral, including the Cash Collateral, to the extent of any Diminution that may result from (i) the incurrence of the DIP Obligations, (ii) the use of Prepetition Collateral (including Cash Collateral), and (iii) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

G.    <u>Findings Regarding the DIP Credit Facility</u>.

(i)    <u>Need for the DIP Credit Facility and to Use Cash Collateral</u>.  An immediate need exists for the Debtors to obtain funds pursuant to borrowings under the Interim DIP Credit Facility and to use Cash Collateral in order to continue operations, fund payroll and operating expenses, and to administer and preserve the value of their estates pending the Final Hearing.  The ability of the Debtors to finance their operations through the Interim DIP Credit Facility and use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the

Debtors' estates, to maximize the value of the Debtors' assets for the benefit of their creditors, and to avoid immediate and irreparable harm to the Debtors, their estates and their creditors.

(ii)     No Credit Available on More Favorable Terms.  The Debtors have been unable to obtain (a) unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, or (b) credit for money borrowed secured by a lien on property of the estates on more favorable terms and conditions than those provided in the DIP Agreement and this Interim Order.  The Debtors are unable to obtain credit for borrowed money without granting to the Lender the DIP Protections (as defined below).

H.     Sections 506(c) and 552(b) Waivers. As a material inducement to get the Lender to agree to provide the DIP Credit Facility and recognizing the Lender agreeing to permit the use of the Prepetition Collateral (including Cash Collateral for payments made in accordance with the Budget (as defined below) and the terms of this Interim Order), the Lender is entitled to a waiver of the provisions of section 506(c), and the Prepetition Lender is entitled to a waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code.

I.     Use of Proceeds of the DIP Credit Facility.  Proceeds of the DIP Credit Facility (net of any amounts used to pay fees, costs and expenses under the DIP Documents) shall be used in a manner consistent with the terms and conditions of the DIP Agreement and this Interim Order and in accordance with the Budget.

J.     Application of Proceeds of DIP Collateral.  All proceeds of any sale or other disposition of the DIP Collateral, if any, shall be applied in accordance with the Budget and the terms and conditions of the DIP Documents.

K.     Effect of Reversal; Good Faith.  The Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Agreement and this Interim Order, provided

that the DIP Obligations, DIP Liens and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order as provided in section 364(e) of the Bankruptcy Code.  The Lender has acted in good faith in agreeing to provide the DIP Credit Facility approved by this Interim Order.

L.      <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.

(i)      The terms and conditions of the DIP Credit Facility and the DIP Documents, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration;

(ii)      The DIP Documents and use of Cash Collateral were negotiated in good faith and at arms' length between the Debtors, GHP and the Lender; and

(iii)      The DIP Credit Facility loan proceeds to be obtained pursuant to the DIP Documents will be so advanced in good faith, and for valid business purposes and uses, as a consequence of which the Lender is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

M.      <u>The RSA Is In the Estates' Best Interests</u>.  The terms of the RSA represent a sound and reasonable exercise of the Debtors' business judgment.

N.      <u>Immediate Entry of Interim Order</u>. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b). The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its

implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful sale of substantially all of their assets. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

NOW, THEREFORE, based upon the foregoing findings, and upon consideration of the Motion and the record made before this Court with respect to the Motion, including the record created during the Interim Hearing, and with the consent of the Debtors and the Lender to the form and entry of this Interim Order, and good and sufficient cause appearing therefor, and the Court being otherwise fully advised in the premises;

IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.      <u>Motion Granted</u>.   The Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Agreement.  Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  All capitalized terms not otherwise defined in this Interim Order shall have the meaning ascribed to same in the DIP Agreement.

2.      <u>The DIP Documents</u>.

(a)      <u>Approval of Entry Into the DIP Documents</u>.  The Debtors are authorized to execute, deliver and perform in accordance with the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and

perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized to use Cash Collateral.  The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Agreement and all other DIP Documents as such become due.

(b)    Authorization for DIP Financing.    To enable the Debtors to continue to preserve the value of their estates during the period prior to entry of the Final Order (the "Interim Period") and subject to the terms and conditions of this Interim Order, the Budget and the DIP Documents, upon the execution of the DIP Agreement and the other DIP Documents, the Debtors are hereby authorized to borrow, pursuant to the Interim DIP Credit Facility, a principal amount not to exceed $3,350,000.

