# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| YOGAWORKS, INC., *et al.* | Case No.  20-12599 - KBO |
| Debtors.[1] | (Joint Administration Requested) |

I, Brian Cooper, declare and state as follows:

1.     I am the Chief Executive Officer (the "CEO") for YogaWorks, Inc., a Delaware corporation ("YogaWorks") and Yoga Works, Inc., a California corporation ("Yoga Works") that have filed voluntary petitions (the "Chapter 11 Petitions") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing these Chapter 11 cases (the "Cases"). The Debtors are referred to herein collectively as "YogaWorks," the "Debtors," or the "Company."

2.     To minimize the adverse effects of filing the Chapter 11 Petitions while at the same time maximizing value for the benefit of stakeholders, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings"). I submit this Declaration in support of the Chapter 11 Petitions and the First Day Pleadings. I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize recoveries; and (c) best serves the Debtors' estates and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these Chapter 11 cases.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number is (1) YogaWorks, Inc., a Delaware corporation (9105); and (2) Yoga Works, Inc., a California corporation (0457).

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  The Debtors have authorized me to submit this Declaration.

4.      I am also personally familiar with, and am custodian of, the records of the Debtors as they pertain to any of the Debtors' records submitted in support of the First Day Pleadings.  The records of the Debtors are made by employees or agents of the Debtors who report to me and who have a business duty to enter the records of the Debtors accurately and at or near the time of the event which they record.  In general, the Debtors retain their files electronically in their computer files which are backed up regularly.

5.      I began serving as the CEO of the Debtors in October 2019 and served as a Board member prior to that for approximately two (2) years.  Prior to my time with the Debtors, I worked in various capacities in the accounting and consulting fields as a Certified Public Accountant and eventually was a partner at KPMG.  In 2003, I joined an entrepreneurial group that was starting a company to compete with WebMD called Everyday Health.  I was the CFO of Everyday Health from 2003 to 2016 and took the company from a start-up of 10 people to a multi-hundred million dollar, publicly held company of over 700 people.  I earned a B.A. degree from The American University.

6.      This Declaration is divided into four parts.  Part I sets forth an executive summary. Part II provides an overview of the Debtors' businesses, their corporate structure and their prepetition indebtedness.  Part III discusses the Debtors' recent financial performance, their proposed turnaround plan and the circumstances surrounding the commencement of these Chapter 11 cases and what the Debtors view as the path forward.  Finally, Part IV sets forth relevant facts in support of the First Day Pleadings.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

## I.    EXECUTIVE SUMMARY

7.      The Debtors operated a yoga business with over sixty (60) studio locations across the United States in Los Angeles, Orange County, Northern California, New York City, Boston, Baltimore, the Washington, D.C. area, Houston and Atlanta until March 2020 when the Debtors closed all of their storefront locations in response to the operating restrictions tied to the COVID-19 pandemic.  While a few of the stores reopened for a short period of time, the Debtors closed all of their studios indefinitely in September 2020.

8.      The Debtors' corporate headquarters was located in Culver City, California until mid-2020 when it was moved to Santa Monica, California.

9.      The Company was founded in 1987 with one studio in Santa Monica, California and grew significantly over the years to over seventy (70) studios at one time.  The Debtors also expanded their business model to include teacher training and in 2013, began offering pre-recorded classes digitally.

10.     The Company continued expanding and went public in 2017.  Unfortunately, the Company was too focused on expansion and failed to successfully integrate acquired studios with existing operations, and as a result the enterprise was faltering and the Company started to lose money.

11.     During the first half of 2019, the Company attempted to find a buyer using investment banker Guggenheim Securities ("Guggenheim") but those efforts were unsuccessful. I was then brought in as CEO in October 2019 to begin to turn the Company around.  We were successfully moving toward that goal when the COVID-19 pandemic hit and the Company was forced to close all of its studios.  The closure of the studios left the Debtors with significantly decreased revenue.

12.     Fortunately, the Company quickly developed a robust and successful live streaming digital platform that has allowed it to survive and find a buyer for substantially all of its assets.

13.     In approximately May 2020, the Debtors re-engaged Guggenheim as well as Force Ten Partners, LLC ("Force 10"), an advisory firm specializing in business restructuring and

3

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

sourcing buyers for distressed businesses, to help them find a buyer for the business. Guggenheim approached at least twenty (20) private equity firms and other potential bidders who participated in the out-of-court financing solicitation, to discuss interest in a restructuring. At the same time, Force 10 approached approximately thirty-five (35) parties.

14.    Through those discussions, the Company, in its business judgment, agreed to terms with Serene Investment Management, LLC or affiliates ("Serene" or the "Stalking Horse") regarding a "stalking horse" bid to purchase the Company's assets. The Stalking Horse has agreed to purchase certain of the Company's assets, including the Company's brand and intellectual property (collectively, the "Purchased Assets").

15.    The Debtors now file these Cases to complete the open and competitive process begun more than three (3) months ago, in order to sell substantially all of their assets, with Serene acting as the Stalking Horse for the Purchased Assets. The Debtors intend to maintain their current operations of providing classes via their live stream and on-demand digital platforms, YogaWorks Live and My YogaWorks, while this sale process is ongoing. Their goal is to sell their digital businesses as a going concern, officially shut down all brick and mortar operations (subject to any successful overbidder desiring to keep certain studios open), sell any remaining unsold assets, and wind up their estates.

## II.    OVERVIEW OF THE DEBTORS' BUSINESSES

### A.    Historic Overview

16.    Since the Company's founding in 1987 by Maty Ezraty, Chuck Miller and Alan Finger, the Debtors experienced explosive growth and success. The Company's first studio was opened in Santa Monica, California in 1987 and at one time, had over seventy (70) locations.

17.    When they started, the founders developed a unique style and philosophy of yoga that is now known as the "YogaWorks yoga" style. "YogaWorks yoga" is a vinyasa-based, carefully-instructed flow that observes a distinct approach to sequencing and breaks down the yoga poses with particular attention to detail. It strengthens the body with the use of traditional poses,

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

invigorating vinyasa flows, twisting and balancing sequences, inversions, core engagement and restorative supine postures to slow down and reset.

18.     The founders wanted to expand their new yoga style beyond their first location in California.  For a long time, the Debtors' intent was to expand its portfolio of yoga studios.  In fact, the Debtors did that by expanding to nine (9) separate markets in the United States with over seventy (70) locations at one time.  The Debtors expanded to different markets both by opening brand new studios and also by acquiring studios and re-branding those studios as YogaWorks studios.

19.     The Debtors also expanded their business model to include an international teaching school for yoga instructors and in 2013, began to offer pre-recorded on-demand yoga videos and workshops through a new service called My YogaWorks Live.

20.     On August 11, 2017, YogaWorks completed its initial public offering, becoming the first yoga "chain" to be publicly traded.  The Company voluntarily de-listed from the NASDAQ in the beginning of 2020.  While this resulted in the Company being delisted and deregistered with the SEC, the shares of the Company were not cancelled.

**B.     The Debtors' Business Operations**

**1.     Business Segments**

21.     <u>In Person Studios</u>.    Prior to the COVID-19 outbreak, the Debtors operated approximately 60 studios throughout the United states, which offered students in person yoga classes for all skill levels using the YogaWorks style that was developed when the Company was founded, as well as other styles of yoga.  Classes could be purchased individually on a per class basis, in bulk by buying a block of classes for a discount, or by a membership that allows the student to take unlimited classes for a certain price each month.  The studios also sold retail merchandise which provided a smaller proportion of the Debtors' total gross revenues.  In 2019, the Debtors' in person studio business generated approximately $58.5 million in revenue, the majority of the Company's overall revenue.  Since mid March 2020, however, all studios had closed as a result of the COVID-19 outbreak and of those that were able to reopen at various points,

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

student attendance was very low.  Currently, all in studio memberships and student obligations have been converted to digital offerings, and as such, the studios are not generating any revenue.

