**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| YOGAWORKS INC., a Delaware corporation, *et al.* | Case No. 20-12599 - KBO |
| Debtors.[1] | **Joint Administration Requested** |

**DECLARATION OF ADAM MEISLIK IN SUPPORT OF DEBTORS' MOTION FOR ORDER (A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL; (B) GRANTING LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE PROTECTION; (C) SCHEDULING A FINAL HEARING; AND (D) MODIFYING THE AUTOMATIC STAY**

I, Adam Meislik, declare as follows:

1. Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath. I am submitting this declaration in support of YogaWorks, Inc., a Delaware corporation ("YogaWorks") and Yoga Works, Inc., a California corporation ("Yoga Works" and collectively the "Debtors") Motion for Order (A) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (B) Granting Liens and Super-Priority Claims and Adequate Protection; (C) Scheduling a Final Hearing; and (D) Modifying the Automatic Stay (the "DIP Motion").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number is (1) YogaWorks, Inc., a Delaware corporation (9105); and (2) Yoga Works, Inc., a California corporation (0457).

2.	I am a member of Force Ten Partners LLC ("Force 10"), with headquarters offices located at 20341 SW Birch Street, Suite 220, Newport Beach, California. Force 10 is an advisory firm with deep domain knowledge in financial and operational corporate restructuring, valuation, forensic accounting, and complex litigation support. Force 10 serves middle-market companies as well as their creditors, stakeholders, and professionals by providing turnaround-management services (CRO), financial advisory services, expert witness support, and investment banking and M&A advisory services.

3.	For over twenty-five years, I have been involved in the restructuring and corporate finance sector, serving various roles, including Financial Advisor, Investment Banker, CRO, Fiduciary, and Expert Witness. Prior to forming Force 10 in mid-2016, I served as Co-President, Chief Compliance Officer for GlassRatner Securities, LLC (2014-2016) and Senior Managing Director for GlassRatner, LLC (2012-2016) and, prior to that, was a Principal at XRoads Solutions Group, LLC (2009-2012), Managing Director in the Investment Banking Group of Salem Partners LLC (2006-2007), Executive Director and Director in the Investment Banking Group of CIBC World Markets (1996-2006), and Analyst and Associate in the Corporate Financing Group of Jefferies & Company, Inc. (1993-1995). I obtained my Bachelor of Science in Management (Finance) from Tulane University, Freeman School of Business in 1993.

4.	Throughout my career, I have worked extensively with companies in numerous sectors, bank lenders and other secured and unsecured creditors, buyers, sellers, bankruptcy counsel and litigators, all in the context of workouts, insolvency proceedings, fundraising, M&A, and litigation. I have also provided expert testimony concerning transactions, feasibility, intangible/intellectual assets, valuation, solvency, and reasonably equivalent value issues.

Furthermore, I have advised, structured, and executed more than 100 mergers, acquisitions, capital transactions restructurings, and litigation support assignments.

5.     I am the individual at Force 10 with primary responsibility for Force 10's aforementioned engagement with the Debtors. References to actions taken by "Force 10" within this Declaration include actions I took in conjunction with other members of Force 10 that I manage and supervise in connection with the financial advisor and investment banking services rendered to the Debtors.

**Force 10's Pre-Petition Engagement**

6.     Force 10 was engaged by Debtors in May 2020, although Force 10 was not asked to investigate potential purchasers until August 2020. On August 20, 2020, Force 10's engagement was expanded by the Debtors to serve as their financial advisor in connection with proposed financing options and addressing a potential chapter 11 restructuring (the "Scope of Work").[2]

7.     Force 10 then joined an effort to seek a resolution to the Debtors' capital deficiency and impending defaults under the Debtors' senior secured indebtedness. Although already struggling, the COVID-10 pandemic dealt a death blow to the Debtors' in-studio operations. Prior to August 2020, Guggenheim Securities ("Guggenheim") was engaged by the Debtors to seek growth capital or a sale of the Debtors. Although the two efforts were similar, Force 10 ramped up a focus on a solution that could only be obtainable through Chapter 11 of the United States

