**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

*RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of October 9, 2020, by and among (i) YogaWorks, Inc., a Delaware corporation, Yoga Works, Inc. a California corporation (collectively, the "**Company**" or the "**Debtors**"); (ii) Serene Investment Management, LLC and its affiliates including without limitation Yogaworks Investment Fund, LLC, in its capacity as proposed DIP Lender and Stalking Horse Purchaser (the "**Purchaser**"); and (iii) Great Hill Equity Partners V, LP, in its capacity as [holder of approximately sixty (60) percent of the common equity interests of the Company] ("**Equity Holder**") and pre-petition secured lender ("**Prepetition Lender**" and with the Equity Holder, "**GHP**" and collectively, with the Debtors and the Purchaser, the "**Parties**").

*RECITALS*

**WHEREAS**, the Debtors plan to commence voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101- 1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, the Purchaser intends to (a) effectuate a prepetition purchase (the "**Debt Purchase**") of the Senior Secured Facility of the Company (the "**Senior Prepetition Debt**") from the Prepetition Lender, (b) enter into a stalking horse purchase agreement for substantially all the assets of the Company, and (c) offer the Debtors a debtor-in-possession financing facility funded with proceeds that would otherwise be paid to GHP in connection with the Debt Purchase (the "**DIP Facility**");

**WHEREAS**, the Debtors plan to effect a sale (the "**Asset Sale**") of substantially all of their assets pursuant to section 363 of the Bankruptcy Code to Purchaser or such higher and better bidder pursuant to bidding procedures to be agreed upon by the Parties and approved by the Bankruptcy Court and a restructuring through a liquidating chapter 11 plan of reorganization (the "**Plan**");

**WHEREAS,** in order to provide the funding necessary for the Debtors to file the Chapter 11 Cases, conduct the Asset Sale, consummate a sale to the Purchaser or a higher and better bidder and pursue confirmation of the Plan, GHP has agreed to allow the Purchaser to use proceeds that would otherwise be paid to GHP in connection with the Debt Purchase to fund the DIP Facility;

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding the Debt Purchase, DIP Facility, Asset Sale and Plan and desire to support and effectuate the Debt Purchase, Asset Sale and Plan pursuant to the terms and upon the conditions set forth in this Agreement;

**WHEREAS**, the Parties further desire to establish certain terms with respect to the Debt Purchase, DIP Facility, Asset Sale and Plan;

**WHEREAS**, each of the Debt Purchase, DIP Facility, Asset Sale and Plan are integral to one another and interdependent on one another; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Agreement Effective Date*. This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the date (such date, the "**Agreement Effective Date**") on which: (a) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Purchaser and counsel to the Prepetition Lender; (b) the Purchaser shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Debtors and counsel to the Prepetition Lender; (c) the Prepetition Lender shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Debtors and counsel to the Purchaser and (d) the Purchaser shall have paid the deposit on the Debt Purchase as required to be paid pursuant to Section 3.01(b) hereof. If the Agreement Effective Date shall not have occurred on or before October 30, 2020, all signature pages referred to in this Section 1 shall be returned to the Party providing the same and this Agreement, and all documents to which such signature pages apply, shall have no force or effect.

**Section 2.** *Definitive Documentation.* The definitive documents and agreements governing the Debt Purchase, Asset Sale and Plan (collectively, the "**Definitive Documentation**") is anticipated to consist, without limitation, of: (a) the Plan (and all exhibits thereto); (b) the order confirming the Plan (the "**Confirmation Order**") and pleadings in support of entry of the Confirmation Order; (c) the disclosure statement (the "**Disclosure Statement**") and the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"); and (d) the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (the "**Disclosure Statement Order**"); (e) the documentation in respect of the DIP Facility provided by the Purchaser (in such capacity, the "**DIP Lender**"), including the DIP credit agreement (the "**DIP Credit Agreement**"), the interim and final orders approving the DIP Facility (the "**Interim DIP Order**" and "**Final DIP Order**", respectively), the motion to approve the DIP Credit Agreement, and all other motions, briefs, affidavits, declarations, orders, and other documents related to the DIP Credit Agreement (collectively, the "**DIP Documentation**"); (f) the documentation in respect of the Asset Sale, including the asset purchase agreement (the "**APA**"), the orders approving the sale and any related bid procedures (the "**Sale Orders**") and all other motions, briefs, affidavits, declarations, orders, and other documents related to the Sale; (g) the documentation in respect of the Debt Purchase, including the Loan Sale Agreement (the "**Loan**

