**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YOGAWORKS, *et al.*, | ) | Case No. 20-12599 – KBO |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**MOTION OF DEBTORS FOR ORDER APPROVING DEBTORS' ASSUMPTION OF AND ENTRY INTO THE RESTRUCTURING SUPPORT AGREEMENT**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned counsel, hereby file this motion (the "Motion") for the entry of an order authorizing the Debtors' assumption of and entry into the Restructuring Support Agreement ("RSA") entered into by and among the Debtors, Serene Investment Management, LLC ("Serene") and its affiliates including without limitation Yogaworks Investment Fund LLC ("YWIF" or "Stalking Horse") and Great Hill Equity Partners V, LP ("GHP"), a true and correct copy of which is attached hereto as **Exhibit 1**, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

In support of this Motion, the Debtors rely upon, and incorporate by reference, the First Day Declaration of Brian Cooper [Docket 11] (the "First Day Declaration") in support of the Debtors' voluntary petitions (the "Chapter 11 Petitions") for chapter 11 relief, commencing the above-captioned chapter 11 cases (the "Cases") and the first day pleadings and applications (the "First Day Pleadings"), filed concurrently herewith, each of which is incorporated by reference as if set forth herein, and in further support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number is (1) YogaWorks, Inc., a Delaware corporation (9105); and (2) Yoga Works, Inc., a California corporation (0457).

## JURISDICTION, VENUE, AND STATUTORY PREDICATE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

2. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Ruled 9014.

## BACKGROUND

### A. Summary of the Debtors' Business and Events Leading to Bankruptcy

5. The Debtors operated a yoga business with over sixty (60) studio locations across the United States in Los Angeles, Orange County, Northern California, New York City, Boston, Baltimore, the Washington, D.C. area, Houston and Atlanta until March 2020 when the Debtors closed all of their storefront locations in response to the operating restrictions tied to the COVID-19 pandemic. While a few of the stores reopened for a short period of time, the Debtors closed all of their studios indefinitely in September 2020. The Debtors' corporate headquarters was located in Culver City, California until mid-2020 when it was moved to Santa Monica, California.

6. The company was founded in 1987 with one studio in Santa Monica, California and grew significantly over the years to over seventy (70) studios at one time. The Debtors also expanded their business models to include teacher training and in 2013, began offering pre-recorded classes digitally.

7.      The Debtors continued expanding and YogaWorks went public in 2017 (they voluntarily de-listed from the NASDAQ in early 2020). Unfortunately, unexpected operational challenges caused the enterprise to falter. As a result, the Debtors started to lose money.

8.      During the first half of 2019, the Debtors attempted to find a buyer using investment banker Guggenheim Securities ("Guggenheim") but those efforts were unsuccessful. The Debtors were trying to improve their finances when the COVID-19 pandemic hit and the Debtors were forced to close all of their studios. The closure of the studios left the Debtors with significantly decreased revenue.

9.      Fortunately, the Debtors quickly developed a robust and successful live streaming digital platform that has allowed it to survive and find a buyer for substantially all of its assets.

10.     In approximately May 2020, the Debtors re-engaged Guggenheim as well as Force Ten Partners, LLC ("Force 10"), an advisory firm specializing in business restructuring and sourcing buyers for distressed businesses, to help them find a buyer for the business. Guggenheim approached at least twenty (20) private equity firms and other potential bidders who participated in the out-of-court financing solicitation, to discuss interest in a restructuring. At the same time, Force 10 approached approximately thirty-five (35) parties. Through those discussions, the Company, in its business judgment, agreed to terms with YWIF regarding a "stalking horse" bid to purchase the Company's assets. The Stalking Horse has agreed to purchase certain of the Company's assets, including the Company's brand and intellectual property (collectively, the "Purchased Assets").

11.     The Debtors filed these Cases to complete the open and competitive process begun more than three (3) months ago, in order to sell substantially all of their assets, with YWIF acting as the stalking horse purchaser for the Purchased Assets. The Debtors intend to maintain their current operations of offering live stream and on-demand classes through YogaWorks Live and My YogaWorks while this sale process is ongoing with the goal of selling part or all of their businesses as a going concern and thereafter intend to discontinue operations, liquidate any remaining unsold assets and wind up their estates.