(c)    Conditions Precedent.    The Lender shall have no obligation to make any loans under the DIP Agreement during the Interim Period unless the conditions precedent to making such loans under the DIP Agreement, as set forth in Sections 3.1 and 3.2, have been satisfied in full or waived by the Lender in its sole discretion.

(d)    Enforceable Obligations.    The DIP Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors or representatives thereof, in accordance with their terms.

(e)    Protection of the Lender and Other Rights.    From and after the Petition Date, the Debtors shall use the proceeds of the DIP Credit Facility only for the purposes specifically set forth in the DIP Agreement and this Interim Order and in strict compliance with the Budget (subject to any variances thereto that may be permitted by the DIP Agreement or the Budget).

3.    The DIP Lien Priority.

(a)    To secure the DIP Obligations, the Lender is hereby granted pursuant to and in accordance with Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "DIP Liens") in and on all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds, all proceeds or property recovered in connection with actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), all intercompany claims, all claims, and causes of action of each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "DIP Collateral");

(b)    The DIP Liens shall be effective immediately upon the entry of the Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any

other lien, security interest or claim existing as of the Petition Date or created thereafter, including under Sections 363 or 364(d) of the Bankruptcy Code or otherwise;

(c)    The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of the Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no additional actions need be taken by the Lender or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.  At all times prior to indefeasible payment in cash in full of the DIP Obligations or waiver by the Lender, the priority of the DIP Liens will:

(d)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, be perfected first priority liens on all DIP Collateral which, as of the Petition Date, was unencumbered or subject to invalid, unperfected or avoidable liens;

(e)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, be perfected second priority liens on all DIP Collateral that was, as of the Petition Date, subject to valid, perfected, unavoidable liens in existence at the time of the commencement of the Cases (other than the liens in favor of the Prepetition Secured Lender) with a priority immediately junior to any such liens ("Senior Third-Party Liens");

(f)    Subject to the Carve-Out (as defined below), be superpriority administrative expense claims (the "DIP Superpriority Claim" and, together with the DIP Liens, the "DIP Protections") with priority in the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature

14

whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of a final order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code and pursuant to any other provision of the Bankruptcy Code except as otherwise set forth herein, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.  The DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to the Carve-Out (as defined below), provided that the DIP Superpriority Claim shall be payable from the proceeds of the Avoidance Actions only upon entry of the Final Order; and

(g)     The DIP Liens shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (a "Successor Case"), or upon the dismissal of the any of the Cases or Successor Case.

4.     Authorization to Use Proceeds of the DIP Credit Facility and Cash Collateral. Pursuant to the terms and conditions of this Interim Order, the DIP Agreement and the other DIP Documents, and in accordance with the Budget and any variances thereto that may be permitted pursuant thereto or pursuant to the DIP Agreement, the Debtors are authorized to use the borrowings pursuant to the DIP Agreement and to use Cash Collateral during the Interim Period and terminating upon the occurrence of an Event of Default (as defined below) and the termination of the DIP Agreement in accordance with its terms and subject to the provisions hereof.  Subject to the terms of the DIP Agreement, the Debtors and the Lender may agree in writing to modify the Budget in their discretion at any time that the DIP Credit Facility remains outstanding.

5.      <u>Relief from the Automatic Stay</u>.  Only upon five (5) Business Days' prior written notice to the Debtors, counsel approved by this Court for the Committee[4] and the U.S. Trustee and as set forth in this Interim Order or Final Order (when applicable), the Lender is hereby granted relief from any stay of proceeding (including, without limitation, the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of either of the Debtors which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole).  Furthermore, the Lender is hereby granted relief from the automatic stay to take steps to perfect the DIP Liens, as described below.

6.      <u>Postpetition Lien Perfection</u>.

(i)      This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.  Notwithstanding the foregoing, the Lender may, at its discretion, file financing statements, without notice to the Debtors, with all appropriate jurisdictions to perfect or protect the Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either of the Debtors or any other Person, shall be deemed to violate the rights of the Lender under the Uniform Commercial Code.  Such financing statements may indicate the Collateral as "all assets of the Debtors" or

---

[4] "**Committee**" shall mean the unsecured creditors' committee selected and appointed by the United States Trustee's Office for the District of Delaware, if any.  For the sake of clarity, no Committee has been selected or appointed as of the entry of this Interim Order.

words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the

Lender's discretion, and is hereby granted relief from the automatic stay of section 362 of the

Bankruptcy Code in order to do so, and any and all of such financing statements, mortgages,

notices of lien and other documents shall be deemed to have been filed or recorded at the time and

on the date of the commencement of the Cases.