22.    <u>Education.</u>  The Debtors' business model also includes educational resources and training to teach potential yoga instructors the YogaWorks method.  The Debtors' well-known training cultivates the richest yoga talent from around the globe and now sets the gold standard for teaching.  The current teacher training model includes both core in-house trainings developed by its education department, and partner trainings whereby YogaWorks is contracted by other studios and yoga providers to provide best in class teacher training on their behalf for a fee.

23.    <u>Digital.</u>  The Debtors' business model also includes a digital platform that includes YogaWorks Live and My YogaWorks.  YogaWorks Live provides approximately 40 live classes per day and was launched in April 2020 in response to COVID-19.  MyYogaWorks was launched in 2013 and includes approximately 1,300 hours of pre-recorded classes and workshops.  Members may subscribe to either service for a monthly membership fee which provides them unlimited access to live or pre-recorded classes.  The Debtors currently have approximately 9,000 members paying for YogaWorks Live and 21,000 members paying for MyYogaWorks.  In 2019, the digital portion of the Debtors' business generated net revenue totaling approximately $1.6 million.

24.    Across its various classes and trainings, the Debtors employ nearly 200 instructors, including substitute teachers.

**2. Employees**

25.    The Company employs a total approximately 205 employees as follows.

| Operation/Segment | Number of Employees |
|---|---|
| Corporate/Field | 13% |
| LiveStream Instructors | 43% |
| Trainers | 11% |
| LiveStream substitute instructors | 21% |
| Privates instructors | 8% |
| Teacher training managers | 4% |

It should be noted that only approximately thirty (30) of the Debtors' employees are full time employees and most of those are included in the "Corporate/Field" category.  The majority of the

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

employees, including the instructors, are part time employees who only work a few hours per week.

## C.    The Debtors' Corporate Organizational Structure

26.    YogaWorks is a Delaware C corporation that holds all the stock of Yoga Works. YogaWorks is organized under the laws of Delaware.

27.    Yoga Works is a California C corporation that holds all the operating assets of the Debtors.  Yoga Works is a wholly owned subsidiary of YogaWorks and is organized under the laws of California.

## D.    The Debtors' Prepetition Indebtedness

28.    As of October 14, 2020 (the "Petition Date"), the Debtors had outstanding funded secured debt in the aggregate principal amount of $10 million owed to Serene Investment Management,  LLC ("Prepetition Secured Lender").

### 1.    Secured Debt to Serene

29.    On or about January 23, 2020, the Debtors entered into a $10 million Credit Agreement with Avidbank ("Avidbank Facility").  On September 18, 2020, Great Hill Equity Partners V, LP ("GHP") purchased the Avidbank Facility through an assignment from Avidbank ("GHP Facility").  On or about October 14, 2020, the Prepetition Secured Lender purchased the GHP Facility through an assignment from GHP ("YW Investment Facility").  The YW Investment Facility was then assigned to Serene Investment Management, LLC ("Serene Facility").  The Serene Facility is secured by a senior lien on substantially all of the assets of YogaWorks and Yoga Works.  As of the Petition Date, $10.0 million remains outstanding under the Serene Facility, plus accrued and unpaid interest, fees and expenses, if any.

### 2.    Unsecured Debt

30.    The Debtors owe material amounts, on an unsecured basis, to its landlords, totaling at least $5.4 million.  The Debtors owe other unsecured debts to trade vendors and the like of

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

approximately $2 million, plus an approximate $1 million settlement claim based on wages, and another approximately $800,000 for taxes, wages and other debts likely entitled to priority status.

### 3. Equity Interests

31.     Yoga Works is a wholly owned subsidiary of YogaWorks.

32.     While YogaWorks has been delisted, the Depository Trust Company Committee on Uniform Securities Identification Procedures still shows YogaWorks as open and the shares have not been cancelled.  Currently, GHP owns about 70% of the common stock of YogaWorks and the other 30% is owned by employees and other private shareholders.  As of the Petition Date, the number of shares of YogaWorks outstanding totaled 17,154,471 shares.

### III. RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE CHAPTER 11 CASES

33.     The Debtors enjoyed significant growth from its inception.  After the Company went public in 2017; however, some mistakes were made which resulted in a large loss of revenues for the Debtors.  For example, the Debtors (1) were too focused on new acquisitions and its existing studios started to falter; (2) failed to focus on a recurring revenue model such as selling memberships to its students, instead focusing on pre-paid class packages and constantly undercutting its own pricing to continue to sell limited use packages; and (3) failed to properly integrate and unify new studios that were brought into the portfolio creating further operating inefficiencies.  For all these reasons, many of the studios started to operate at a sub-par level and caused the Debtors to incur large expenses.

34.     In 2019 and 2018, the Debtors had $60.1 and $59.6 million in revenue, respectively, and cash flow from operations of negative $10.3 and negative $6.5 million, respectively.

35.     In 2019, the Debtors explored a possible sale but they were unsuccessful.

36.     When I came on as CEO, the plan was to continue existing efforts to close unproductive studios, complete a voluntary de-listing from NASDAQ and take private, restructure the operations, promote and attract new management, and secure new financing. In early 2020, we approved a budget including 5 to 10% revenue growth and approximately $2 million in positive

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

EBITDA.  Unfortunately, when the COVID-19 outbreak occurred, those plans could not come to fruition.

37.     When the COVID-19 outbreak occurred in March 2020, the Debtors were forced to shut down all of their studio locations as a result of various stay at home and shut down orders put in all of the states in which the Debtors' studios are located.  While some of the locations were allowed to reopen for a short period of time, attendance was very low and the Debtors decided to close all of their studios indefinitely in September 2020.

38.     While the Debtors quickly pivoted to focus on their digital offerings and immediately developed a platform for teachers to teach from home, over 80%  of its revenue was based on in-person studio classes and Debtors could not afford to pay its rent and other financial obligations.

39.     With no reasonable options to address its needs out of court and with a declining cash position, the Debtors' Board of Directors decided to prepare the Company for a potential bankruptcy proceeding.  On October 5, 2020, the Board of Directors formed a Steering Committee made up of independent directors with distress experience to oversee, manage, and advise regarding preparation for a potential bankruptcy proceeding.

40.     As more fully discussed in the Meislik Declaration, the Debtors also re-engaged Guggenheim and Force 10 to try to find a buyer for the Debtors.  Guggenheim and Force 10 contacted over twenty (20) private equity firms. Guggenheim approached at least twenty (20) private equity firms and other potential bidders who participated in the out-of-court financing solicitation, to discuss interest in a restructuring.   At the same time, Force 10 approached approximately thirty-five (35) parties.  The Meislik Declaration discusses in detail Force 10's negotiations with various interested parties.

41.     The Asset Purchase Agreement with the Stalking Horse (the "Stalking Horse APA") has been extensively negotiated between the parties and the Company's secured lender at arm's length and in good faith, and confers several substantial benefits on the Debtors' estates.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

42.    Accordingly, in order to minimize administrative expenses in these Cases and maximize creditors' recoveries, the Debtors will be filing shortly a Motion for Entry of an Order; (I)(A) Approving Bidding Procedures and Protections in Connection With a Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims Encumbrances and Interests; (B) Scheduling an Auction and Sale Hearing; (C) Approving the Form and Manner of Notice Thereof; (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Leases; and (E) Granting Related Relief; and (II)(A) Authorizing Sale of Substantially All of Debtors' Assets Pursuant to Successful Bidder(s)' Asset Purchase Agreement, Free and Clear of Liens, Claims and Other Interests; and (B) Approving Assumption and Assignment of Certain Executory Contracts and Leases (the "Sale Motion").  The Sale Motion seeks authority to conduct a postpetition sale and marketing process for substantially all of the Debtors' assets, with an auction to be held in mid-November 2020 and closing of a sale transaction by the end of November 2020 all as set forth more fully in the Sale Motion.

43.    As noted, the Debtors are experiencing a severe liquidity crisis and it does not have the cash to continue operating for much longer.  The Debtors have, therefore, determined in their business judgment that a shorter marketing period will offer the estates the best chance of preserving the Debtors' value during the sale process, saving jobs and maximizing returns to creditors.  I believe it is in the best interest of the Debtors' estates for the Debtors to proceed with the Stalking Horse APA on the proposed timeline.