---

[2] The Scope of Work included the following: (i) seek financing, including post-petition debtor-in-possession financing; and (ii) seek to reorganize and/or sell, through a section 363 transaction and/or a plan of reorganization some or all of the Debtor's assets in one or more Transactions (as defined in that certain agreement dated August 20, 2020). To this effect, Force 10 agrees to perform the following services, in each case under the direction of the Debtors: (a) assist the Debtors in identifying and evaluating interested parties; (b) advise the Debtors on tactics and strategies for negotiating with potential parties to a Transaction, creditors, and other stakeholders, and participate in such negotiations; (c) assist the Debtors in preparing materials describing the Debtors for distribution and presentation to parties that might be interested in a Transaction; (d) advise the Debtors on the timing, nature, and terms of new securities, other consideration, or other inducements to be offered pursuant to any Transaction; (e) render financial advice to the Debtors related to a Transaction and participate in meetings or negotiations with creditors, stakeholders, or other appropriate parties.

Bankruptcy Code, and Guggenheim's efforts were primarily focused on out-of-court solutions. Force 10 and Guggenheim worked together for the benefit of the Debtors.

8. Force 10's efforts to solicit a potential bankruptcy transaction was multifaceted and targeted towards parties most likely to be interested and could close within the timeframe available. Among other things:

    a. Force 10 contacted fifty-seven (57) potential parties that are known to Force 10 to close transactions in distressed situations at a size similar to the Debtors' businesses.

    b. Force 10 provided additional information to approximately thirty-five (35) of the potential parties.

    c. Thirteen (13) of the parties signed confidentiality agreements with the Debtors and received confidential information.

    d. Management held due diligence meetings with and provided information to five (5) of the parties.

    e. Force 10 engaged in extensive negotiations with one (1) potential party, Serene Investment Management, LLC ("Serene"), who ultimately agreed to the highest and best transaction for the Debtors and their creditors.

**Guggenheim Process**

9. At the same time, Guggenheim was engaged in a similar process that started in 2019, whereby they introduced the opportunity to invest in or acquire the Debtors to approximately thirty-five (35) parties. Of those, one (1) submitted an indication of interest that was aligned with the Debtors' goals as of September 2020. This indication of interest was not ultimately the highest and best as the offered sale price was much less than that of Serene, who will be the stalking horse bidder for the Debtors' assets which will be detailed in a subsequent motion to be filed.

**Bankruptcy Transaction Proposals**

10.     <u>Serene</u>.  Serene began conducting due diligence in late August 2020. Its efforts involved the review of financial and operational information from the Debtors, conference calls with the Debtors' management, and multiple discussions with Force 10.

11.     On September 11, 2020, Serene ultimately submitted an initial proposal for $3,500,000 to immediately acquire the Debtors' senior secured debt held by Great Hill Equity Partners V, LP ("GHP") for the ability to credit bid for the Debtors' assets, and then provide postpetition financing with the balance of the proceeds. Serene left it to the Debtors and GHP to decide the loan purchase price and the amount of debtor in possession financing based on the Debtors' postpetition financing requirements.

12.     Through a series of negotiations, on or about September 16, 2020, Serene counter-offered an aggregate of $3,850,000 and agreed to the general terms the Debtors sought for postpetition financing, including no interest and no fees. The Debtors and GHP accepted this term sheet and executed it on September 16, 2020.  A true and correct copy of the term sheet is attached hereto as <u>Exhibit A</u>.

13.     <u>G4</u>. On October 3, 2020, G4 Development Group ("G4") made an unsolicited offer to the Debtors and GHP for an aggregate of $4,850,000. G4 was introduced to the opportunity by Brian Cooper, CEO of the Debtors, and I understand Mr. Cooper was participating as an investor in G4's bid. $4,850,000 was offered because it was $1 million more than the Serene $3,850,000 transaction.  The Serene $3,850,000 term sheet contained a form of exclusivity whereby GHP and the Debtors could accept an offer of at least $1,000,000 more ($4,850,000) by another party if Serene had the opportunity to match and continue bidding.

14. Through a series of additional negotiations, Serene further increased its bid to $4,150,000, and GHP accepted Serene's increased bid over G4's bid of $4,850,000 (the "<u>Final Serene Transaction</u>").

15. Although the aggregate price offered by G4 was $700,000 higher, it would only inure to the benefit of GHP and no other creditor, given the postpetition budget would be the same, thus requiring the same amount of postpetition financing -- $3,350,000.

16. In addition to the price received by GHP and the money available to the Debtors for postpetition financing, the Final Serene Transaction has other salient points that benefit the Debtors, including no-interest and no-fees on the postpetition transaction and "middle of the road" bid procedures.