**Sale Agreement**"); (h) the certificates of incorporation, limited liability agreements, bylaws, and other organizational documents (as applicable) of the post-confirmation Debtors (the "**Post-Confirmation Debtors**"); and (i) all other documents that will comprise any Plan supplement or are otherwise related to the Plan. The Definitive Documentation remains subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and shall be subject to any consent rights set forth in this Agreement and otherwise be in form and substance acceptable to the Debtors, the Purchaser and GHP.

**Section 3.** *Commitments Regarding the Debt Purchase, Asset Sale and Plan.*

 3.01. Mutual Commitments Regarding the Debt Purchase.

 (a) Purchaser shall pay to the Prepetition Lender total consideration of $4,150,000 (the "**Debt Purchase Price**") for the purchase of the $10,000,000 Prepetition Lender's Senior Secured Facility of the Company, of which $800,000, less the $100,000 deposit, (the "**Prepetition Lender Direct Payment**") shall be remitted to the Prepetition Lender on the Agreement Effective Date and $3,350,000 shall be held by the Purchaser to fund the DIP Facility.

 (b) The Purchaser has remitted a $100,000 non-refundable deposit (the "**Deposit**") to the Prepetition Lender. The Deposit will be allocated in full to the Prepetition Lender Direct Payment.

 (c) The Purchaser, as DIP Lender, and the Prepetition Lender shall negotiate a DIP Facility with the Company on terms consistent with those set forth in Section 3.02, hereof.

 3.02. Mutual Commitments Regarding the DIP Facility.

 (a) The Purchaser shall provide the Debtors with a $3,350,000 super-priority DIP Facility on the Petition Date (the "**DIP Facility Amount**").

 (b) GHP shall allow the Purchaser to use proceeds that would otherwise be paid to GHP in connection with the Debt Purchase to fund the DIP Facility, but only when and in the amount approved by the Bankruptcy Court pursuant to the entry of each of the Interim DIP Order and Final DIP Order.

 (c) The Debtors shall seek authority to receive the DIP Facility in two draws: $1,000.000 upon entry of the Interim DIP Order (the "**Interim DIP Draw**"), and $2,350,000 upon entry of the Final DIP Order (the "**Final DIP Draw**").

 (d) The DIP Facility shall not bear interest.

 (e) No fees shall be paid to the Purchaser in connection with the DIP Facility.

 (f) If the Debtors' assets are sold to the Purchaser, repayment of the DIP Facility shall be forgiven upon the Effective Date of the Plan. If the Debtors' assets are sold to an entity other than the Purchaser, the DIP facility shall be repaid pursuant to its terms.

3

(g) The budget (the "**DIP Budget**") for use of the Interim DIP Draw and Final DIP Draw and/or and cash collateral budget shall be mutually agreed upon by and between the Debtors, the Purchaser and the Prepetition Lender, with customary covenants and agreed upon variances. The Debtors agree to ensure that the DIP Loan is used as set forth in the DIP Budget, subject to the agreed upon variance and the Prepetition Lender shall have consent rights over any changes to the DIP Budget or other similar terms or rights under DIP Facility.

(h) The Final DIP Draw shall include certain funds (the "**Plan Funding Advance**") necessary to fund payments, as set forth in the DIP Budget, required to be made pursuant to the Plan. The Plan Funding Advance shall be deposited in escrow and only released to the Debtors seven (7) days in advance of the hearing on confirmation of the Plan, and only provided that the Debtors are in material compliance with this Agreement.