12. Concurrently with this Motion, the Debtors are filing a motion seeking approval of the sale of substantially all of its assets (the "Asset Sale") and bidding procedures related the Asset Sale. The Agreement allows the Debtors to continue pursuing a sale of substantially all of their assets while at the same time locking in a purchase price of $5 million. This would not be possible without the efforts of GHP, Serene, and YWIF to allow the Debtors DIP financing and use of Serene's and YWIF's cash collateral while the sale process proceeds.

13. A more thorough and complete discussion of the Debtors' history, their operations and efforts surrounding the marketing of the Debtors' businesses is set forth in the First Day Declaration, which is incorporated herein.

**B.    The Debtors' Prepetition Indebtedness**

14. Prior to the Petition Date, the Debtors had outstanding funded debt in the principal amount of $10.0 million with Avidbank. The Credit Agreement and related documents were subsequently assigned by Avidbank to GHP and then assigned prior to the Petition Date by GHP to YWIF (the "GHP Loan"). The GHP Loan is secured by a senior lien on substantially all of the assets of YogaWorks and Yoga Works. As of the Petition Date, $10.0 million remains outstanding under the GHP Loan, plus accrued and unpaid interest, fees and expenses.

15. Serene agreed to provide the Debtors a Credit Facility in the principal amount of $3,350,000 pursuant to the terms of the DIP Credit Agreement ("the "DIP Credit Facility"). Serene only agreed to provide the Credit Facility if, pursuant to the RSA, GHP would agree that a portion of the purchase price consideration for the purchase and assignment of the GHP Loan to YWIF, as an affiliate of Serene, could and would be used for Serene to fund the entirety of the DIP Credit Facility. The DIP Credit Facility was approved on an interim basis pursuant to a Court order entered on October 16, 2020 and is scheduled for a final hearing on November 4, 2020.

16. The Debtors also owe material amounts, on an unsecured basis, to their landlords, totaling at least $5.4 million. The Debtors owe other unsecured debts to trade vendors and the like of approximately $2 million, plus $1 million in a wage and hour litigation settlement, and another approximately $800,000 for taxes, wages and other debts likely entitled to priority status.

**C.     Filing of the Bankruptcy Case**

17.     The Debtors are authorized to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18.     No official committee has been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

19.     Pursuant to an order entered on October 16, 2020, the Debtors' two (2) cases are being jointly administered.

**D.     The Restructuring Support Agreement**

20.     Although the Debtors desired to: (1) file the Cases, (2) effectuate the Asset Sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code with YWIF acting as the stalking horse purchase for the Purchased Assets, (3) confirm a liquidating chapter 11 plan (the "Plan") paying creditors, and (4) wind down remaining operations, they lacked funds to accomplish any of those objectives.

21.     During the process of searching for a party to extend debtor in possession funding, the Debtors and GHP explored various mechanisms by which the parties' goals could be accomplished.  The Debtors needed to obtain financing to allow for the sale process to be completed while maintaining virtual operations so that the Debtors' customers could continue to support the business and remain customers once the Purchased Assets were sold.  At the same time, GHP was interested in exiting the credit it had obtained by taking an assignment of the Avidbank Credit Agreement, all the while remaining supportive of the Debtors' efforts to complete a sale transaction and emerge with the virtual business intact.

22.     To that end, the Debtors, GHP, and ultimately Serene engaged in extensive negotiations which would not only accomplish those goals, but also enable YWIF, as an affiliate of Serene, to participate in the sale process as the stalking horse bidder.  It was ultimately determined that the preferred structure was for YWIF, as an affiliate of Serene, to purchase the GHP Loan at an agreed upon price and for GHP to allow Serene to lend the majority of the sale proceeds to the Debtors in the form of DIP financing.  As part of those negotiations, the parties

endeavored to create a structure which benefitted all parties, albeit in different ways. The result of those extensive negotiations was the RSA.

23. Accordingly, after good faith, arm's-length negotiations, the Debtors, GHP and Serene, including YWIF, entered into the RSA designed to allow the Debtors to meet their objectives of filing the Cases, effectuating the Asset Sale and confirming a Plan, a true and correct copy of which is attached to the Motion as **Exhibit 1**.