(ii)    The Debtors shall from time to time execute and deliver to the Lender, at

the request of the Lender, all financing statements and other documents that the Lender may

reasonably request, in form satisfactory to the Lender, to perfect and continue the perfection of the

Lender's security interests in the Collateral and in order to fully consummate all of the transactions

contemplated under the DIP Documents.

7.    <u>Carve Out</u>.  Subject and subordinate to the Carve-Out (as defined below) in all

respects, the DIP Obligations shall constitute allowed superpriority administrative expense claims

and shall have priority over all other allowed Chapter 11 and Chapter 7 administrative expense

claims, including expenses of a chapter 11 and chapter 7 trustee, under sections 364(c)(1), 503(b),

507(a)(2) and 507(d) of the Bankruptcy Code.  "<u>Carve-Out</u>" means (i) all fees required to be paid

to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section

1930(a) of title 28 of the United States Code (without regard to the notice set forth in (ii) below)

(the "<u>U.S. Trustee Fees</u>"); (ii) to the extent allowed at any time, whether by interim order,

procedural order, or otherwise by the Court, all unpaid fees (including, without limitation,

transaction fees paid upon the closing of the respective transaction but excluding success fees) and

expenses (collectively, the "<u>Professional Fees</u>") accrued or incurred by persons or firms retained

by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Professionals</u>")

and any Committee  professionals (the "<u>Committee Professionals</u>" and, together with the

Professionals, the "<u>Professional Persons</u>") employed by the Committee, if the Committee

professional is appointed in the Chapter 11 Case pursuant to sections 328 or 1103 of the

Bankruptcy Code at any time on or prior to delivery by or on behalf of the Lender of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iii) the Professional Fees in an aggregate amount not to exceed $_____ for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth in this clause (iii) being the "Post-Carve-Out Trigger Notice Cap"). "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) to the Debtors and their counsel, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event Of Default under the DIP Documents, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  No portion of the Carve-Out, or proceeds of the DIP Credit Facility or any other amounts may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the challenge of, (i) the liens and/or claims of the Lender, or the initiation or prosecution of any claim or action against the Lender, including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, and any other federal, state or foreign law, in respect of the DIP Documents or (ii) any claims or causes of actions against the Lender under the DIP Documents, their advisors, professionals, agents and sub-agents, including formal discovery proceedings in anticipation thereof.

8.      Payment of Compensation.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtors or any Committee or affect the right of any party in interest to object to the allowance and payment of such fees and expenses.

9.      Adequate Protection for Prepetition Lenders. As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition Lender is hereby granted the following adequate protection:

18

(i)    <u>Adequate Protection Liens</u>.  The Prepetition Lender is hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "<u>Adequate Protection Liens</u>") in and on all of the DIP Collateral, with a priority subject and subordinate only to the DIP Liens.

(ii)    <u>506(c) and 552(b) Waivers</u>.  Subject to the entry of the Final Order, the Prepetition Lender's consent to use of Cash Collateral and Prepetition Collateral under this Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived.

10.    <u>Collateral Rights</u>.  In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Serene or its affiliate, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, section 363(k) of the Bankruptcy Code, the Debtors give the DIP Lender the power and right to "credit bid" the full amount of all Obligations, except that the DIP Lender shall not credit bid any portion of its DIP Facility claims, in order to purchase (either directly or through one or more

acquisition vehicles) all or any portion of the Collateral.  The DIP Lender may also credit bid all obligations owing under the GHP Loan.

11.    Maturity Date.  The maturity date (the "Maturity Date") of the DIP Agreement is the earlier of (i) the closing of a sale of Debtors' assets pursuant to section 363 of the Bankruptcy Code to any purchaser other than Serene or its affiliate; (ii) the effective date of Debtors' chapter 11 plan, (iii) entry of an order by the Bankruptcy Court converting the Cases to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (iv) entry of a final order by the Bankruptcy Court dismissing the Cases; or (v) the date of termination of the DIP Credit Facility and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of the DIP Agreement.

12.    Events of Default.  The occurrence of an "Event of Default" pursuant to Section 8 of the DIP Agreement shall constitute an event of default under this Interim Order, unless expressly waived in writing in accordance with the DIP Documents (collectively, the "Event of Default").