## IV.    FIRST DAY PLEADINGS

44.    Concurrently with the filing of these Cases the Debtors filed the First Day Pleadings seeking relief related to the administration of these Cases, the Debtors' customers and employees, their operations, and their cash and financing needs.  Below is a list of the First Day Pleadings:

a.    Motion for Entry of An Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief (the "Joint Administration Motion");

b.    Motion for an Order (I) Authorizing Debtors to (A) File Consolidated List of Creditors; (B) File Consolidated List of Debtors' Top Thirty Unsecured Creditors; (C)

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

Omit Members and Former Employees From the Creditor Matrix; (II) Approving Manner of Notice to Members and Former Employees (the "<u>Consolidated Creditors Motion</u>");

      c.      Emergency Motion For an Order Authorizing Debtors to Honor and Continue Certain Customer Programs and Customer Obligations In the Ordinary Course of Business (the "<u>Customer Obligation Motion</u>");

      d.      Emergency Motion for an Order Authorizing: (1) Maintenance Of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System, and (3) Continued Use of Business Forms Pursuant To 11 U.S.C. §§ 105, 345, and 363 (the "<u>Cash Management Motion</u>");

      e.      Emergency Motion for Order Authorizing Payment of Prepetition Employee Wages, Benefits and Associated Expenses and Granting Related Relief (the "<u>Wage Motion</u>");

      f.      Motion for Order: (1)  Authorizing Debtors to Reject Certain Real Property Leases; and (2) Setting Deadline for Filing Proofs of Claim Arising From the Rejected Leases (the "<u>Motion to Reject</u>");and

      g.      Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens and Super-Priority Claims and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Approving Debtors' Assumption of and Entry Into the Restructuring Support Agreement; and (IV) Granting Related Relief (the "<u>DIP Financing Motion</u>").

45.     The Debtors have narrowly tailored the First Day Pleadings to meet their goals of: (a) continuing their operations in Chapter 11 with as little disruption and loss of productivity as possible until such time as the sale process is complete; (b) maintaining the confidence and support of their key customer and employee constituencies during the sale process and subsequent wind-down of remaining operations; and (c) establishing procedures for the efficient administration of these Cases.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

46.     I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

47.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Company's efforts to maximize the recovery of its creditors through a sale transaction.

48.     It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs, including but not limited to those First Day Pleadings seeking relief related to the Debtors' obligations to their employees and customers, the relief requested is essential to the Debtors' continued operation through a sale process and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

49.     The success of these Cases depends upon the Debtors' ability to maintain their operations to the extent necessary to effectuate a sale transaction.  The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

50.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted based upon the following:

**A.      The Joint Administration Motion**

51.     The Debtors seek the entry of an order: (i) directing joint administration of these chapter 11 cases; and (ii) granting related relief.

52.     There is substantial overlap with respect to the Debtors.  In light of this overlap, I believe that joint administration will avoid otherwise unnecessary and expensive duplication of effort and papers caused by preparing and serving the same creditors with multiple sets of differently-captioned but otherwise identical papers.  Joint administration of the Cases will enable

12

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

the Debtors to avoid the substantial cost of preparation, filing and serving duplicative motions in each proceeding, and the consequent burden on the estates and the Court.

53.      By jointly administering the Debtors' estates, creditors will receive appropriate notice of matters involving each of the Debtors, thereby ensuring that creditors are fully informed of matters potentially affecting their claims.

54.      In short, joint administration of the Debtors' cases, including (i) combining the estates by using a single docket for administrative matters, including a listing of claims filed, and the filing, lodging and docketing of pleadings and orders, (ii) the use of a single pleadings docket, (ii) the combining of notices to creditors and parties-in-interest of the different estates, (iii) the scheduling of hearings; (iv) financial reporting by the Debtors; (v) the joint and several liability of the estates for administrative purposes; and (vi) the joint handling of other purely administrative matters will aid in expediting the Cases and rendering the process substantially less costly, without prejudicing the substantive rights of any creditor.

55.      Joint administration is warranted in the Cases.  As stated above, Yoga Works is the wholly owned subsidiary of YogaWorks. Substantially all of the Debtors' assets and operations are owned by Yoga Works.  Based on this relationship, the Debtors plainly are "related" and are "affiliate[s]" as those terms are used in the Bankruptcy Code.

56.      To a great extent, the Debtors anticipate that numerous similar, if not identical, applications, motions and orders will be involved in the Cases.  Joint administration will avoid wasting resources that would result through duplication of effort if the cases involving the Debtors were to proceed separately.

57.      I believe the Debtors' creditors stand to benefit from the increased efficiency of administration anticipated through joint administration because they will not be required to review and separately respond to substantially similar motions, disclosure statements, and other pleadings that would otherwise be filed in separate cases.  On the other hand, I believe joint administration will permit the Debtors to respond more efficiently to the demands of their creditors, and will reduce attorneys' fees, copying costs, mailing costs and costs of administering the cases.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

58.     Moreover, through joint administration of the Debtors' cases, the Court and the Bankruptcy Court Clerk's office will be relieved of the burden of having to file and maintain dockets and case files for each of the related cases.  Furthermore, joint administration will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

59.     In my opinion, joint administration will not adversely affect the Debtors' respective constituencies because the motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.  Accordingly, I believe that the joint administration of the Cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

## B.     The Consolidated Creditors Motion

60.     The Debtors seek entry of an order authorizing the Debtors to: (a) file consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor; (b) file a consolidated list of the Debtors' thirty (30) largest general unsecured creditors; (c) omit Members (as defined herein) and Former Employees (as defined herein) from the Creditor Matrix; and approving the manner of notice to Members and Former Employees.

61.     The Debtors presently maintain computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in these chapter 11 cases.  The lists are maintained without regard to which entity a party may  have a relationship.

62.     I believe that the information as maintained in the Debtors' computer files (or those of their agents) may be utilized efficiently to provide interested parties with  notices and other similar documents as contemplated by Local Rule 1007-2 on a consolidated basis.  Requiring the Debtors to submit Debtor-specific creditor matrices for each of the Debtors would be an unnecessarily burdensome task and would likely result in duplicate mailings.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

63.     Moreover, the Debtors have concurrently, or will be filing within the coming days, an application (the "Agent Application") seeking the appointment of BMC Group ("Agent") as noticing, balloting and disbursing agent in these chapter 11 cases.

64.     If the Agent Application is granted, the Agent will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor and security holder database and (b) complete the mailing of notices and other documents in these chapter 11 cases to the parties in these databases.

65.     After consultation with the Agent, I believe that filing the lists in the formats currently maintained in the ordinary course of business will be sufficient to permit the Agent to notice promptly all applicable parties as required by applicable Local Rules.

66.     The Debtors' largest creditors will likely be their landlords for past due pre-petition rent and certain taxing authorities.  YogaWorks is the named tenant in some of the leases and in others, Yoga Works is the named tenant.  On the Debtors' records, however, they are treated without regard to exactly which entity is the contracting party.

67.     Due to the number and nature of creditors in the Cases, I believe that a single consolidated list of the Debtors' combined thirty largest unsecured creditors would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.  In addition, I believe a single, consolidated list of the company's thirty (30) largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

68.     The Debtors have approximately 30,000 Members.  The vast majority of the Members will likely not have claims to assert in these Cases.  Given the voluminous nature of the detail regarding Members, providing a list including each Member and his or her address would be burdensome and time-consuming and would result in a significant waste of the estates' resources.

69.     In the ordinary course of business, the Debtors' primary method of communication with its Members is strictly through email.  Although all Members are typically required to provide

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

a valid email address at the time they enter into a membership agreement, the Debtors do not have valid email addresses on file for certain Members.

70.    Likewise, the Debtors have approximately 4,500 individuals that were employees of the Debtors at some point during the past three (3) years but are no longer employed by the Debtors ("Former Employees").  The vast majority of the Former Employees will likely not have claims to assert in these Cases but the Debtors believe it is appropriate to give them notice of these Cases in the event they wish to assert a claim.  Providing a list including each Former Employee and his or her address would be burdensome and time-consuming and would result in a significant waste of the estates' resources.