**DIP Financing**

17. In order to fund their working capital needs and keep their operations running through a sale process, subject to Court approval, the Debtors have secured a $3.350 million postpetition senior secured super-priority debtor-in-possession credit facility (the "DIP Credit Facility") from Serene, which will be disbursed following approval by the Court.

18. The DIP Credit Facility was negotiated at arms' length with the Debtors, and also with GHP. Following such negotiations, Serene and GHP have agreed to support the amount and substance of the DIP Credit Facility.

19. The Debtors are in need of an immediate infusion of liquidity to, among other things, pay employee wages and benefits, fund certain operational expenses, maintain ordinary course relationships with vendors, suppliers, and customers, and satisfy working capital needs in the ordinary course. As of the Petition Date, the Debtors only have approximately $100,000 in cash on hand with which to operate their businesses and fund the Cases.

20. Force 10 undertook an analysis of the incremental liquidity that would be necessary to maintain operations in connection with the filing of the Cases. Based on the Debtors' 13-week cash flow forecast, the Debtors determined that they will have additional net cash needs of approximately $2,200,000 in the first 13-weeks of the Cases.

21. The Debtors, along with Force 10, and Serene and GHP negotiated the terms of the proposed DIP financing. As part of these negotiations, on the Debtors' behalf, I negotiated extensively with the other parties regarding the amount and extent of the DIP Credit Facility. The focus of those discussions was on the balance between the time needed to complete a successful postpetition marketing process for the Debtors' assets, and the extended costs and potential harm to the Debtors' businesses of operating in a chapter 11 case. I believe the proposed bid procedures (for which the Debtor will seek approval pursuant to a bid procedures and sale motion to be filed a few days after the Petition Date) and the proposed DIP financing strikes the right balance between these competing interests. The proposed DIP financing is very favorable to the Debtors because it provides sufficient funds to Debtors to fund operations, bears no interest or fees and has standard covenants which will enable the Debtors to operate without undue constraints.

22. The Debtors require the financing provided under the DIP Credit Facility for the operation of their businesses, to preserve their going concern value, to pay vendors, suppliers and customers, to satisfy payroll obligations, to pay for certain costs and expenses related to the Cases and to satisfy the Debtors' other working capital needs. Access to sufficient working capital and liquidity made available through the DIP Credit Facility is vital to the preservation and maintenance of the Debtors' going concern value and to the Debtors' ultimate goal of selling substantially all of their assets, as detailed in the Sale Motion.

23. It is my belief that the Debtors cannot sustain operations if they cannot obtain postpetition funds by way of a debtor-in-possession loan. To do so, the Debtors must obtain financing from Serene.

24. Despite the efforts of the Debtors and Force 10, the Debtors have been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a) or (b); or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought. Serene was unwilling to extend financing on terms more favorable to the Debtors, and the Debtors were not able to obtain alternative sources of financing upon more favorable terms.

25. I believe that the DIP Credit Facility represents the best possible terms for debtor-in-possession financing under the circumstances, following arm's-length negotiations and a thorough marketing process. The DIP Credit Facility, coupled with cash flow from operations, will permit the Debtors to fund their businesses through a controlled and orderly sale process. Without the funding provided by the DIP Credit Facility, the Debtors will experience an immediate liquidity shortfall and will be unable to conduct a sale process in a way that preserves value for its creditors. Thus, the DIP Credit Facility will enhance the Debtors' ability to minimize immediate disruption to their business and instill confidence among employees and service providers and ensure their continued support pending a sale of the Debtors' assets. In my opinion, approval of the DIP Motion is necessary because, without the ability to borrow funds from Serene, the Debtors will lack the cash to operate their businesses during the pendency of the Cases.

26. In my opinion, access to sufficient working capital and liquidity made available through the DIP Credit Facility, as requested in the DIP Motion, is vital to the preservation and

maintenance of the Debtors' going concern value and to the Debtors' ultimate goal of selling substantially all of their assets.

27. Based upon the aforementioned, and for the reasons stated in the DIP Motion and proposed order, I believe the Debtors have demonstrated good and sufficient reasons: (1) for approval of the proposed DIP Credit Facility; and (2) to grant Serene superpriority administrative claims and other liens and rights as set forth in the DIP Motion and the DIP Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: October 14, 2020
Newport Beach California

Adam Meislik