(i) In exchange for the Prepetition Lender agreeing to allow a portion of the Debt Purchase Price to be used to fund the DIP Facility, the Interim DIP Order and the Final DIP Order shall include releases of the Prepetition Lender and its affiliates including without limitation Great Hill Investors, LLC ("**GHI**"), officers, directors and employees, etc., to the maximum extent permitted by law and satisfactory to the Prepetition Lender. The Interim DIP Order and Final DIP Order shall provide similar releases to the Purchaser and its affiliates.

(j) At the request of the Prepetition Lender, any unused portion of the DIP Facility as of the date immediately prior to the Effective Date of the Plan, less the amount necessary, as agreed by and between the Debtors, the DIP Lender and Prepetition Lender, to fund the wind-down of the Chapter 11 Cases including without limitation professional fees, shall be returned to DIP Lender who shall immediately remit same to the Prepetition Lender as consideration for the Debt Purchase.

3.03. Mutual Commitments Regarding the Asset Sale.

(a) The Debtors shall effectuate a post-petition Asset Sale of substantially all assets of the Debtors, but excluding the assets (the "**Excluded Assets**") set forth in Section 3.03(g), hereof.

(b) Prior to the Petition Date, the Debtors shall enter into a stalking horse agreement (the "**Stalking Horse Agreement**") with the Purchaser on terms mutually agreeable to the Debtors, the Purchaser and the Prepetition Lender, including, without limitation, a three (3)% break-up fee.

(c) The Stalking Horse Agreement shall provide, without limitation, that the Purchaser's initial credit bid under Section 363(k) of the Bankruptcy Code shall be $5,000,000 (the "**Stalking Horse Purchase Price**"). Purchaser shall not credit bid any portion of its DIP Facility claims but may credit bid any portion of its Senior Prepetition Debt.

(d) The minimum initial overbid in the Asset Sale shall be $100,000 over the Stalking Horse Purchase Price, plus the three (3)% break-up fee.

(e) Further bids shall be in increments of $50,000.

(f) The Purchaser may bid in cash or credit, as applicable.

(g) The following assets, without limitation, will be Excluded Assets in the Asset Sale: (a) all cash, cash equivalents, cash accounts, monies held or on deposit owned or held by the Company including in any savings accounts, checking accounts, certificates of deposit, money market accounts or other bank accounts; (b) all promissory notes receivable, accounts receivable and other receivables owned or held by the Debtors; and (c) any and all claims for relief and/or causes of action held by the Debtors against any third party, including but not limited, any fraudulent and/or preferential transfer(s) as provided under the Bankruptcy Code.

3.04. Mutual Commitments Regarding the Plan.

(a) The Company shall conduct its business in accordance with its ordinary, usual and normal course of prepetition business heretofore conducted by it. No Material Adverse Effects (as defined in the Interim DIP Order) for the digital business may occur prior to the Petition Date.

(b) In connection with the Asset Sale, the Purchaser intends to cure and assume the lease on the Company's headquarters, located at 2215 Main Street, Santa Monica, California, in the event that Purchaser and landlord of the Company's headquarters are able to agree on the terms of an amended lease. Any contractual cure cost shall be in addition to the Stalking Horse Purchase Price and shall not exceed $180,000.

(c) The Purchaser does not anticipate assuming or retaining any remaining leases unless an advantageous cure amount and future rent agreement can be negotiated. Such assumption shall be in the Purchaser's sole discretion and any cure amount shall be added to the Purchase Price.

(d) To facilitate the Plan, if the Purchaser is the successful bidder at the Asset Sale, the Purchaser shall waive all of its secured and unsecured claims related to the Senior Prepetition Debt upon consummation of the Asset Sale to the Purchaser.

(e) In exchange for the Prepetition Lender agreeing to allow a portion of the Debt Purchase Price to be utilized to fund the DIP Facility, the Plan shall include a release of GHP and its affiliates including without limitation GHI, officers, directors and employees, etc., to the maximum extent permitted by law and satisfactory to GHP. The Plan shall include similar releases for the Purchaser and its affiliates.

(f) The Debtors shall be responsible for all operational and bankruptcy related expenses of the Debtors until the closing of the Asset Purchase. The Purchaser shall be responsible for its own due diligence, oversight, and bankruptcy costs until the closing of the Asset Sale.