24. The RSA provides for a series of transactions—the prepetition debt purchase (the "Debt Purchase"), DIP Credit Facility, Asset Sale and Plan—all of which are integral to one another and interdependent on one another.

a. Debt Purchase – The RSA provides for a prepetition debt purchase whereby YWIF paid to GHP total consideration of $4,150,000 for the purchase of the $10,000,000 GHP Loan, of which only $800,000, was actually remitted to GHP, as GHP agreed that $3,350,000 could be held by Serene to fund the DIP Credit Facility to enable the Debtors not only to conduct the Asset Sale, but to fund both a liquidating chapter 11 plan and the wind-down of remaining operations.

b. DIP Facility – The RSA provides that Serene will provide the Debtors with a $3,350,000 DIP Credit Facility and that GHP will allow Serene to use proceeds that would otherwise be paid to GHP in connection with the prepetition Debt Purchase to fund the DIP Credit Facility. The RSA further provides that the Debtors shall seek authority to receive the DIP Credit Facility in two draws: $1,000.000 upon entry of the interim DIP order and $2,350,000 upon entry of the final DIP order, including certain funds necessary to fund payments required to be made pursuant to the Debtors' Plan, which are to be deposited in escrow and only released to the Debtors in advance of the hearing on confirmation of the Plan if the Debtors are in compliance with the RSA. As noted in prior filings with the Court, the DIP Facility is both interest and fee free, a significant and almost unheard of benefit for the Debtors. In exchange for GHP agreeing to allow a portion of YWIF's purchase price for the GHP Loan to be used by Serene to fund the DIP Credit Facility, the RSA provides that the interim DIP order and the final DIP order shall include releases

of GHP and its affiliates, officers, directors and employees, etc., to the maximum extent permitted by law and satisfactory to GHP. Finally, the RSA provides that any unused portion of the DIP Credit Facility as of the date immediately prior to the Effective Date of the Plan, less the amount necessary, as agreed by and among the Debtors, GHP and Serene (including YWIF), to fund the wind-down of the Cases including without limitation professional fees, shall be returned to Serene who shall immediately remit same to GHP as consideration for the Debt Purchase.

c. The Asset Sale – The RSA provides that the Debtors shall effectuate a post-petition Asset Sale of substantially all assets of the Debtors and enter into a stalking horse agreement with YWIF on terms, including, without limitation, a $5,000,000 purchase price, a three (3)% break-up fee, an initial overbid of $100,000 plus the break-up fee and subsequent bidding increments of $50,000.

d. The Plan – In recognition of and return for GHP making the DIP financing, the Asset Sale and confirmation of the Plan possible, the RSA provides that in exchange for GHP agreeing to allow the majority of YWIF's purchase price for the GHP Loan to be used by Serene to fund the DIP Credit Facility, the Debtors' Plan shall include releases of GHP and its affiliates including without limitation GHI, officers, directors and employees, etc., to the maximum extent permitted by law and satisfactory to GHP. The RSA also provides for the Plan to contain a release of Serene and its affiliates, including YWIF.

25. For the reasons discussed below, Debtors request approval and assumption of the RSA.

## RELIEF REQUESTED

26. The Debtors seek, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, entry of an order approving the assumption of and entry into the RSA between and among the Debtors, Serene, including YWIF, and GHP, dated October 9, 2020, a copy of which is attached to the Motion as **Exhibit 1,** and such other relief as the Bankruptcy Court may find just and proper.

27. The relief sought herein is essential to the successful prosecution of these cases, is the product of good faith, arms' length negotiations by and among the Debtors, Serene, including YWIF, and GHP, and should be approved.

## BASIS FOR RELIEF REQUESTED

### A. Assumption of the RSA is Proper and in the Best Interest of the Debtors' Estates and Creditors.

28. Approval of assumption and entry into the RSA is in the best interests of the estates and is supported by the Debtors' sound business judgment.

29. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Approval of a debtor's actions under section 363(b)(1) of the Bankruptcy Code requires the debtor to show that its decision was based on its business judgment. *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.,* No. 06-11202, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (*quoting In re Exide Techs., Inc.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

30. Likewise, section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts reviewing a debtor's decision to assume or reject an executory contract or unexpired lease apply a business judgment standard. *See In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of

executory contracts and unexpired leases”). Debtors receive considerable discretion in determining whether to assume or reject an executory contract. *Stanziale v. Machtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). Once “the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor’s conduct.” *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

31. Accordingly, so long as a debtor exercises “reasonable” business judgment, a court should approve the proposed assumption or rejection. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993) (“This Court has broad discretion to approve a settlement or compromise, and it should do so unless the proposed settlement falls below the lowest point in the range of reasonableness.”).

32. Once the debtor articulates a valid business justification, the business judgment rule creates “a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.” *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted). The debtor’s business judgment “should be approved by the court unless it is shown to be ‘so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.’” *In re Aerovox, Inc.*, 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234) (Bankr. E.D. Mo. 1991). “Courts are loathe to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence.” *Integrated Res.*, 147 B.R. at 656.

33. The RSA represents an essential step toward the Debtors’ intended chapter 11 liquidation plan. Without the support of GHP memorialized in the RSA, the Debtors would be unable to have filed the Cases, secured the DIP financing, effectuate the Asset Sale or fund and confirm the Plan. Accordingly, the terms of the RSA represent a sound and reasonable exercise

of the Debtors' business judgment as it secures the financial support of Serene and GHP while the Debtors move toward a sale of their assets.

34. Approval of the Debtors' assumption of and entry into the RSA will enable the Debtors to move expeditiously toward the Asset Sale and confirmation and consummation of a Plan, as well as provide the financial support to both continue operations pending the Asset Sale and wind down operations after the Asset Sale. Specifically, without GHP's assistance with respect to the DIP Credit Facility and the Asset Sale, as well as its agreement to allow the majority of the purchase price of the GHP Loan to be used to provide DIP financing to the Debtors, the Debtors unequivocally would not have the ability to proceed with the Asset Sale or the Plan.

35. Accordingly, the Debtors submit it is appropriate and in their estates' best interests for the Court to authorize the Debtors to assume and enter into and act in accordance with the RSA in obtaining DIP financing, effectuating the Asset Sale and proposing and seeking approval of a Plan in their Cases.

36. Based on the foregoing, the Debtors seek approval of assumption and entry into the RSA.

**B.     Request for Immediate Relief and Waiver of Stay**

37. Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b). The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

38. The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, and that Bankruptcy Rule 6003 has been satisfied.

39. In addition, in order to implement the foregoing successfully, the Debtors respectfully request a waiver of the 14-day stay of an order authorizing the use, sale, or lease of

property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the operations, value, and ability of the Debtors to reorganize.

40. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

**NOTICE**

41. Notice of the Motion has been given by the Debtors to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); (ii) counsel to the DIP Lender and its counsel; (iii) all known holders of liens upon the Debtors' assets; (iv) counsel to GHP and its counsel; and (v) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; by facsimile transmission, email, overnight courier and/or hand delivery.

42. The Debtors respectfully submit that, under the circumstances, such notice of the Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rule 2002, and the Local Rules, and in light of the nature of the relief requested, no other or further notice need be given.

**NO PRIOR REQUEST**

43. The Debtors previously requested the relief requested herein as part of its First Day Motion for Order (I) Authorizing Debtors to Obtain Post-Petition Financing and Use Cash Collateral; (II) Granting Liens and Super-Priority Claims and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Approving Debtors' Assumption of and Entry Into the Restructuring Support Agreement; and (V) Granting Related Relief. At the hearing held on such motion on October 16, 2020, the Court advised that approval of the RSA should be requested via separate motion. As such, the Debtors now file the instant Motion.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated: October 20, 2020

**COZEN O'CONNOR**

*/s/Thomas J. Francella*
Thomas J. Francella, Jr. (DE Bar No. 3835)
Thomas M. Horan (DE Bar No. 4641)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 250-4495
E-mail: tfrancella@cozen.com
E-mail: thoran@cozen.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman, Esquire
Melissa Davis Lowe, Esquire
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Telephone: (949) 340-3400
Facsimile: (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com

*Proposed Counsel to the Debtors and Debtors in Possession*