13.    Rights and Remedies Upon Event of Default.

(a)    If the Debtors, upon thirty (30) days prior written notice and opportunity to cure fail or neglect to perform or observe any other material term, provision, condition, covenant contained in the DIP Agreement, in any of the DIP Documents, or in any other present or future agreement between the Debtors and the Lender and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within ten (10) calendar days after the Debtors receive notice thereof or any officer of the Debtors becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) calendar day period or cannot after diligent attempts by the Debtors be cured within such ten (10) calendar day period, and such default is likely to be cured within a reasonable time, then the Debtors shall have an additional reasonable period (which shall not in any case exceed twenty (20) calendar days) to attempt to cure such default, and within such reasonable time period the failure

20

to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made.

(b)      Upon the occurrence and during the continuance of an Event of Default, the Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Debtors:

(i)  The Lender may seek an order from the Bankruptcy Court on a shortened time basis  to do any of the following: (i) terminate the DIP Loan Facility with respect to further Advances; (ii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Debtors; or (iii) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under the DIP Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon five (5) Business Days' prior written notice to Borrower, counsel approved by the Bankruptcy Court for the Committee and the U.S. Trustee and as set forth in this Interim Order.

(ii)  Waivers by the Debtors.  Except as otherwise provided for in the DIP Agreement or by applicable law, the Debtors waive:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever the Lender may do in this regard, (b) all rights to notice and a hearing prior to the Lender's taking possession or control of, or to the Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

(c)      Nothing included herein shall prejudice, impair, or otherwise affect the Lender's right to seek any other or supplemental relief in respect of the rights of the Lender, as provided in the DIP Agreement or otherwise.

14.    <u>Proofs of Claim</u>.  Neither the Lender nor the Prepetition Secured Lender shall be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. The Debtors' Acknowledgments and Stipulations set forth in Paragraph D of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Lender upon approval of this Interim Order. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Cases or Successor Cases to the contrary, the Prepetition Lender is hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement as it sees fit) a proof of claim and/or proofs of claim in each of these Cases or Successor Cases for any claim allowed herein.

15.    <u>Other Rights and Obligations</u>.

(a)    <u>Good Faith Under Section 364(e) of the Bankruptcy Code</u>.  The Lender has acted in good faith in connection with negotiating the DIP Documents, and the loans to be made pursuant thereto, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), in the event any or all of the provisions of this Interim Order are hereafter reversed, modified amended or vacated by a subsequent order of this or any other Court, the Lender is entitled to all of the benefits and protections provided in section 364(e) of the Bankruptcy Code.  Any reversal, modification, amendment or vacating of this Interim Order shall not affect the validity and enforceability of any Advances made pursuant to this Interim Order or the liens or priority authorized or created hereby.

(b)    <u>Binding Effect</u>.  The DIP Liens and the Adequate Protection Liens and other rights and remedies granted under this Interim Order to the Lender shall continue in these Cases and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Cases and upon the dismissal of any or all of the Debtors' Cases, or in any Successor Case(s), and such liens and security interests shall maintain their first priority as

provided in this Interim Order until all the DIP Obligations and the Prepetition Obligations have been indefeasibly paid in full in cash and the Lender's commitments have been terminated in accordance with the DIP Documents and this Interim Order.

(c)     <u>The Lender's Liability for Collateral.</u>  So long as the Lender complies with reasonable commercial lending practices, the Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

(d)     <u>Remedies Cumulative</u>.  The Lender's rights and remedies under the DIP Agreement, the DIP Documents, and all other agreements shall be cumulative.  The Lender shall have all other rights and remedies not inconsistent herewith as provided under the California Uniform Commercial Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by the Lender of one right or remedy shall be deemed an election, and no waiver by the Lender of any Event of Default on the Debtors' part shall be deemed a continuing waiver.  No delay by the Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by the Lender shall be effective unless made in a written document signed on behalf of the Lender and then shall be effective only in the instance and for the purpose for which it was given.

(e)     <u>Demand; Protest</u>.  The Debtors waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts,

documents, instruments, chattel paper, and guarantees at any time held by the Lender on which the Debtors may in any way be liable.