71.    If the Debtors were to provide actual notice by mail of pleadings and hearings to all Member and Former Employees, the costs could be astronomical.  BMC estimates that the cost of postage alone to mail a single notice to a total of 30,000 Members would exceed $15,500.00. In addition to postage, however, the Debtors would also have to pay for copying charges, printing charges, overhead costs, and hourly fees for professionals.

72.    Given the excessive costs of mailing notices to all current and former Members and all Former Employees, I believe the procedures set forth in the Consolidated Creditors Motion are the best and the most practical method to notify the Members and the Former Employees of the commencement of the Cases and of all further and future pleadings and hearings and are an efficient use of the estates' resources.

73.    In sum, I believe that a single consolidated list of the Debtors' thirty (30) largest unsecured creditors in the Cases and the procedures for notice to the Members and Former Employees is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of the Cases.

## C.    The Customer Obligation Motion

74.    By and through the Customer Obligation Motion, the Debtors request relief authorizing, but not directing the Debtors, in their sole discretion, to continue, maintain, implement

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

new and/or modify, their customer programs, promotions, and practices in the ordinary course of business consistent with past practice.

75.     In addition, the Customer Obligation Motion requests entry of an order authorizing; (a) all applicable banks and other financial institutions, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with the Customer Obligation Motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that all banks may rely on the representations of the Debtors with respect to whether any check or transfer issued or made by the Debtors before the Petition Date should be honored pursuant to the Customer Obligation Motion (such banks and other financial institutions having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with the Customer Obligation Motion are dishonored or rejected by the banks.

76.     The Debtors are requesting the relief sought in the Customer Obligation Motion be granted on an emergency basis because the uninterrupted customer programs are essential to the Debtors' ability to seamlessly operate under Chapter 11.  The Debtors recognize that treating customers well is a top priority and their customers may be their most valuable commodity.

77.     Prior to the Petition Date, in the ordinary course of business and as is customary in the retail industry, the Debtors created and implemented various programs to develop and sustain a positive customer relationship ("Customer Programs") which were designed to develop and sustain customer relationships and loyalty, improve profitability, and generate goodwill for the Debtors.  On account of the Customer Programs, the Debtors may owe certain obligations to their customers as well as other third parties, arising both before and after the Petition Date (collectively, the "Customer Obligations").

78.     Following the commencement of the Cases, I believe the Debtors must assure customers of their continued ability to satisfy Customer Obligations in order to maintain their

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

valuable customer base, goodwill, and other important benefits derived from a valuable customer base. I strongly believe that any inability of the Debtors to promptly honor the Customer Obligations will damage goodwill and may lead to the loss of their Members. Continued use of the Customer Programs, on the other hand, will allow the Debtors to protect their customer base and revenue growth opportunities.

79.     As of the Petition Date, the Customer Programs consist of: i) prepaid gift cards sold directly by the Debtors and indirectly through one or more third-parties (the "<u>Gift Cards</u>"); (ii) various coupons, discounts, promotions and similar policies, programs, and practices of the Debtors (collectively, the "<u>Promotions</u>"); (iii) refunds to guests that have a bad experience with any of the Debtors' services, guests that paid for long-term memberships in advance and due to COVID-19 would like a prorated refund, or guests who canceled services and were incorrectly charged after their proper cancellation (the "<u>Customer Refunds</u>"); and (iv) account credits consisting of various account credits tied to monetary value provided by the Debtors to customers as incentives, for customer service goodwill, or other promotional activities (the "<u>Account Credits</u>"). Some of the Programs have also helped to convert normally in-person studio students to online students. For example, students that had purchased class packages by number of classes (as opposed to by duration) have the ability to use the classes purchased for online classes. The Debtor is hopeful, and is seeing, that some of these in-person students are converting to online students since the studios are closed.

80.     <u>Gift Cards.</u> The Gift Cards program has been successful in that it encourages loyal customers and new customers to come into the Debtors' locations or visit the Debtors' website for digital livestream and on demand classes.

81.     Holders of gift cards often spend more than the amount of the gift card. Moreover, gift cards are redeemed over time but the Debtors receive the benefit of the cash from the gift card purchase immediately. The Debtors intend, subject to Court approval, to continue issuing and honoring gift cards after the Petition Date. With respect to gift cards purchased prior to the Petition Date, the Debtors seek authority to honor those cards in the ordinary course of business.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

82.     I estimate that the total amount of outstanding gift card liability on the Petition Date is approximately $786,776, of which only $144,674 has been purchased within the prior two (2) years.  Based on prior usage patterns, not all gift cards will be redeemed immediately and some cards are not ever redeemed in whole or part.  I believe that failure to honor all gift cards and ending the Gift Cards program will have a severe and negative impact on the Debtors' business and their reorganization.

83.     Promotions.  In the ordinary course of business, the Debtors issue promotional certificates (free class coupons, trials, etc.), groupon or similar merchant sites.  The Promotions are offered through the Debtors' website and email blasts to drive more business.

84.     I do not believe that any payments to customers are owed on account of Promotions in place prior to the Petition Date.  However, out of an abundance of caution, the Debtors request authority to make payments in respect of outstanding prepetition Promotions, and to otherwise continue to honor the terms of the Promotions.

85.     I believe the Promotions help foster goodwill and are a means for the Debtors to provide their customers with information in the hopes of retaining customer loyalty, to expand their customer base and to maintain the Debtors' brand reputation.

86.     There is no direct out-of-pocket expense to the Debtors associated with Promotions and the Debtors have found that these programs are successful and beneficial.

87.     I believe continuing to honor existing Promotions and to implement new Promotions in the Debtors' exclusive discretion is vital to maintain their customer relationships and to increase growth. Accordingly, the Debtors seek the authority to continue, in their discretion, to administer and honor the Promotions in the ordinary course of business, consistent with past practices.

88.     Customer Refunds.  In the ordinary course of business, the Debtors issue Customer Refunds in hopes of retaining the customers as future customers and to maintain the Debtors' brand reputation.  This includes when customers have a bad experience, members that paid for long-term

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

memberships in advance and due to COVID-19 have requested a prorated refund, or members who canceled services and were incorrectly charged after their proper cancellation.

89.    I believe that continuing to honor the Customer Refunds is essential to maintaining their relationships with their customers. Accordingly, the Debtors seek the authority to continue, in their discretion, to administer and honor the Customer Refunds in the ordinary course of business, consistent with past practices, including causing any prepetition checks that were given in payment of Customer Refunds to be honored.

90.    <u>Account Credits</u>.  In the ordinary course of business, the Debtors offer certain account credits consisting of various account credits tied to monetary value provided by the Debtors to customers as incentives, for customer service goodwill, or other promotional activities. I believe that continuing to honor the Account Credits is essential to maintaining the Debtors' relationships with their customers.

91.    <u>Donations</u>. As part of their promotions to entice customers to attend class, the Debtors from time to time offer to pay a certain amount of money of each class taken by a Member to a variety of charities.  The Donations encourage the Debtors' customers to take more classes or to sign up for a membership.

92.    As of the Petition Date, I estimate that the Debtors owe approximately $5,296 in Donations.

93.    Continuing the Donations is a vital part to preserving the Debtors' valuable relationships with their customers and students.  I believe that any failure to pay the Donations or to maintain the Donations going forward could diminish the Debtors' reputation and possibly cause the loss of valuable customer relationships.

94.    I believe that continuing the Customer Programs without interruption during the Cases and honoring prepetition commitments to customers will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all the Debtors' creditors and benefit their estates.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

95.     The Debtors have developed the Customer Programs to access new customers, build brand loyalty, and continue their goodwill.  If the Debtors are unable to continue their Customer Programs after the Petition Date or satisfy Customer Obligations, the Debtors risk losing revenue, customer loyalty, and goodwill that will harm their prospects for maximizing value from the sale of their assets.

96.     For these reasons, as well as those stated within the Customer Obligations Motion, I believe the Customer Obligations Motion must be granted in its entirety to avoid the irreparable harm the Debtors' would suffer without such relief.