(g) During the period beginning on the Agreement Effective Date and ending on a Termination Date (as defined in Section 6.05, hereof) (such period, the "**Effective Period**"), the Debtors, subject to their fiduciary duties, the Purchaser and the Prepetition Lender shall:

(i) use good faith efforts to negotiate, execute and implement the Definitive Documentation on terms consistent with this Agreement and to implement the Debt Purchase, Asset Sale, DIP Facility and Plan;

(ii) not (A) object to, delay, interfere, impede, or take any other action to delay, interfere or impede, directly or indirectly, with the Debt Purchase, the Asset Sale, confirmation of the Plan, or approval of the Disclosure Statement or the Solicitation Materials (including joining in or supporting any efforts to object to or oppose any of the foregoing) or (B) propose, file, support, or vote for, directly or indirectly, any restructuring, workout, plan of arrangement, alternative transaction, including any alternative sale pursuant to section 363 of the Bankruptcy Code, or chapter 11 plan for the Debtors other than the Asset Sale and the Plan;

(iii) not, nor encourage any other person or entity to, take any action, including initiating or joining in any legal proceeding that is inconsistent with this Agreement, or delay, impede, appeal, or take any other negative action, directly or indirectly, that could reasonably be expected to interfere with the approval, acceptance, confirmation, consummation, or implementation of the Asset Sale or Plan, as applicable;

(iv) not object to or opt out of any release included in the Solicitation Materials or the Plan.

(h) Nothing contained herein nor any vote to accept the Plan or other acceptance of or support for the Plan shall limit (i) the rights of the Purchaser or the Prepetition Lender under applicable bankruptcy or insolvency law, or in any foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as the exercise of any such right is consistent with this Agreement.

3.05. <u>Further Commitments of the Debtors</u>.

(a) During the Effective Period, the Debtors, subject to their fiduciary duties, agree to:

(i) pursue the Asset Sale and Plan on terms consistent with this Agreement, including by obtaining an Asset Sale Order permitting the Purchaser to credit bid its Senior Prepetition Debt pursuant to Section 363(k) of the Bankruptcy Code, and not sign any agreement to pursue any alternative auction, sale process or other restructuring transaction for the Debtors or any significant portion of their assets outside of the ordinary course of business inconsistent with this Agreement;

(ii) use good faith efforts to obtain Bankruptcy Court approval of and implement this Agreement and the transactions and other actions contemplated hereby and thereby;

(iii) (A) support and complete the Debt Purchase, DIP Facility, Asset Sale and Plan and all transactions set forth in this Agreement, including consummation of the Debt Purchase and Asset Sale, confirmation of the Plan and entry of the Confirmation Order; (B) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the Agreement Effective Date; (C) execute and deliver any other required agreements to effectuate and consummate the Debt Purchase, Asset Sale or Plan; (D) make commercially reasonable efforts to obtain any required regulatory and/or third-party approvals for the Debt Purchase, Asset Sale and Plan; (E) complete the Debt Purchase, the Asset Sale and confirmation of the Plan in a timely and expeditious manner, and as otherwise required by this Agreement and the Definitive Documentation; (F) operate their business, subject to the Interim DIP Order and the Final DIP

Order, in the ordinary course, taking into account the Asset Sale and the commencement of the Chapter 11 Cases; and (G) not undertake any actions materially inconsistent with the Asset Sale or the pursuit, adoption and implementation of the Plan and confirmation thereof;

(iv)     not object to, delay, or impede, or take any other action that is materially inconsistent with, or is intended or is likely to interfere with, acceptance or implementation of the Plan;

(v)     not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documentation or any other document related to the Debt Purchase, Asset Sale, DIP Facility or Plan in a manner that is materially inconsistent with this Agreement; and

(vi)     not file any pleading that is materially inconsistent with the Asset Sale, the Plan or the terms of this Agreement.