(f)    <u>Borrower Liability</u>.    Each of the Debtors shall be jointly and severally obligated to repay all Credit Extensions made under the DIP Agreement, regardless of which of the Debtors actually receives said Credit Extension, as if each of the Debtors directly received all Credit Extensions.  Each of the Debtors waive (i) any suretyship defenses available to it under the California Uniform Commercial Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, 2810, 2819, 2839, 2845, 2847, 2848, 2849, 2850, and 2899 and 3433, and (ii) any right to require the Lender to:  (1) proceed against the Debtors or any other person; (2) proceed against or exhaust any security; or (3) pursue any other remedy.  The Lender may exercise or not exercise any right or remedy it has against any of the Debtors or any security they hold (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability.  Notwithstanding any other provision of the DIP Agreement or other related document, each Debtor irrevocably waives all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of the Lender under the DIP Agreement) to seek contribution, indemnification or any other form of reimbursement from any other Debtor, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise.    Any  agreement  providing  for  indemnification,  reimbursement  or  any  other

24

arrangement prohibited under Section 9.8 of the DIP Agreement shall be null and void.  If any payment is made to a Debtor in contravention of Section 9.8 of the DIP Agreement, such Debtor shall hold such payment in trust for the Lender and such payment shall be promptly delivered to the Lender for application to the Obligations, whether matured or unmatured.

(g)   _Protective Payments_. If the Debtors fail to obtain the insurance called for by Section 6.6 of the DIP Agreement or fail to pay any premium thereon or fails to pay any other amount which the Debtors are obligated to pay under the DIP Agreement or any other DIP Document or which may be required to preserve the Collateral, the Lender may obtain such insurance or make such payment, and all amounts so paid by the Lender are immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  The Lender will make reasonable efforts to provide the Debtors with notice of the Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by the Lender are deemed an agreement to make similar payments in the future or the Lender's waiver of any Event of Default.

(h)   _Amendments in Writing, Integration_.  Except as expressly set forth in the DIP Agreement, all amendments to or terminations of the DIP Agreement or the DIP Documents must be in writing signed by each of the parties thereto.  All prior agreements, understandings, representations, warranties, and negotiations between any of the parties thereto with respect to the subject matter of the DIP Agreement and the DIP Documents, if any, are merged into the DIP Agreement and the DIP Documents.

16.   _Release_.  The release, discharge, waivers, settlements, compromises, and agreements set forth in this Paragraph 16 and the Debtors' Acknowledgments and Stipulations set forth in Paragraph D of this Interim Order shall be deemed effective upon entry of the Interim Order, subject only to the rights set forth in Paragraph 18 below. The Debtors forever and

irrevocably release, discharge, and acquit each of GHP, the Lender, and their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, and all claims and causes of action under chapter 5 of the Bankruptcy Code.

17.    Indemnity.    Each Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Loans, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Credit Facility, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the Debtors shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "Indemnified Party") against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Borrower whether under this Agreement, the DIP Loan Facility, the Cases, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by an Indemnified Party's gross negligence or willful misconduct.  This Section 17 shall not apply to Taxes.

18.    Reservation of Certain Third Party Rights and Bar of Challenges and Claims. The releases set forth in Paragraph 16 above and the Debtors' Acknowledgments and Stipulations set forth in Paragraph D of this Interim Order shall be binding upon the Debtors upon entry of this Interim Order. In addition, such releases and stipulations shall be binding upon each other party in interest, including the Committee, if any, unless a party in interest having standing, first, commences, (x) within forty-five (45) calendar days from date of the formation of a Committee

for actions brought by a Creditor's Committee, or (y) sixty (60) calendar days following the date of entry of this Interim Order for any party other than a Committee (such time period established by clauses (x) and (y), shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly and timely file a Challenge and only for the matters specifically set forth in such Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) challenging or otherwise objecting to the releases set forth in Paragraph 16 above or the Debtors' Acknowledgments and Stipulations set forth in Paragraph D of this Interim Order or (B) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) against any DIP Lender Releasee relating to any pre-Petition Date act, omission or aspect of the relationship between such DIP Lender Releasee and the Debtors ((A) and (B) being, collectively, the "Challenges" and, each individually, a "Challenge"), and, second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action. Upon the Challenge Period Termination Date and for all purposes in these Cases and any Successor Case(s), (i) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred and (ii) the releases in Paragraph 16 above and the Debtors' Acknowledgments and Stipulations set forth in Paragraph D of this Interim Order shall be binding on all parties in interest, including any Committee.