### D.     The Cash Management Motion

97.     Pursuant to 11 U.S.C. §§ 105(a), 345(b), and 363(c), the Debtors seek authorization to maintain their existing Cash Management System.

98.     The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtors' day-to-day businesses.  The Cash Management System facilitates reporting, monitors collection, and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various Bank Accounts required to effectuate the collection, disbursement, and movement of cash.  Because of the nature of the Debtors' businesses and the disruption that would result if they were forced to close their existing Bank Accounts and establish a new cash management system, it is critical that the existing Cash Management System remain in place.

99.     The Debtors have four (4) bank accounts held at the Bank[2] as follows: (1) main depository account (ending in 3729) ("Concentration Account"); (2) field depository account (ending in 2956) (collectively, the "Depository Accounts"); (3) main disbursement account

---

[2] Prior to the Petition Date, the Debtors also held one account at Avid Bank, which account was closed on or about September 22, 2020 and  one account at Bank of America, which account is either closed or in the process of being closed.  To the extent there are any remaining funds held in the Bank of America account, such funds will be transferred to the Concentration Account immediately upon the closing of the Bank of America account.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

(ending in 3745); and (4) payroll disbursement account (ending in 3737) (collectively, the "Disbursement Accounts"). The Debtors also either have now or will shortly, open a debtor in possession tax account with the Bank.

100. Other than the Concentration Account, the Bank Accounts are zero balance accounts that are connected directly to the Concentration Account. Specifically, every night, all funds held in the field depository account are swept into the Concentration Account, which funds are then transferred into a money market account over night and then transferred back into the Concentration Account the next morning.

101. The Debtors have 2 disbursement accounts as described above; one (1) general disbursement account and one (1) payroll disbursement account. Both disbursement accounts are held at the Bank. When a disbursement is presented, the applicable disbursement account pulls automatically from the Concentration Account and the disbursement is then paid from the applicable disbursement account.

102. The Debtors currently have only two (2) deposit accounts as listed above. In September 2020, the Debtors had over seventy (70) regional depository accounts in order to have one (1) account tied to each studio location, which funds were transferred every evening to the Concentration Account. With all studios now closed, the regional depository accounts are unnecessary and the Debtors felt it would be more economical and efficient to have far less depository accounts. As such, as noted in the Cash Management Motion, the Debtors closed (or are in the process of closing) approximately seventy (70) accounts prior to the Petition Date and now maintain only one regional depository account and the Concentration Account (as well as disbursement accounts).

103. In addition, the Debtors have approximately seventy (70) separate merchant accounts with TSYS for processing credit card payments ("Merchant Accounts"). The Merchant accounts are used for transacting online credit card transactions from the Debtors' members through Mind Body Online. Credit card payments are deposited into the particular Merchant Account where the member is located. The balances in the Merchant Accounts are then swept into

22

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

the field depository account on a daily basis, approximately three (3) business days in arrears, as determined by TSYS.

104.    I believe it is imperative that the Debtors maintain the Merchant Accounts because many of the Debtors' current members converted from in-studio to digital memberships and their subscriptions are housed under separate point-of-sale location accounts.   Moreover, when Members purchase a monthly membership from the Debtors, the Member agrees to pay an automatic monthly recurring charge until the membership is canceled.   Any changes to the Merchant Accounts could disrupt and delay those recurring monthly credit card charges which would severely harm the Debtors finances as the majority of its revenue is from credit card sales. Also, while the Debtors can relatively easily close its bank accounts to where the Merchant Account funds are drawn, it is a much more time consuming and expensive process to transfer memberships and processing accounts, such as the Merchant Accounts.

105.    The Cash Management System preserves orderly flow of cash and also permits the Debtors to accurately track its revenue.  The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their bank accounts.  If the Bank Accounts had to be closed and re-opened I believe it would wreak havoc on the cash flow of the business as the Debtors' revenue comes almost exclusively from credit card sales.

106.    In addition, I believe that closing the Merchant Accounts would cause a severe disruption in the Debtors' cash flow.  For one thing, deposits are made into the Merchant Accounts every two to three days from the credit card companies and the Debtors completely rely heavily on this revenue for their operations.   Further, I believe that opening new merchant accounts would require extensive documentation with the credit card companies and could take weeks.  If the Debtors are not authorized to keep the Merchant Accounts open, I believe the credit card companies would be able to hold the Debtors' receipts for extensive time periods, which is cash the Debtors desperately need for operations and which could result in irreparable harm to the

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

Debtors due to their need for working capital. This is unnecessary, especially in this case where it is expected that a sale of the Debtors' business may occur within the next thirty to sixty days.

107.    The Debtors seek a waiver of the UST's requirements that they close the existing Bank Accounts. Instead, the Debtors request that they be allowed to convert the Bank Accounts, which are already at depositories authorized by the UST, to "debtor in possession" accounts and continue to utilize them as necessary to best serve their business needs and to maintain their current Cash Management System. The Bank Accounts are (a) covered by FDIC insurance and (b) located at the Banks that have standing agreements with the UST.

108.    Other than the Concentration Account, the Bank Accounts are zero balance accounts. The field depository account averages a flow of funds of approximately $50,000.00 per day. The Concentration Account traditionally carried an average balance of between $2 million and $3 million although it has been closer to $600,000 to $1.2 million in the past few months. The Debtors have internal monitoring mechanisms in place that will detect any impending failure of the Bank where the Concentration Account is held.

109.    To protect against the unauthorized payment of prepetition obligations, I represent that, if the Debtors are authorized to continue to use the Bank Accounts, they will not pay, and the Banks will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

110.    In addition, the Bank Accounts, including the DIP tax account to be opened, cover the three accounts the Debtors would otherwise have to open pursuant to the UST Guidelines. Given the size of the Debtors' operations and the complexity of the Cash Management System, I believe that requiring the Debtors to close the Bank Accounts and the Merchant Accounts and to open new accounts will disrupt the Debtors' operations. It will disrupt operations because (a) depositors will not respond quickly to the change and will likely continue to send deposits to the original deposit accounts, and (b) any changes to the disbursement accounts will slow down the payment to crucial vendors as they are paid through electronic fund transfers.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

111.    I believe closing the Bank Accounts will also increase the work of the Debtors' accounting personnel, who are already dealing with the many and varied issues related to these Cases.  Furthermore, closing the Bank Accounts and opening new ones would needlessly cost the Debtors time and money and would result in no discernable benefit to the Debtors' bankruptcy estates.

112.    In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors have and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (i) Bank services (the "Service Charges"), (ii) checks deposited with the Banks which have been dishonored or returned for insufficient funds in the applicable amount, (iii) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "Bank Account Agreements").  As such, the Debtors seek authority, in their sole discretion, to pay: (i) all undisputed prepetition Cash Management Claims; and (ii) any such routine Cash Management Claims that accrue to the Banks post-petition, in a monthly aggregate amount not to exceed $20,000.00 (excluding merchant/credit card fees).

113.    As with the Cash Management System, I believe that payment of the Cash Management Claims will minimize disruption to the Debtors' operations and is therefore in the best interests of the estates.  Absent payment of the Cash Management Claims, the Bank might assert setoff rights against the funds in the Bank Accounts on account of the Cash Management Claims or freeze the Bank Accounts.  I believe that the payment of Cash Management Claims will not prejudice unsecured creditors given that, as noted above, the Bank may have setoff rights with respect to the Cash Management Claims in any event.

114.    In the ordinary course of business, the Debtors use business letterhead, invoices, envelopes, promotional materials, and a number of other pre-printed business forms and correspondence (collectively, the "Existing Forms").  Because the Existing Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession.  The Debtors

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

are seeking authorization to continue using all Existing Forms in the forms existing immediately prior to the Petition Date.  I am not aware of any requirement that they include a reference to themselves as a "Debtor in Possession" on their Existing Forms, but am requesting authorization out of an abundance of caution.

115.    I believe that most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity of the Cases, the press releases issued by the Debtors, and additional press coverage.  Changing the Debtors' Existing Forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.