(b)     During the Effective Period, the Debtors or Post-Confirmation Debtors, as applicable, further agree to the following affirmative covenants:

(i)     The Debtors shall provide counsel for the Purchaser and the Prepetition Lender, at least twenty-four (24) hours prior to the date when the Debtors intend to file such document draft, copies of all material motions and proposed orders intended to be filed with the Bankruptcy Court.  Notwithstanding the foregoing, all customary "first day" and "second day" motions and proposed orders (the "**First and Second Day Motions**") shall be provided to counsel for the Purchaser and the Prepetition Lender, at least three (3) days prior to the date when the Debtors intend to file such First and Second Day Motions.  The Debtors shall consult in good faith with such counsel regarding the form and substance of all such material proposed filings with the Bankruptcy Court;

(ii)     the Chapter 11 Cases shall be commenced on or before October 13, 2020 (the "**Petition Date**"), subject to extension with the consent of the Purchaser and the Prepetition Lender;

(iii)     the Debtors shall timely file a formal objection to any unresolved motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization under section 1121 of the Bankruptcy Code and shall consider filing a formal objection to any motion for derivative standing on behalf of any Debtor's estate to seek any relief adverse to the Purchaser or the Prepetition Lender;

(iv)     the Debtors shall timely file a formal written response in opposition to (or otherwise address in a manner reasonably acceptable to the Purchaser and the Prepetition Lender) any objection filed with the Bankruptcy Court with respect to (A) entry of the Interim DIP Order or the Final DIP Order or with respect to any adequate protection proposed to be granted or granted

to the DIP Lender pursuant to any cash collateral order, (B) the Asset Sale, (C) the Plan or Disclosure Statement or (D) this Agreement;

(v) the Debtors shall promptly notify the Purchaser and the Prepetition Lender in writing of any governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened); and

(vi) the Debtors shall promptly notify the Purchaser and the Prepetition Lender of any breach by the Debtors in respect of any of the obligations, representations, warranties or covenants set forth in this Agreement by furnishing written notice to the Purchaser and the Prepetition Lender pursuant to Section 8.09 hereof within two (2) calendar days of actual knowledge of such breach.

To the extent of any conflict between this Agreement and any DIP Documentation, Loan Sale Agreement or APA, this Agreement shall not be deemed to supersede or modify such DIP Documentation, Loan Sale Agreement or APA.

**Section 4.** *Mutual Representations, Warranties, and Covenants*. Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party:

4.01. Enforceability. It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

4.02. No Consent or Approval. Except as expressly provided in this Agreement, the Plan, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Debt Purchase, Asset Sale or Plan contemplated by, and perform the respective obligations under, this Agreement.

4.03. Compliance with Laws; No Conflict. The execution, delivery, and performance of this Agreement does not and shall not: (i) violate any provision of law, rules, or regulations applicable to it or any of its subsidiaries in any material respect; (ii) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Debt Purchase, Asset Sale or Plan.

4.04. Power and Authority. Except as expressly provided in this Agreement, each Party represents that it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Debt Purchase, Asset Sale and Plan contemplated by, and perform its respective obligations under, this Agreement, subject to Bankruptcy Court approval.

4.05. Governmental Consents. Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Asset Sale or Plan), the execution, delivery and

performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

**Section 5.**  *Acknowledgement*. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The Debtors will not solicit acceptances of the Plan in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 6.**  *Termination Events*.

> 6.01.  Purchaser and Prepetition Lender Termination Events.

(a)   *6.01.  Purchaser and Prepetition Lender Termination Events*. This Agreement may be terminated by either the Purchaser or Prepetition Lender with respect to the other Parties by the delivery to the other Parties, of a written notice in accordance with Section 8.09 hereof by the Purchaser or Prepetition Lender, upon the occurrence and continuation of any of the following events:

> (i)   any other Party, as applicable, materially breaches its obligations under this Agreement and such breach has not been cured (if susceptible to cure) within five (5) business days after the receipt by the breaching Party of written notice of such breach;

> (ii)   any Debtor publicly announces or informs the Purchaser or Prepetition Lender of its intention to pursue one or more restructuring transactions not consistent with this Agreement in any respect;

> (iii)   the breach in any material respect by any Debtors of their representations, warranties, or covenants set forth in this Agreement that, if susceptible to cure, remains uncured for a period of five (5) business days after the receipt by the Debtors of written notice of such breach;