19.    Restrictions on Use of Funds. Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, without the express written consent of the Lender, no proceeds of the DIP Credit Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, any Creditors' Committee, any trustee appointed under these Cases or any Successor Case(s), or

any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364 of the Bankruptcy Code or otherwise, other than from the Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, or (b) investigate (except as set forth in this paragraph below), assert, join, commence, support, prosecute, or defend any Challenge or other action or claim, counter-claim, cause of action, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the Lender or any other DIP Lender Releasee with respect to any transaction, occurrence, omission, or action including, without limitation, (i) any actions under chapter 5 of the Bankruptcy Code, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Lender Releasees, on the one hand, and either of the Debtors, on the other, (iii) any action with respect to the validity, extent, perfection, and enforceability of the DIP Obligations, the Prepetition Obligations, or the validity, extent, priority, perfection, and enforceability of the DIP Liens, the Prepetition Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens, or the Adequate Protection Liens, (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the Lender in respect of the enforcement of the DIP Liens, or (vi) any action for lender liability claims or subordination claims, (c) subject to authority provided to the Debtors pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtors have received a written objection to such payment from the Lender, and/or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Documents, without the express written consent of the applicable Lender.  Notwithstanding the foregoing, up to $10,000 in the aggregate of the DIP Credit Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by a Committee during the Challenge Period to investigate claims against the DIP Lender Releasees, and any amount spent in excess of

such amount shall not constitute administrative expenses of the Cases and shall be automatically disallowed.

20.     <u>No Marshalling</u>.  From and after the entry of the Final Order, the Lender (and after payment in full of the DIP Obligations) shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, from and after the entry of the Final Order, no party (other than the Lender and after payment in full of the DIP Obligations) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

21.     <u>Survival of Interim Order and Other Matters</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in the Cases, (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code or a Successor Case, (iii) to the extent authorized by applicable law, dismissing the Cases, (iv) withdrawing the reference of the Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court and this Interim Order.  The terms and provisions of this Interim Order shall be binding upon the Debtors and the Lender, the Prepetition Secured Lender and each of its respective successors and assigns, and shall inure to the benefit of the Debtors and the Lender, the  Prepetition Secured Lender and each of its respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed or elected in a case for any Debtor under any chapter of the Bankruptcy Code, including any Successor Case. The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest, including, but not limited to a trustee appointed or elected under chapter 7 or chapter 11 of the Bankruptcy Code.

(i)    <u>Inconsistency</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(ii)    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.  The rights of all parties in interest to object to the terms of the Final Order and any of the DIP Documents at the Final Hearing are expressly reserved.

(iii)    <u>Objections Overruled</u>.  All objections to the Motion to the extent not withdrawn or resolved, are hereby overruled on an interim basis.

22.    <u>Governmental Consents</u>.  Except as otherwise provided herein, the execution, delivery and performance by the Debtors of the DIP Documents and the consummation of the transactions contemplated by the DIP Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any governmental authority.

23.    The Debtors are authorized to assume and enter into the RSA, dated October 9, 2020, a copy of which is attached hereto as Exhibit C;

24.    <u>Final Hearing</u>.

(i)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Credit Facility is scheduled for _____, 2020 prevailing Eastern Time at the United States Bankruptcy Court for the District of Delaware.  If no objections to the relief sought

in the Motion are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(ii)    Within two (2) business days following entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order, the proposed Final Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; and (c) counsel for the Committee, if any.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court and served upon the following: (a) (a) Debtors, to    tfrancella@cozen.com,    thoran@cozen.com,    afriedman@shulmanbastian.com,    and mlowe@shulmanbastian.com; (b) any committee; (c) counsel to GHP, to mclemente@sidley.com and    kdybala@sidley.com;    (d)    counsel    to    the    Lender,    to randy.michelson@michelsonlawgroup.com and karl.kuhn@michelsonlawgroup.com; (e) UST, to Benjamin.A.Hackman@usdoj.gov, and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, so as to allow actual receipt of the foregoing no later than 5:00 p.m. prevailing Eastern Time.  Notwithstanding the terms of this Interim Order, this Court is not precluded from entering a Final Order containing provisions that are inconsistent with, or contrary to any of the terms in this Interim Order, subject to the protections under section 364(e) and the rights of the Lender to terminate the DIP Agreement if such Final Order is not acceptable. In the event this Court modifies any of the provisions of this Interim Order or the DIP Documents following such further hearing, such modifications shall not affect the rights and priorities of the Lender pursuant to this Interim Order with respect to the Collateral, and any portion of the DIP

Obligations which arises or is incurred, advanced or paid prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

(iii)    Priority of Terms. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as limited by" or "as more fully described in" the DIP Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

(iv)    Retention of Jurisdiction.  This Court has and will retain jurisdiction to enforce this Interim Order.