116.    In connection with keeping the Bank Accounts open, the Debtors seek an order authorizing and directing the Bank to honor postpetition checks, if any, drawn and transfers from the Bank Accounts.

117.    Further, in the event that the Bank refuses to honor a check drawn or a transfer made on a Bank Account maintained by the Debtors (provided there are sufficient good funds in the Bank Account to complete the transfer), the Bank must immediately turn over the deposits held in the applicable Bank Account upon the Debtors' request.

118.    The Debtors are also requesting authorization to continue using their existing checks without the "Debtor in Possession" designation; provided, however, that if the Debtors are required to generate new checks during the pendency of the Cases, then the checks will include this designation.

119.    I believe it would be an unwise expenditure of the estates' resources to require the Debtors to obtain all new checks simply to have "Debtor in Possession" printed on the check when all parties with whom the Debtors will be transacting business will know that the Cases have been filed as a result of the publicity of the Cases, the press releases issued by the Debtors, additional press coverage and creditors will receive notice of the bankruptcy filings.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

120.    I believe preserving the Cash Management System will enable the Debtors to continue to track all receipts and payments accurately and to provide complete reporting to the UST.

121.    Finally, the Debtors request that the relief sought herein be granted on an emergency basis because the uninterrupted use of the Bank Accounts, Cash Management System, and their business forms, are essential to the Debtors' ability to seamlessly operate under Chapter 11.  Therefore, pursuant to Local Bankruptcy Rule 2081-1(a), the Debtors request that this Motion be heard on an emergency basis.

122.    In sum, the Bank Accounts and Cash Management System facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtors' business. Because of the disruption to the business that would result if the Debtors were forced to close these Bank Accounts, I believe it is critical that the Debtors maintain their Cash Management System and the Bank Accounts.

### E.    <u>The Wage Motion</u>

123.    The Debtors have filed the Wage Motion seeking the entry of an interim and final order, authorizing but not directing, the Debtors, in their discretion, to pay, continue, or otherwise honor various prepetition employee-related obligations (collectively, the "<u>Prepetition Obligations</u>") to or for the benefit of their current employees (individually, an "<u>Employee</u>" or collectively, the "<u>Employees</u>"), for wages, compensation, severance, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Dates (as described below, individually, "<u>Employee Program</u>" or collectively, the "<u>Employee Programs</u>") and have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests.

124.    The Debtors employ approximately 205 Employees. The table below summarizes how this population is distributed across the Debtors' operations.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

| Operation/Segment | Approx. Percentage |
|---|---|
| Corporate/Field | 13% |
| LiveStream Instructors | 43% |
| Trainers | 11% |
| LiveStream substitute instructors | 21% |
| Private instructors | 8% |
| Teacher training program manager | 4% |

125.     As noted above, only approximately thirty (30) of the Debtors' employees are full time employees the rest work a few hours per week.

126.     I believe it is absolutely critical that the Debtors be able to assure the Employees that their Wages and the Employee Programs will continue unaffected by their chapter 11 filings in order to effectuate a successful outcome in the Cases.  Moreover, if the Debtors fail to pay the Prepetition Obligations and continue the Employee Programs in the ordinary course, I believe the Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on workforce morale and would likely result in unmanageable turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

127.     This is especially true given the specific YogaWorks style of yoga that must be taught to each new instructor.  Many of the Employees have also gained recognition and loyalty from their students, the members of the Debtors.  If the Employees were to leave the Debtors' employment, the Debtors could lose valuable members and revenue from those members.  It is absolutely imperative that the Debtors' highly trained and valuable Employees remain satisfied with their employment, which means their Wages and Employment Programs must be maintained.

128.     The Debtors' paid payroll on October 9, 2020 for the two (2) week period ending October 4, 2020.  As such, the Employees will accrue wages and other Pre-Petition Obligations for the period of  October 5, 2020 through October 14, 2020 for which the Debtors seek authority to pay post-petition in the ordinary course.  None of the Employees, including insiders, will receive more than the maximum amount provided for in Section 507(a)(4), with one exception noted below.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

129.    The Prepetition Obligations owed by the Debtors are summarized below:

| Category | Amount |
|---|---|
| Employee Wages | $185,990 |
| Withholding Obligations (includes pre-paid Health Benefits that are not listed below as Employee Deductions or Employee Payroll Taxes) | $38,738 |
| Obligations to Independent Contractors | $34,804 |
| Employee Business Expenses and Reimbursements | $0 |
| Employee Vacation and Sick Leave | $335,281 |
| Employee Health Benefits - Medical and Dental Insurance | $0 |
| Employee Vision Insurance | $0 |
| Life, Accidental Death and Dismemberment | $0 |
| Flex Spending | $0 |
| Total Employee Compensation Owed | $259,532 |
| Average Total Compensation Per Employee | $1,269 |
| Employee Deductions (owed to third parties) | $3,838 |
| Employee Payroll Taxes (owed to third parties) | $30,073 |

130.    Certain insiders of the Debtors, namely Brian Cooper, CEO, and Matt Shechtman, General Counsel, are included in the amount of pre-petition Wages that remain outstanding.  I represent that none of the insiders will receive amounts over the cap of $13,650 set forth in Section 507(a)(4) except as discussed below.

131.    Some of the Debtors' Employees receive their paycheck via a physical check.  The Debtors currently have approximately sixteen (16) outstanding checks for Pre-Petition Obligations for Wages that have not yet cleared the Debtors' bank accounts.  The total of such outstanding checks is approximately $25,721.15 (which sum is included in the above chart) and none of the amounts owed to any one (1) Employee are over the maximum set forth in Section 507(a)(4), with one exception discussed below.  The Debtors seek authority through this Motion for any checks for Pre-Petition Obligations that have not yet cleared the Debtors' bank accounts to be honored post-petition.

132.    On or about October 2, 2020, the Debtors' terminated the employment of Robert Settembro, the Debtors' former COO.  At that time, he was owed the sum of $15,890.44 for Wages

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

and other Pre-Petition Obligations.  Such sum was paid to Mr. Settembro via check but it has not yet been cashed.

133.    As listed in the above chart, the Debtors owe approximately $34,804 to independent contractors.  Specifically, the Debtors owe such sum to twelve (12) former employees that were terminated but have been providing services on an as needed basis to the Debtors as independent contractors since their employment termination.  It is my understanding that at least 75% of the amount that each individual earned by acting as an independent contractor in the sale of goods or services was earned from the Debtors for the last twelve (12) months.

134.    The Debtors also owe approximately $650,000 as of October 13, 2020 (and will owe another $90,000 post-petition) in deferred employer payroll taxes and previous employee withholdings.  The Debtors have delayed payment of such payroll taxes since late March 2020 based on their interpretation of the CARES Act provisions.  The Debtors expect such sum will not be due to be paid until early 2021.  The Debtors are not seeking authority to pay these payroll taxes at this time but want to make the Court aware of this obligation and reserve their rights to request authority to pay such payroll taxes in the future.

135.    Employees are paid bi-weekly, each approximately one week in arrears. Payroll averages $210,000.00.  The Debtors' payroll payments are made by UltiPro Services ("UltiPro") through a separate contractual arrangement, which requires the Debtors to fund their obligations to UltiPro by way of reverse wires from the relevant operating account or disbursement account one (1) day prior to each pay date and the same day for payroll taxes and garnishments.

136.    Further, as of the Petition Date, the Debtors, through UltiPro, made deductions from the Employees' paychecks for payments on behalf of the Employees for various federal, state, and local income, FICA, and other taxes, as well as for garnishments, support payments and tax levies, savings programs, benefit plans, 401k plans, flexible savings accounts, insurance programs, credit unions, and other similar programs on account of which the Debtors deduct a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, the "Deductions").

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

The Debtors' aggregate average bi-weekly Deductions for the Employees is approximately $80,000.00.

137.    By virtue of the timing of the filing of the Cases, the Employees have not been paid all their compensation earned through the Petition Date.  In addition, the applicable Deductions may not have yet been taken.  To the extent Deductions have been taken, however, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions.  I estimate that, as of the Petition Date, the Debtors are holding Deductions already taken aggregating approximately $38,738, which the Debtors seek to pay to third parties in accordance with their prepetition practice.