> (iv)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order enjoining, the consummation of a material portion of the Asset Sale or Plan, provided, however, that the Debtors shall have five (5) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Asset Sale or Plan that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the Purchaser and Prepetition Lender;

> (v)   entry of an order by the Bankruptcy Court appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases;

9

(vi)     any Debtor files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within three (3) calendar days of receipt of notice by such Debtor that such motion or pleading is materially inconsistent with this Agreement;

(vii)    any Debtor announces or otherwise provides notice of, without the prior written consent of the Purchaser and Prepetition Lender, its intention to pursue any transaction outside of the ordinary course of business that is not consistent with this Agreement;

(viii)   the entry of a ruling or order by the Bankruptcy Court that would prevent consummation of the DIP Facility, Asset Sale or Plan; provided, however, that the Debtors shall have five (5) business days after the date of such ruling or order to seek a stay of such ruling or order and shall have ten (10) calendar days after issuance of such ruling or order to obtain relief that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the Purchaser and Prepetition Lender;

(ix)    the conversion or dismissal of the Chapter 11 Cases;

(x)     any of the Definitive Documentation shall have been modified without the prior written consent of the Purchaser and Prepetition Lender (such consent not to be unreasonably withheld);

(xi)    the occurrence of any Event of Default (as defined in the DIP Credit Agreement) under the DIP Facility unless such Event of Default has been waived in accordance with the terms thereof no later than three (3) business days following the occurrence thereof;

(xii)   the acceleration of the obligations under the DIP Credit Agreement;

(xiii)  the Bankruptcy Court enters an order in the Chapter 11 Cases terminating, or modifying without the prior written consent of the Purchaser and Prepetition Lender, the Debtors' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

(xiv)   any Debtor executes or files with the Bankruptcy Court any Definitive Documentation that does not conform to this Agreement or is otherwise not reasonably acceptable to the Purchaser and Prepetition Lender;

(xv)    the Bankruptcy Court enters a ruling or order that would preclude the Parties' ability to comply with any of the Milestones (as defined below);

(xvi)   the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) that would have a material adverse effect on the Asset Sale or the Plan, without the written consent of the Purchaser and Prepetition Lender;

(xvii)  either (A) any Debtor files with the Bankruptcy Court a motion, application, or adversary proceeding (or any Debtor supports any such motion, application, or adversary proceeding filed or commenced by any third party (including by consent to derivative standing on

10

behalf of any Debtor's estate for a third party to file such motion, application, or adversary proceeding, except for any such consent that may be set forth in the Interim DIP Order or the Final DIP Order)) (1) challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of, any prepetition claims of the Purchaser or Prepetition Lender or (B) the Bankruptcy Court enters an order providing relief against the Purchaser or Prepetition Lender with respect to any of the foregoing causes of action or proceedings filed by any Debtor;

(xviii)  any Debtor makes a payment or other transfer outside of the ordinary course of business, without the prior written consent of the Purchaser or Prepetition Lender, to any insider of any Debtor that is inconsistent with the terms of the Debtors' existing insider compensation plans;

(xix)  the Chapter 11 Cases are not commenced before the Bankruptcy Court by October 20, 2020;

(xx)  the Interim DIP Order has not been entered by the Bankruptcy Court by within five (5) calendar days of the Petition Date;

(xxi)  the motion to approve the Asset Sale and any applicable bid procedures has not been filed with the Bankruptcy Court within five (5) calendar days of the Petition Date;

(xxii)  the Final DIP Order has not been entered by the Bankruptcy Court within thirty (30) calendar days of the Petition Date;

(xxiii)  the Order approving bid procedures has not been entered by the Bankruptcy Court within thirty (30) calendar days of the Petition Date;

(xxiv)  the Order approving the Asset Sale has not been entered by the Bankruptcy Court within sixty (60) calendar days of the order approving bid procedures;

(xxv)  the Plan and Disclosure Statement have not been filed with the Bankruptcy Court within fifteen (15) calendar days of the entry of the order approving the Asset Sale;

(xxvi)  the Disclosure Statement Order has not been entered by the Bankruptcy Court within sixty (60) calendar days of the entry of the order approving the Asset Sale;

(xxvii) the Confirmation Order has not been entered by the Bankruptcy Court within ninety (90) calendar days of entry of the entry of the order approving the Asset Sale; and

(xxviii) the effective date of the Plan (the "**Plan Effective Date**")has not occurred within one hundred (100) calendar days following the entry of the order approving the Asset Sale (together with the milestones set forth in the foregoing clauses (xix) to (xxvii), collectively, the "**Milestones**").