138.    I estimate that, as of the Petition Date, accrued but unpaid compensation, including the Deductions, total approximately $259,532.  The Debtors seek authority to pay, continue, or otherwise honor their Prepetition Obligations in the ordinary course of their businesses.  None of the amounts to be paid to the Employees for pre-petition wages will exceed the $13,650 cap set forth in Bankruptcy Code Section 507(a)(4) other than with respect to Mr. Settembro.  I believe that the costs associated with paying such amounts are relatively minimal compared with the damage to the Debtors' estates that would follow if employee morale were harmed by the Debtors' failure to meet their payroll obligations.

139.    The Debtors, in the ordinary course of their businesses, reimburse the Employees for a variety of business related expenses that the Employees incur.  These include expenses for cell phone reimbursement, ad hoc office purchases, travel, lodging, automobile rentals, meals, business-related entertainment expenses, lunch, dinner, long-distance telephone charges and cellular phone charges, internet charges when traveling, taxi, mileage, and incidental expenses such as parking and tolls.  I believe that it is essential to the continued operation of the Debtors' businesses that the Debtors be permitted to continue reimbursing the Employees for such business expenses.

140.    The Debtors require that, to be reimbursed for business expenses, an Employee must submit expense reports, together with appropriate supporting documentation.  Based upon

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

prior activity levels, I estimate that the total amount of unreimbursed business expenses, as of the Petition Date, will not exceed $15,000.00.

141.    As part of their overall compensation, most of the salaried and hourly Employees working at least thirty (30) hours per week are entitled to receive a certain number of paid time off ("PTO") vacation hours per year.  Vacation time starts to accrue immediately upon employment, but Employees must wait ninety (90) days before they can use accrued vacation time.  A corporate Employee who has been employed by the Debtors for less than one (1) year can accrue up to 80 hours of vacation time per year with a maximum accrual of 120 hours; a corporate Employee who has been employed for more than one (1) year but less than three (3) years can accrue up to 120 hours of vacation time per year with a maximum accrual of 180 hours; a corporate Employee who has been employed for more than three (3) years but less than five (5) years can accrue up to 160 hours of vacation time per year with a maximum accrual of 240 hours; and a corporate Employee who has been employed for more than five (5) years can accrue up to 200 hours of vacation time per year with a maximum accrual of 300 hours.  Corporate employees also get one day per year to use freely as a "floating holiday" which does not roll over.  A field Employee who has been employed by the Debtor for less than five (5) years can accrue up to 80 hours of vacation time per year with a maximum accrual of 120 hours; a field Employee who has been employed for more than five (5) years but less than ten (10) years can accrue up to 120 hours of vacation time per year with a maximum accrual of 180 hours; and a field Employee who has been employed for more than ten (10) years can accrue up to 160 hours of vacation time per year with a maximum accrual of 240 hours.  An Employee can carry over a certain number of unused vacation days from one year to the next, up to the maximums set forth above.  Upon termination or retirement, an Employee generally receives "cash out" payments for any accrued and unused vacation days unless it is not required by state law.

142.    Mr. Shechtman, the Debtors' general counsel, accrues 120 hours per year for the first nine (9) years of employment and then 160 hours per year from his tenth (10th) year of

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

employment and thereafter.  I accrue 160 hours per year for the first four (4) years of employment and then 200 hours per year from his fifth (5th) year of employment and thereafter.

143.    Part-time, seasonal, temporary and per diem Employees are not eligible to accrue vacation time but are eligible to accrue sick leave.  Full time Employees also accrue sick leave. Sick leave begins accruing immediately but Employees cannot use sick time until they have been employed for ninety (90) days.  Sick leave accrues according to the relevant City ordinance where the Employee is located.  Sick leave only carries over into the following year if required by local or state law.

144.    The Debtors estimate that, as of the Petition Date, total accrued but unpaid vacation and sick leave is approximately $335,000.00.

145.    The Debtors offer the Employees various PPO and HMO plans with UnitedHealthcare ("UHC") for medical insurance (the "Medical Plan").  Employees may pick from about six (6) different plans depending on how much coverage they desire and how much they want to pay in co-pays versus what percentage of the premiums the Employee wants to pay. In most cases, (i) under the HMO option, the Debtors pay the following percentages of the HMO base plan: HMO High, 57%, HMO Med, 65%, HMO Low, 74%; (ii) under the PPO option, the Debtors pay the following for the premiums: CA PPO High, 45%, CA PPO Low, 50%; and (iii) for Non-California employees, the Debtors pay the following for premiums: PPO High, 51%, PPO Low, 65% and EPO, 59%. As of the Petition Date, approximately 67 Employees were participating in one of the foregoing medical insurance plans.

146.    The Debtors also offer the Employees two (2) options for dental insurance – a D HMO or PPO plan with UHC (the "Dental Plan").  The Debtors do not pay any portion of the premiums for the Dental Plan. As of the Petition Date, I estimate that approximately 40 of the Employees were participating in one of the foregoing dental insurance plans.

147.    The Debtors offer the Employees a P P O vision insurance plan with UHC  (the "Vision Plan").  The Debtors do not pay any portion of the premiums for the Dental Plan.  As of the Petition Date, approximately 30 of the Employees were participating in the Vision Plan.

33

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

148.    The Debtors provide all Employees with a policy for life insurance and accidental death and dismemberment in the amount of $15,000 through Unum (the "Life Plan").  The Debtors pay 100% of the premium for this insurance, and provide the Employees with an option to purchase additional insurance at their own expense.

149.    The Debtors provide eligible Employees with the option to contribute to a 401k plan which is administered through John Hancock ("401k Plan").  The Debtors do not match any contributions made by the Employees.  As of the Petition Date, I believe that approximately 45 of the Employees contribute to the 401k Plan.

150.    The Debtors provide eligible Employees with an option to contribute to a flex spending account ("FSA") through Paypro ("FSA Plan").  Employees pay into their own FSA account and Paypro monitors and processes payment to the Employees.  The medical flexible spending account allows an Employee to set aside a portion of his or her earnings to pay for qualified medical expenses.  As of the Petition Date, approximately fifteen (15) of the Employees were participating in the medical flexible spending account program.  The Debtors provide the eligible Employees with a dependent care flexible spending account program, also administered by PayPro, which allows an Employee to set aside a portion of his or her earnings to pay for qualified dependent care expenses.  As of the Petition Date, one (1) of the Employees were participating in the dependent care flexible spending account program.

151.    As required by statute, the Debtors provide the Employees a workers' compensation benefit program ("Workers' Compensation Program") for income protection, medical services, and rehabilitation services to employees with job-related injuries and illnesses (the "WC Insurance").  I do not believe any amount is owed for the WC Insurance as of the Petition Date.

152.    Prior to the Petition Date, the Debtors paid certain of their Prepetition Obligations with checks that had not been presented for payment as of the Petition Date.  In order to ensure the orderly payment of the Prepetition Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts,

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to the Motion.  To the extent that any such checks are refused payment, the Debtors additionally request authority to issue replacement checks and to reimburse the Employees for any loss resulting from the dishonoring.

153.    With respect to the compensation and the Employee Programs described above, the Debtors contract with several vendors to administer and deliver payments or other benefits to their Employees (the "Administrators").  In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtors for reimbursement of payments made.  For example, the Debtors, in the ordinary course of business, pay various third-party administrator expenses in connection with the FSA Plan and the 401k Plan, which fees total approximately $75.00 per month to PayPro, and a one-time fee of approximately $1,219.67 for professional services to prepare and coordinate required 401k participant notices at the beginning of the year to the Debtors' 401k administrator, Actuarial Benefits Corp.

154.    In conjunction with the Debtors' payment of compensation and other benefits, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees.  I believe that the Administrators may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered.  A need to replace any one of the Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees.