The Milestones may be extended with the prior written consent of the Purchaser (prior to the consummation of the Asset Sale) and the Prepetition Lender.

11

6.02.  <u>Debtors' Termination Events</u>. The Debtors may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 8.09 hereof, upon the occurrence of any of the following events: (a) the breach by either of the Purchaser or Prepetition Lender of any material provision set forth in this Agreement that remains uncured for a period of five (5) business days after the receipt by the Purchaser or Prepetition Lender of notice of such breach; (b) the board of directors, board of managers, or such similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Asset Sale or Plan would be inconsistent with the exercise of its fiduciary duties; or (c) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Asset Sale or Plan; <u>provided</u> that, for the avoidance of doubt, a ruling by the Bankruptcy Court that the Plan is not confirmable as a result of terms included therein a shall not, by itself, constitute a termination event.

6.03.  <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among all of the following: (a) the Prepetition Lender, (b) the Purchaser and (c) each of the Debtors.

6.04.  <u>Termination Upon Completion</u>. This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

6.05.  <u>Effect of Termination</u>.

(a)  No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.  The date on which termination of this Agreement as to a Party is effective in accordance with Sections 6.01, 6.02, 6.03, or 6.04 shall be referred to as a "**Termination Date**."

(b)  Except as set forth below, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement.  Upon the occurrence of a Termination Date, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with this Agreement or otherwise.

(c)  Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit the Debtors, the Purchaser or the Prepetition Lender from contesting whether any such termination is in accordance with the terms of, or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and preserve its rights

(including rights under this Agreement), remedies, and interests, including its claims against any other Party.

**Section 7.** *Amendments*. This Agreement may not be modified, amended, or supplemented without prior written consent of the Debtors, the Purchaser and the Prepetition Lender.

**Section 8.** *Miscellaneous*.

8.01.   Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Debt Purchase, Asset Sale or Plan, as applicable.

8.02.   Complete Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

8.03.   Headings. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

8.04.   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF DELAWARE APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; provided, however, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive jurisdiction, rather than any Chosen Court.

8.05.   Trial by Jury Waiver. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.06.   Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

8.07. <u>Interpretation and Rules of Construction</u>. This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

8.08. <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

8.09. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a) if to the Company, to:

Yoga Works, Inc.
2215 Main Street
Santa Monica, California 90405
Attention: Brian Cooper
E-mail address: brian@yogaworks.com

with copies (which alone shall not constitute notice) to:

Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Attention: Alan J. Friedman
Email address:  afriedman@shulmanbastian.com

(b) if to the Prepetition Lender, to:

Great Hill Equity Partners V, LP
200 Clarendon St., 29th Floor
Boston, MA 02116
Attention: Michael Kumin, John Dwyer and Peter L. Garran
E-mail addresses:  mkumin@greathillpartners.com
   jdwyer@greathillpartners.com
   pgarran@greathillpartners.com

with copies (which alone shall not constitute notice) to:

        Sidley Austin LLP
        One South Dearborn
        Chicago, IL 60603
        Attention: Matthew A. Clemente and William E. Curtin
        E-mail addresses:  mclemente@sidley.com
                              wcurtin@sidley.com

(c)    if to the Purchaser, to:

        Serene Investment Management, LLC
        2148 Jimmy Durante Boulevard, Suite B
        Del Mar, CA 92014
        Attention: Adam Phillips
        E-mail address: adam@sereneim.com

        with copies (which alone shall not constitute notice) to:

        Loeb & Loeb LLP
        345 Park Avenue
        New York, New York 10154
        Attention: Peter Beardsley
        E-mail address: pbeardsley@loeb.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by delivery, mail, or courier shall be effective when received.