155.    I believe it is absolutely critical that the Debtors be able to assure their Employees that the Employee Programs will continue unaffected by their Chapter 11 filings in order to effectuate a successful outcome in these cases.  The Debtors' employees and specifically, the yoga instructors as discussed in more detail above, are the backbone of its businesses and maintenance of employee morale is absolutely essential to Debtors' ability to conduct business and ultimately sell their assets for the highest value.  I believe that any deterioration in employee morale at this

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

time will substantially and adversely impact Debtors' business and its prospects for a sale. If, by consequence of the Chapter 11 filing, there is interruption in the Debtors' ability to honor wages incurred prior to the Petition Date, I believe employees may suffer extreme personal hardship and, in some cases, may cease working. The inevitable consequence would be employee defections, unmanageable staff turnover, resentment, loss of goodwill and, at the very least, disintegration of employee morale.

156.    Furthermore, I believe that authorizing the Debtors to honor the Employee Programs is consistent with the Debtors' duties and is being performed in the ordinary course of business.

157.    Moreover, the payment of, and otherwise honoring, the Employee Programs in the ordinary course of business will not prejudice general unsecured creditors or materially affect the Debtors' estates because these claims would otherwise be entitled to priority under sections 507(a)(4), (a)(5)and (a)(8)(D) of the Bankruptcy Code and would be entitled to be paid ahead of general unsecured claims.

158.    The Debtors represent that: (a) with the exception of Mr. Settembro, who will be receive the sum of $15,890.44, they will not distribute any amounts over $13,650 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Wages or (ii) any other compensation due to an Employee; (b) they will not make contributions to any employee benefit plan on account of unpaid prepetition amounts in excess of (i) the number of Employees covered by such plan multiplied by $13,650, less (ii) the aggregate amount of prepetition Wages and ordinary course bonus payments, plus the aggregate amount paid by the Debtors on behalf of such Employees to any other employee benefit plan, as provided under section 507(a)(5) of the Bankruptcy Code; and (c) they will not pay any amounts in excess of the estimated outstanding prepetition cap amounts for each category of prepetition claims identified in the chart above without further order from this Court, except to the extent required under state law.

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

159.     In sum, I believe that granting the relief requested herein will preserve employee morale and facilitate a successful sale and Chapter 11 plan by permitting the Debtors' business operations to continue with minimal interruption.  Accordingly, it is my opinion that approval of the Wage Motion is necessary without delay.

**F.**     **The Motion to Reject**

160.     Through the Motion to Reject, the Debtors seek authority to terminate and reject the leases the Debtors and I have deemed burdensome (the "Burdensome Leases") as of October 13, 2020.  The underlying leased assets (i) have no significant benefit for the Debtors' Estates and their creditors, (ii) are no longer being used and (iii) are not necessary for the Debtors' reorganization.  Termination and rejection of the Burdensome Leases will result in reduced operating costs (over $850,000 per month) so termination and rejection is appropriate and will serve the best interest of the Debtors' Estates and their creditors.

161.     Prior to the Petition Date, the Debtors entered into written agreements as the lessee under the Burdensome Leases as listed in the attached **Exhibit 1.**

162.     The Burdensome Leases have no benefit for the Debtors' Estates or their creditors and have no value for the Debtors' reorganization.  The Debtors, in the exercise of their business judgment, have determined to cease business operations at the locations covered by the subject leases.  The underlying leased locations assets are therefore no longer being used and are not necessary for the Debtors' reorganization.

163.     In rejecting the Burdensome Leases, the Debtors are not acting in bad faith or on a whim.  Rather, the Debtors are merely trying to avoid the administrative liability that could be asserted against the Estates to the detriment of unsecured creditors if the Debtors are not allowed to reject  the Burdensome Leases related to assets that are no longer being used.  The Burdensome Leases are not necessary for the Debtors' reorganization efforts, and in fact, are a detriment. Furthermore, the rejection of the Burdensome Leases will assist the Debtors in substantially reducing monthly operating costs.  If the Burdensome Leases are not rejected, the administrative

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

expense of the Estates will increase which will result in a reduction of funds that might otherwise be available for creditors.

164.    Based upon the aforementioned, I believe termination and rejection of the Burdensome Leases is a necessary component of the Debtors' bankruptcy and will serve the best interests of the Debtors' Estates and their creditors.

### H.    The DIP Financing Motion

165.    Pursuant to the DIP Financing Motion, the Debtors seek Court authority: (a) to obtain postpetition financing in the form of the DIP Credit Facility, (b) to use Cash Collateral pursuant to sections 362 and 363, (c) modifying the automatic stay, and (d) approving Debtors' assumption of an entry into the Restructuring Support Agreement ("RSA").

166.    The Debtors determined that, in order for each to operate their businesses during these chapter 11 cases, the Debtors will need more cash over the next approximately thirteen weeks (or until the closing of a sale of substantially all of the Debtors' assets, which is anticipated to close within the next sixty to ninety days) than the Debtors can reasonably expect to be generated from their business operations.  The Debtors are in need of an immediate additional infusion of liquidity to, among other things, pay employee wages and benefits, fund certain operational expenses, maintain ordinary course relationships with vendors, suppliers, and customers, and satisfy working capital needs in the ordinary course.  As of the Petition Date, the Debtors only have approximately $100,000 in cash on hand with which to operate their businesses and fund the Cases.  Therefore, together with Force 10 and other advisors, the Debtors undertook an analysis of the incremental liquidity that would be necessary to maintain operations in connection with the filing of the Cases.  Based on the Debtors' 13-week cash flow forecast, the Debtors determined that they will have additional net cash needs of approximately $2,200,000 in the first 13-weeks of the Cases and another $1,150,000 to fund the Debtors' plan and winddown.

167.    The Debtors require the financing provided under the DIP Credit Facility for the operation of their businesses, to preserve their going concern value, to pay vendors, suppliers and customers, to satisfy payroll obligations, to pay for certain costs and expenses related to the Cases

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

and to satisfy the Debtors' other working capital needs.  I believe that access to sufficient working capital and liquidity made available through the DIP Credit Facility is vital to the preservation and maintenance of the Debtors' going concern value and to the Debtors' ultimate goal of selling substantially all of their assets.

168.    Despite the efforts of the Debtors and their advisors, the Debtors have been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a) or (b); or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

169.    The Debtors cannot sustain operations if they cannot obtain postpetition funds by way of a debtor-in-possession loan.  In order to do so, the Debtors must obtain financing from the DIP Lender, however, the only way to obtain such financing is to grant to the DIP Lender the protections provided as described in the Motion.

170.    Pursuant to the RSA, the Debtors contemplate that they will effectuate a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code to the DIP Lender or such higher and better bidder pursuant to bidding procedures to be agreed upon by the parties to the RSA and approved by the Bankruptcy Court and a restructuring through a liquidating chapter 11 plan of reorganization.  The RSA also provides for the sale of the GHP Facility to Serene with a portion of the purchase price being used to fund the DIP Facility. To that end, the RSA provides for the provision of $3,350,000.00 in debtor-in-possession financing from Serene, as well as the provision for Plan funding by way of a final DIP draw in an amount necessary to fund payments, as set forth in the DIP Budget, required to be made pursuant to the Plan, as well as the provision of a break-up fee of three percent (3%) of the sale price.  In addition, the RSA provides that in exchange for GHP agreeing to allow a portion of Serene's purchase price of the GHP Credit Facility to be used to fund the DIP Facility, Serene, GHP and their affiliates shall obtain releases.

171.    I believe the RSA represents a major step toward the Debtors' intended chapter 11 liquidation plan. Approval of the Debtors' assumption of and entry into the RSA will not only

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077

allow funding beyond the initial draw by way of the DIP Facility, but will otherwise enable the Debtors to move expeditiously toward confirmation and consummation of a Plan with the financial support to continue operations pending the sale.

172.    I believe the RSA is a sound and reasonable exercise of the Debtors' business judgment as it secures the financial support of the DIP Lender and GHP while the Debtors move toward a sale of their assets.

## CONCLUSION

173.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  October 15, 2020
New York, NY

_____
Brian Cooper
Chief Executive Officer

Doc ID: 8bc0fc977cfa01a414d8553ac5c1ffdfd50af077