      8.10.   <u>Access</u>. Each Debtor agrees to (a) provide the Purchaser and the Prepetition Lender and their representatives with reasonable access to inspect such Debtor's financial records and properties provided that such visits shall be during normal business hours (which access shall include, for the avoidance of doubt, access, upon reasonable notice during normal business hours, to relevant properties, books, contracts, commitments, records, directors, officers, personnel, advisors and representatives of the Debtors) and (b) promptly provide such customary financial and other information regarding the Debtors and their respective businesses and operations that the Purchaser and the Prepetition Lender or their advisors may reasonably request to the extent that (i) such information is readily available to a Debtor, (ii) such information does not constitute trade secrets and (iii) the provision of such information is not prohibited by law or by the legally binding confidentiality obligations of any Debtor to a third party (other than another Debtor); <u>provided</u> that the Debtors shall use commercially reasonable efforts to obtain the consent of any such third party to provide such information to the Purchaser and the Prepetition Lender or their advisors on a confidential basis and use commercially reasonable efforts to communicate, to the extent permitted, the applicable information in a way that would not risk waiver of such privilege or violate the applicable obligation; <u>provided</u>, <u>further</u>, that the Debtors' obligations under this Section 8.10 shall be conditioned upon the applicable Purchaser and the Prepetition Lender or representative agreeing to maintain the confidentiality of such information in a manner mutually agreeable to the Parties.  In addition, each Debtor agrees to provide the Prepetition Lender and its

15

representatives with the reports and information delivered to the DIP Lenders under the DIP Orders contemporaneously with such delivery.

8.11.   Independent Due Diligence and Decision Making. Each Party hereby confirms that it is (a) a sophisticated party with respect to the matters that are the subject of this Agreement, (b) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement and acknowledges and agrees that it voluntarily and of its own choice and not under coercion or duress enters into the Agreement, (c) has adequate information concerning the matters that are the subject of this Agreement, and (d) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Agreement.

8.12.   Waiver. If the Debt Purchase, Asset Sale or Plan are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

8.13.   Automatic Stay. The Company acknowledges and agrees, and shall not dispute, that the giving of a termination notice in accordance with Section 6. 6 and 8.09 hereof by the Purchaser or the Prepetition Lender shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of such automatic stay to the giving of such notice), and the Purchaser and the Prepetition Lender are hereby authorized to take any steps necessary to effectuate the termination of this Agreement notwithstanding section 362 of the Bankruptcy Code or any other applicable law, and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the Purchaser and the Prepetition Lender.

8.14.   Settlement Discussions; No Admission. This Agreement, the Debt Purchase, the Asset Sale and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.

8.15.   Several, Not Joint, Claims. The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

8.16.   Severability. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

8.17.   Specific Performance/Remedies. It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party

16

and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorney's fees and costs) as a remedy for any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, at law or equity, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Chosen Court or the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

8.18.    <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

[*Remainder of page intentionally left blank.*

IN WITNESS WHEREOF, the Debtors, the Purchaser and the Prepetition Lender have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

DEBTORS:     YOGAWORKS, INC, and YOGA WORKS, INC.

_____
Brian Cooper
Chief Executive Officer

*[Additional signature pages to the Restructuring Support Agreement to follow]*

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF, the Debtors, the Purchaser and the Prepetition Lender have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

PURCHASER:	SERENE INVESTMENT MANAGEMENT, LLC

By:_____
Adam Phillips
Principal

*[Additional signature pages to the Loan Sale Agreement to follow]*

[Signature Page to Restructuring Support Agreement]

IN WITNESS WHEREOF, the Debtors, the Purchaser and the Prepetition Lender have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

PREPETITION LENDER:     GREAT HILL EQUITY PARTNERS V, L.P.,
a Delaware limited partnership

By: Great Hill Partners GP V, L.P., its general Partner

By: GHP V, LLC, its general partner

By: _____
Michael Kumin
Manager

[Signature Page to Restructuring Support Agreement]