## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YOGAWORKS, INC., *et al.*[1] | Case No. 20-12599 (KBO) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT TO JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**COZEN O'CONNOR**
Thomas J. Francella, Jr., Esq. (No. 3835)
Thomas M. Horan, Esq. (No. 4641)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2000
Facsimile:   (302) 250-4495
E-mail: tfrancella@cozen.com
E-mail: thoran@cozen.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman, Esq.
Melissa Davis Lowe, Esq.
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com

*Counsel to the Debtors and Debtors in Possession*

**MORRIS JAMES LLP**
Eric J. Monzo, Esq. (No. 5214)
Brya M. Keilson, Esq. (No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

and

**KILPATRICK TOWNSEND & STOCKTON LLP**
David M. Posner, Esq. (admitted *pro hac vice*)
Gianfranco Finizio, Esq. (admitted *pro hac vice*)
1114 Avenue of the Americas
New York, NY  10036-7703
Telephone: (212) 775-8840
Facsimile: (646) 786-4442
E-mail: gfinizio@kilpatricktownsend.com
E-mail: dposner@kilpatricktownsend.com

*Counsel to the Official Committee of Unsecured Creditors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification numbers are (1) YogaWorks, Inc., a Delaware corporation (9105); and (2) Yoga Works, Inc., a California corporation (0457).

## TABLE OF CONTENTS

**Pages**

DISCLAIMER ......................................................................................................................1

I.      INTRODUCTION AND SUMMARY .........................................................................2
        A.      Overview..........................................................................................................2
        B.      Summary of Classification and Treatment Under the Plan ...............................3
        C.      Voting and Confirmation Procedures ...............................................................4

II.     THE DEBTORS' BUSINESS AND DEBT STRUCTURE AND EVENTS LEADING
        TO COMMENCEMENT OF THE CHAPTER 11 CASES ...........................................6
        A.      Overview of the Debtors' Businesses ...............................................................6
        B.      The Debtors' Prepetition Indebtedness ............................................................8
        C.      Events Leading to the Chapter 11 Cases..........................................................8

III.    SIGNIFICANT EVENTS DURING THE DEBTORS' CHAPTER 11 CASES.................9
        A.      Overview of Chapter 11 and Commencement of Chapter 11 Cases in General......9
        B.      First Day Motions and Orders.........................................................................10
        C.      Retention of Debtors' Professionals ...............................................................11
        D.      Appointment of Creditors' Committee and Retention of Professionals ...............11
        E.      Debtor-in-Possession Financing and Use of Cash Collateral ................................12
        F.      The Sale of Substantially All of the Debtors' Assets ...........................................13
        G.      Claims Process and Bar Dates ........................................................................14
        H.      Key Employee Retention Plan ........................................................................14
        I.      Settlement of Certain Alleged Preference and Other Claims ................................15
        J.      Other Post Petition Activities..........................................................................15

IV.     OVERVIEW OF THE PLAN......................................................................................16
        A.      General ...........................................................................................................16
        B.      Classification of Claims and Equity Interests .................................................16
        C.      Treatment of Claims and Equity Interests Under the Plan ....................................17
        D.      Implementation of the Plan and Plan Administrator...........................................21
        E.      Voting ............................................................................................................26
        F.      Substantive Consolidation ..............................................................................26
        G.      Remaining Executory Contracts and Unexpired Leases......................................27
        H.      Provisions for Resolving and Treating Claims and Equity Interests ....................28
        I.      Conditions Precedent ......................................................................................28
        J.      Modification, Revocation or Withdrawal of the Plan...........................................30
        K.      Retention of Jurisdiction ................................................................................30
        L.      Discharge, Injunction and Releases ................................................................31
        M.      Miscellaneous Provisions................................................................................35

V.      ACCEPTANCE AND CONFIRMATION OF THE PLAN...........................................37
        A.      Acceptance of the Plan....................................................................................38
        B.      Confirmation ..................................................................................................38

VI.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .........42

VII.    RISK FACTORS ...................................................................................................43
       **A.**     Certain Bankruptcy Related Considerations ..........................................43

VIII.  ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION ............44
       **A.**     Alternative Plans........................................................................................44
       **B.**     Chapter 7 Liquidation ...........................................................................44

IX.     RECOMMENDATION AND CONCLUSION...................................................................45

LEGAL\50997186\1

## DISCLAIMER

THE DEBTORS AND THE CREDITORS' COMMITTEE (COLLECTIVELY, THE "PLAN PROPONENTS") ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. WHILE THE DEBTORS BELIEVE THAT THIS SUMMARY IS FAIR AND ACCURATE AND PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, SUCH SUMMARY IS QUALIFIED TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS IN THE PLAN, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN UNLESS SO SPECIFIED. WHILE THE DEBTORS HAVE MADE EVERY EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES REASONABLY CAN BE EXPECTED TO AFFECT MATERIALLY THE VOTE ON THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT THAT CERTAIN EVENTS, SUCH AS THOSE MATTERS DISCUSSED IN SECTION VII BELOW ENTITLED "RISK FACTORS", DO OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST

**THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.**

**WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE INFORMATION CONTAINED HEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.**

## I.    INTRODUCTION AND SUMMARY

### A.    Overview

YogaWorks, Inc., a Delaware corporation and Yoga Works, Inc., a California corporation, as debtors and debtors-in-possession, (collectively, the "Debtors"), together with the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in these Chapter 11 Cases, transmit this Disclosure Statement (as may be further amended, the "Disclosure Statement") pursuant to Section 1125(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in connection with the *Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditors*, dated February 16, 2021 (as may be further amended, the "Plan"), in order to provide adequate information to enable holders of Claims and Equity Interests that are impaired under (and entitled to vote on) the Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan. A copy of the Plan is annexed hereto as **Exhibit A**. All capitalized terms used but not defined in this Disclosure Statement shall have the respective meanings ascribed to them in the Plan, unless otherwise noted.

The Plan provides a means by which the proceeds from the Debtors' assets already liquidated or to be liquidated over time to be distributed to holders of Allowed Claims under Chapter 11 of the Bankruptcy Code, and sets forth the treatment of all Claims against the Debtors. As described in more detail below, the Debtors have consummated the Court-approved sale of substantially all of their assets (collectively, the "Sale Assets") by selling substantially all of the Debtors' operating assets pursuant to that certain Asset Purchase Agreement dated as of December 22, 2020. The Plan provides for the distribution to creditors of the proceeds of the Sale Assets and the sale, liquidation or other disposition of the Debtors' remaining assets as discussed herein.

---

**THE DEBTORS AND THE CREDITORS' COMMITTEE SUPPORT THE PLAN AND ENCOURAGE ALL CREDITORS ENTITLED TO VOTE THEREON TO VOTE TO ACCEPT THE PLAN.**

---

**EACH HOLDER OF A CLAIM AGAINST THE DEBTORS THAT IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE**

**EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

In addition to the Plan, an Order of the Court (the "Disclosure Statement Approval Order") which, among other things, approves the Disclosure Statement and establishes certain procedures and deadlines with respect to the solicitation of votes to accept or reject the Plan, is attached to this Disclosure Statement as **Exhibit B**.

The Disclosure Statement Approval Order sets forth the deadlines for voting to accept or reject the Plan and for filing objections to confirmation of the Plan. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Approval Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification and valuation of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

## B.    Summary of Classification and Treatment Under the Plan

The following table summarizes (a) the classification of Claims and Equity Interests under the Plan, (b) which Classes are Impaired by the Plan, (c) which Classes are entitled to vote on the Plan, and (d) the estimated recoveries for Holders of Claims and Equity Interests in each Class to the extent such recovery can be estimated. The table is qualified in its entirety by reference to the full text of the Plan. A more detailed description of the Plan is set forth in Section IV of this Disclosure Statement entitled "Overview of The Plan".[2]

| Class | Type of Claim | Treatment of Allowed Claims | Estimated Recovery | Voting? |
|---|---|---|---|---|
| 1 | General Unsecured Claims | All Holders of Allowed General Unsecured Claims will receive their Pro Rata share of the GUC Cash; their Pro Rata share of the proceeds or property derived from the Retained Assets; and if any such Holder submits a Ballot and checks the opt-in box, such Holder shall be deemed a Released Party. Class 2 is estimated to include approximately $17 million in General Unsecured Claims. | 2 % | Yes |
| 2 | Convenience Class Claims | All Holders of General Unsecured Claims against the Debtors that are (i) in an amount equal to or less than $26,000; or (ii) in an amount that has been reduced to | 3% | Yes |

---

[2]    This summary contains only a brief and simplified description of the classification and treatment of Claims under the Plan. It does not describe every provision of the Plan. Accordingly, reference should be made to the entire Disclosure Statement (including exhibits) and the Plan for a complete description of the classification and treatment of Claims.

3

| Class | Type of Claim | Treatment of Allowed Claims | Estimated Recovery | Voting? |
|---|---|---|---|---|
| | | *$26,000 pursuant to a Convenience Class Election made by the Holder of such Claim will receive a distribution of 3% of the amount of the Holder's Allowed General Unsecured Claim no later than forty-five (45) days after the Effective Date; and if any such Holder submits a Ballot and checks the opt-in box, such Holder shall be deemed a Released Party.* | | |
| 3 | Equity Interests | *On the Effective Date, all Equity Interests in the Debtors shall be cancelled and holders of Equity Interests will not receive or retain anything under the Plan on account of such Equity Interests.* | *0%* | *No (deemed to reject)* |

## C.    **Voting and Confirmation Procedures**

As set forth above, accompanying this Disclosure Statement are copies of, among other things, the following documents: (i) the Plan, which is annexed hereto as **Exhibit A**, and (ii) the Disclosure Statement Approval Order, which is annexed hereto as **Exhibit B**, approving (a) this Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, (b) procedures for the solicitation and tabulation of votes to accept or reject the Plan, (c) the notice of and fixing (1) the time for submitting acceptances or rejections to the Plan, (2) the hearing to consider confirmation of the Plan, (3) the time for filing objections to confirmation of the Plan and (4) other deadlines and notice procedures.

1.    <u>Who May Vote</u>

Only holders of claims against or equity interests in a chapter 11 debtor that are in "impaired" (as defined in section 1124 of the Bankruptcy Code) classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of a claim or equity interest in an impaired class will not receive or retain any distribution under a plan on account of such claim or equity interest, section 1126(g) of the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, all such holders do not actually vote on the plan. If a class of claims or equity interests is not impaired by the plan, section 1126(f) of the Bankruptcy Code conclusively presumes the holders in such class to have accepted the plan and, accordingly, such holders are not entitled to vote on the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

LEGAL\50997186\1

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan, in each case, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code. The Bankruptcy Code defines "acceptance" of a plan by a class of equity interests as acceptance by holders in that class that hold at least two-thirds (2/3) in amount of the equity interests that cast ballots for acceptance or rejection of the plan, in each case, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

As set forth above, Classes 1 and 2 are impaired and entitled to vote on the Plan. Class 3 is impaired but is not receiving or retaining anything under the Plan and as such, is not entitled to vote. Accordingly, the Ballots, the Plan, this Disclosure Statement and the related materials delivered together herewith, are being furnished to holders of Claims in Classes 1 and 2 for purposes of soliciting votes on the Plan. The Disclosure Statement is also available at no cost upon request to holders of Equity Interests in Class 3 and other persons or entities, solely for informational purposes.

2.      Voting Procedures

All votes to accept or reject the Plan must be cast by using the form of Ballot. No votes other than ones using such Ballot will be counted except to the extent the Court orders otherwise. The Bankruptcy Court has determined that _____, 2021, has been established as the date (the "Voting Record Date") for the determination of holders of record of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. As set forth above, the Disclosure Statement Approval Order sets forth the deadlines for voting to accept or reject the Plan and for filing objections to confirmation of the Plan. In addition, detailed voting instructions accompany each Ballot.

After carefully reviewing the Plan, the Disclosure Statement Approval Order and this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan on the appropriate Ballot (if applicable) and return such Ballot in the enclosed envelope to BMC Group, the Debtors' balloting agent (the "Balloting Agent"), at the following address:

**IF BY FIRST CLASS MAIL:**

BMC Group
Attn: YW Plan Ballot
PO Box 90100
Los Angeles, CA 90009

LEGAL\50997186\1

**IF BY OVERNIGHT MAIL OR HAND DELIVERY:**

BMC Group
Attn: YW Plan Ballot
3732 West 120th Street
Hawthorne, CA 90250

**IF ONLINE:**

ballots.bmcgroup.com/yogaworks

     **BALLOTS MUST BE PHYSICALLY RECEIVED BY THE BALLOTING AGENT ON OR BEFORE [_:_]0 P.M. (PREVAILING EASTERN TIME) ON [_____], 2021 (THE "<u>VOTING DEADLINE</u>").**

     **ANY BALLOT THAT IS NOT TIMELY RETURNED TO THE BALLOTING AGENT IN CONFORMITY WITH THE INSTRUCTIONS PROVIDED IN THE APPLICABLE BALLOT WILL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN. DELIVERING TO THE BALLOTING AGENT AN OTHERWISE PROPERLY COMPLETED BALLOT THAT IS NOT APPLICABLE TO YOUR CLASS WILL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN. ANY BALLOT THAT IS EXECUTED AND RETURNED, BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL, IN EACH CASE, NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN. ANY BALLOT THAT IS EXECUTED AND RETURNED THAT AFFIRMATIVELY OPTS IN TO THE RELEASES DESCRIBED IN THE PLAN SHALL BE DEEMED TO HAVE ACCEPTED THE RELEASE PROVISIONS SET FORTH IN THE PLAN. THE PLAN PROPONENTS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT A VOTING PARTY TO CURE ANY DEFECTS IN THE BALLOT. THE FAILURE TO VOTE ON THE PLAN DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.**

     II.     **THE DEBTORS' BUSINESS AND DEBT STRUCTURE AND EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES**

A.     <u>Overview of the Debtors' Businesses</u>

     1.     <u>Debtors' Organizational Structure</u>

     YogaWorks is a Delaware C corporation that holds all the stock of Yoga Works. YogaWorks is organized under the laws of Delaware. Yoga Works is a California C corporation that holds all the operating assets of the Debtors. Yoga Works is a wholly owned subsidiary of YogaWorks and is organized under the laws of California.

2.      Description of the Debtors' Business

The Debtors were founded in 1987 with one studio in Santa Monica, California.  The Debtors' corporate headquarters was located in Culver City, California until mid-2020 when it was moved to Santa Monica, California.  As of the Petition Date, the Debtors employed approximately 205 employees.

When the business was started, the founders developed a unique style and philosophy of yoga that is now known as the "YogaWorks yoga" style.  The founders wanted to expand their new yoga style beyond their first location in California and did that by expanding to over 70 locations at one time.  The Debtors also expanded their business model to include an international teaching school for yoga instructors and in 2013, began to offer pre-recorded on-demand yoga videos and workshops through a service called My YogaWorks Live.  On August 11, 2017, YogaWorks completed its initial public offering, becoming the first yoga "chain" to be publicly traded.  The Debtors voluntarily de-listed from the NASDAQ in the beginning of 2020.  While this resulted in the Debtors being delisted and deregistered with the SEC, the Debtors' shares were not cancelled.

3.      The Debtors' Business Operations

In Person Studios.  Prior to the COVID-19 outbreak, the Debtors operated approximately 60 studios throughout the United States, which offered customer in person yoga classes for all skill levels using the YogaWorks style that was developed when the Debtors were founded, as well as other styles of yoga.  Classes could be purchased individually on a per class basis, in bulk by buying a block of classes for a discount, or by a membership that allows the student to take unlimited classes for a certain price each month. The studios also sold retail merchandise which provided a smaller proportion of the Debtors' total gross revenues.  In 2019, the Debtors' in person studio business generated approximately $58.5 million in revenue, the majority of the Company's overall revenue.  In mid March 2020, however, all studios had closed as a result of the COVID-19 outbreak and of those that were able to reopen at various points, student attendance was very low. In September 2020, the Debtors closed all of their locations and student obligations were converted to digital offering.

Education.  The Debtors' business model also included educational resources and training to teach potential yoga instructors the YogaWorks method.  The Debtors' well-known training cultivated the richest yoga talent from around the globe and set the gold standard for teaching.  The teacher training model included both core in-house trainings developed by its education department, and partner trainings whereby YogaWorks was contracted by other studios and yoga providers to provide best in class teacher training on their behalf for a fee.

Digital.  The Debtors' business model also included a digital platform that included YogaWorks Live and My YogaWorks.  YogaWorks Live provides approximately 40 live classes per day and was launched in April 2020 in response to COVID-19.  MyYogaWorks was launched in 2013 and includes approximately 1,300 hours of pre-recorded classes and workshops.  Members could subscribe to either service for a monthly membership fee which provides them unlimited access to live or pre-recorded classes. As of the Petition Date, the Debtors had approximately 9,000 members paying for YogaWorks Live and 21,000 members paying for MyYogaWorks.  In 2019,

the digital portion of the Debtors' business generated net revenue totaling approximately $1.6 million.

**B.    The Debtors' Prepetition Indebtedness**

1.    <u>Secured Debt</u>.  On or about January 23, 2020, the Debtors entered into a $10 million Credit Agreement with Avidbank ("<u>Avidbank Facility</u>").  On September 18, 2020, Great Hill Equity Partners V, LP ("<u>GHP</u>") purchased the Avidbank Facility through an assignment from Avidbank ("<u>GHP Facility</u>").  On or about October 14, 2020, the Prepetition Secured Lender purchased the GHP Facility through an assignment from GHP ("<u>YW Investment Facility</u>").  The YW Investment Facility was then assigned to Serene Investment Management, LLC ("<u>Serene Facility</u>").  Prior to the Sale, the Serene Facility was secured by a senior lien on substantially all of the assets of the Debtors.  As of the Petition Date, $10 million remained outstanding under the Serene Facility, plus accrued and unpaid interest, fees and expenses.  The Serene Facility was satisfied in full as a result of the Sale.

2.    <u>Estimated Unsecured Debt.</u>  As of the Petition Date the Debtors owed material amounts, on an unsecured bases, to their landlords totaling at least $5.4 million and other unsecured debts to trade vendors of approximately $2 million, plus an approximate $1 million settlement claim based on wages, and approximately $800,000 for taxes, wage and other debts likely entitled to priority status.

3.    <u>Equity Interests.</u>  While YogaWorks has been delisted, the Depository Trust Company Committee on Uniform Securities Identification Procedures shows YogaWorks as open and the shares not cancelled.  GHP owns about 70% of the common stock of YogaWorks and the other 30% is owned by employees and other private shareholders.  As of the Petition Date, the number of shares of YogaWorks outstanding totaled 17,154,71 shares.

**C.    Events Leading to the Chapter 11 Cases**

The Debtors enjoyed significant growth from their inception.  After the Debtors went public in 2017, however, some mistakes were made which resulted in a large loss of revenues for the Debtors.  For example, the Debtors (1) were too focused on new acquisitions and their existing studios started to falter; (2) failed to focus on a recurring revenue model such as selling memberships to its students, instead focusing on pre-paid class packages and constantly undercutting its own pricing to continue to sell limited use packages; and (3) failed to properly integrate and unify new studios that were brought into the portfolio creating further operating inefficiencies.  For all these reasons, many of the studios started to operate at a sub-par level and caused the Debtors to incur large expenses.

In 2019 and 2018, the Debtors had $60.1 and $59.6 million in revenue, respectively, and cash flow from operations of negative $10.3 and negative $6.5 million, respectively.

In 2019, the Debtors explored a possible sale but they were unsuccessful.  The Debtors plan was then to continue existing efforts to close unproductive studios, complete a voluntary de-listing from NASDAQ and take private, restructure operations, promote and attract new management, and secure new financing.  In early 2020, the Debtors approved a budget including

5 to 10% revenue growth and approximately $2 million in positive EBITDA. Unfortunately, when the COVID-19 outbreak occurred, such plans could not come to fruition.

When the COVID-19 outbreak occurred in March 2020, the Debtors were forced to shut down all of their studio locations as a result of various stay at home and shut down orders put in all of the states in which the Debtors' studios are located. While some of the locations were allowed to reopen for a short period of time, attendance was very low and the Debtors decided to close all of their studios indefinitely in September 2020. While the Debtors quickly pivoted to focus on their digital offerings and immediately developed a platform for teachers to teach from home, over 80% of its revenue was based on in-person studio classes and Debtors could not afford to pay their rent and other financial obligations.

With no reasonable options and a declining cash position, the Debtors determined in their business judgment that it was in the best interest of their constituents to file for protection under chapter 11 in order to continue to market their assets, preserve the Debtors' value during a sale process, save jobs and maximize returns to creditors.

## III.   SIGNIFICANT EVENTS DURING THE DEBTORS' CHAPTER 11 CASES

### A.   Overview of Chapter 11 and Commencement of Chapter 11 Cases in General

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its finances and operations for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote the optimization of a debtor's assets and equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of the debtor's bankruptcy petition. The Bankruptcy Code provides that a Chapter 11 debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession. The Debtors filed their Cases with the Bankruptcy Court on October 14, 2020. The Debtors' cases were assigned to the Honorable Karen B. Owens, United States Bankruptcy Judge for the District of Delaware. The Debtors continue to retain control of their remaining assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Confirmation and consummation of a plan of reorganization or liquidation are the principal objectives of a Chapter 11 case. In general, confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Before soliciting acceptances of a proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment in voting to accept or reject the plan. The Debtors and the Creditors' Committee are distributing this Disclosure Statement to satisfy the requirements of Section 1125 of the Bankruptcy Code and Rules 3017 of the Federal Rules of Bankruptcy Procedure.

The following is a brief description of some of the major events that have occurred in the Chapter 11 Cases.

## B.    First Day Motions and Orders

On or about the Petition Date, the Debtors filed certain motions and applications seeking relief from the Bankruptcy Court designed to minimize the potential disruption of the Chapter 11 filing on the Debtors' business affairs and facilitate the orderly administration of the Cases.  On, or shortly after the Petition Date, the Bankruptcy Court entered various orders.  These include:

(a)    *Motion for Entry of An Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief* [D.I. No. 3].  On October 16, 2020, the Bankruptcy Court entered an Order granting the motion [D.I. No. 31].

(b)    *Motion for an Order (I) Authorizing Debtors to (A) File Consolidated List of Creditors; (B) File Consolidated List of Debtors' Top Thirty Unsecured Creditors; (C) Omit Members and Former Employees From the Creditor Matrix; (II) Approving Manner of Notice to Members and Former Employees* [D.I. No. 4].  On October 16, 2020, the Bankruptcy Court entered an Order granting, in part, the motion [D.I. No. 43].

(c)    *Emergency Motion for an Order Authorizing Debtors to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business* [D.I. No. 6].  On October 19, 2020, the Bankruptcy Court entered an Interim Order granting the motion [D.I. No. 48].  On November 3, 2020, the Bankruptcy Court entered a Final Order granting the motion [D.I. No. 118].

(d)    *Emergency Motion for an Order Authorizing: (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System, and (3) Continued Use of Business Forms* [D.I. No. 5].  On October 19, 2020, the Bankruptcy Court entered an Interim Order granting the motion [D.I. No. 47].  On November 3, 2020, the Bankruptcy Court entered a Final Order granting the motion [D.I. No. 116].

(e)    *Emergency Motion for Order Authorizing Payment of Prepetition Employee Wages, Benefits and Associated Expenses and Granting Related Relief* [D.I. No. 7].  On October 16, 2020, the Bankruptcy Court entered an Interim Order granting the motion [D.I. No. 40].  On November 3, 2020, the Bankruptcy Court entered a Final Order granting the motion [D.I. No. 117].

(f)    *Motion (A) Authorizing Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property Nunc Pro Tunc to the Petition Date; and (B) Abandon Certain Personal Property in Connection Therewith; and Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases* [D.I. No. 13].  On October 30, 2020, the Bankruptcy Court entered an Order granting the motion [D.I. No. 100].

(g)    *Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens and Super-Priority Claims and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Approving Debtors' Assumption of and Entry Into the Restructuring Support Agreement; and (V) Granting Related Relief* [D.I. No. 10].   On October 16, 2020, the Bankruptcy Court entered an Interim Orders granting the motion [D.I. Nos.

10

44 and 71]. On November 9, 2020, the Bankruptcy Court entered a Final Order granting the motion [D.I. No. 133].

(h)     *Application for Entry of an Order Authorizing Employment and Retention of BMC Group, Inc. a Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. No. 8].   On October 16, 2020, the Bankruptcy Court entered an Order granting the motion [D.I. No. 41].

## C.     Retention of Debtors' Professionals

During the Cases, the Bankruptcy Court entered various orders authorizing the Debtors to retain professionals to assist them with the conduct and administration of the Cases and their reorganization efforts, as follows:

a.   On October 16, 2020, 2020, the Bankruptcy Court entered its Order authorizing the Debtors to employ BMC Group as claims agent *nunc pro tunc* to the Petition Date [D.I. No. 41].

b.   On November 13, 2020, the Bankruptcy Court entered its Order authorizing the Debtors to retain Shulman Bastian Friedman & Bui LLP as general bankruptcy counsel *nunc pro tunc* to the Petition Date [D.I. No. 154].

c.   On November 13, 2020, the Bankruptcy Court entered its Order authorizing the Debtors to retain Force 10 Partners LLC as financial advisors to the Debtors *nunc pro tunc* to the Petition Date [D.I. No. 155].

d.   On November 24, 2020, the Bankruptcy Court entered its Order authorizing the Debtors to employ Cozen O'Connor as counsel for the Debtors *nunc pro tunc* to the Petition Date [D.I. No. 181].

e.   On November 24, 2020, the Bankruptcy Court entered its Order authorizing the Debtors to employ Whiteford Taylor & Preston LLP as conflicts and special counsel for the Debtors *nunc pro tunc* to the Petition Date [D.I. No. 182].

f.   On January 22, 2021, the Bankruptcy Court entered its Order authorizing the Debtors to employ BMC Group as administrative agent *nunc pro tunc* to November 5, 2020 [D.I. No. 316].

On October 21, 2020, the Debtors filed a *Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [D.I. No. 67].  On November 13, 2020, the Bankruptcy Court entered its Order granting the motion [D.I. No. 156].

## D.     Appointment of Creditors' Committee and Retention of Professionals

On or about October 27, 2020, the U.S. Trustee appointed the Creditors' Committee [D.I. No. 87] to represent the interests of the unsecured creditors.  Since the Creditors' Committee's formation, the Debtors have consulted and coordinated with the Creditors' Committee concerning various aspects of the Chapter 11 Cases, including, without limitation, the sale of the Assets, and the formulation of the Plan and this Disclosure Statement.  The members of the Creditors'

Committee are (i) Daniela Caesar-Roden; (ii) Marin Country Mart LLC; (iii) AKF3 Valencia, LLC; (iv) Barjen Realty Trust, U/D/T of Sept. 1, 1981; and (v) Elizabeth B. Kulemin, Trustee of the Elizabeth Brophy Kulemin Trust Agreement, and Trustee of the Brophy-Kulemin Trust I

The Bankruptcy Court entered various orders authorizing the Creditors' Committee to retain professionals as follows:

> a. On November 30, 2020, the Bankruptcy Court entered its Order authorizing the Creditors' Committee to retain Kilpatrick Townsend & Stockton LLP as attorneys for the Creditors' Committee effective as of October 29, 2020 [D.I. No. 187].

> b. On November 30, 2020, the Bankruptcy Court entered its Order authorizing the Creditors' Committee to retain Morris James LLP as attorneys for the Creditors' Committee effective as of October 29, 2020 [D.I. No. 188].

> c. On November 30, 2020, the Bankruptcy Court entered its Order authorizing the Creditors' Committee to retain Dundon Advisers LLC as financial advisors for the Creditors' Committee effective as of November 2, 2020 [D.I. No. 189].

## E.     Debtor-in-Possession Financing and Use of Cash Collateral

On October 15, 2020, the Debtors filed a motion for approval of post-petition financing and use of cash collateral in order to provide the funding critical to the operation of the Debtors' businesses and the administrative costs associated with the Chapter 11 Cases (the "DIP Motion") [D.I. No. 10].

On October 22, 2020, the Bankruptcy Court entered an interim order (the "Interim DIP Financing Order") [D.I. No. 71] that, among other things, authorized on an interim basis, pending a final hearing, the Debtors to (i) obtain secured postpetition financing in an aggregate principal amount not to exceed $3,350,000 (the "DIP Credit Facility"), and the loans provided to the Debtors thereunder, the "DIP Loans"), (ii) enter into a Debtor-in-Possession Loan and Security Agreement (the "DIP Agreement) with Serene (the "Lender").

On November 9, 2020, the Bankruptcy Court entered an order approving the DIP Motion on a final basis [D.I. No. 133] (the "Final DIP Order"). Pursuant to the Final DIP Order, which was negotiated with the Creditors' Committee, the Debtors were, among other things, authorized to borrow, pursuant to the DIP Credit Facility, a principal amount not to exceed $3,350,000.00. In addition, the Final DIP Order granted, to Lender, in order to secure the DIP obligations, valid enforceable and fully perfected liens (the "DIP Liens") in substantially all of the property, assets or interests in property or assets of the Debtors (as more specifically set forth in the Final DIP Order). The Final DIP Order did not grant the Lender liens on and claims in certain of the Debtors' assets including, among others, Avoidance Actions and the proceeds thereof.

12

F.      **The Sale of Substantially All of the Debtors' Assets**

As described above, and as set forth more fully in the Sale Motion (as defined below) and the First Day Declaration of Brian Cooper [D.I. No. 11], prior to the Petition Date, the Debtors and their advisors explored multiple restructuring alternatives, including finding a buyer for the Debtors' business.  Due to a confluence of factors, the Debtors ultimately determined that in order to maximize the value of its assets it would pursue one or more sale transactions pursuant to section 363 of the Bankruptcy Code.

Prior to the Petition Date the Debtors were able to secure a stalking horse asset purchase agreement with Serene regarding a "stalking horse" bid to purchase certain of the Debtors' assets, including the Debtors' brand and intellectual property.

On October 23, 2020, the Debtors filed their *Motion for Entry of an Order: (I) (A) Approving Bidding Procedures and Protections in Connection with a Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Scheduling an Auction and Sale Hearing; (C) Approving the Form and Manner of Notice Thereof; (D) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Leases; and (E) Granting Related Relief; and (II) Authorizing Sale of Substantially All of Debtors' Assets Pursuant to Successful Bidder(s)' Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; and (B) Approving Assumption and Assignment of Certain Executory Contracts and Leases* ("Sale Motion") [D.I. No. 76].

By the Sale Motion, the Debtors sought, among other things, to approve bidding procedures and an auction in connection with the sale of substantially all of the Debtors' Assets to the bidder with the highest and best bid at the auction, free and clear of liens, claims, encumbrances and interests.  On November 10, 2020, the Bankruptcy Court entered an order (the "Bidding Procedures Order") [D.I. No. 141] that authorized the Debtors to, among other things, solicit bids and conduct an auction.

Pursuant to the Bidding Procedures Order, competing bids for any or all of the Debtors' assets were required to be submitted to the Debtors and other parties on or before December 4, 2020 and an auction was scheduled to take place on December 7, 2020.

Pursuant to the Bidding Procedures Order, on December 7, 2020, the Debtors completed the auction with four qualified bidders and determined that the highest and best value for the Debtors' estates and their creditors was offered by funds managed by MEP Capital Management, LLC and affiliates of GoDigital Media Group, LLC (collectively, the "Successful Bidder").  The Successful Bidder's winning bid resulted in total consideration of $9,600,000, consisting of $7,300,000 in cash and an additional $2,300,000 in non-cash consideration.

On December 22, 2020, a hearing on the Sale Motion was held and on December 23, 2020, the Bankruptcy Court entered an Order granting the Sale Motion [D.I. No. 240]. The Sale officially closed on December 30, 2020.  As part of the Sale, the Debtors' pre-petition debt owed to Serene was satisfied in full and otherwise forever waived and relinquished upon the closing of the Sale.

G.   **Claims Process and Bar Dates**

On November 12, 2020, the Debtors filed their schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "Statements") with the Bankruptcy Court [D.I. Nos. 149, 150, 151 and 152]. Among other things, the Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such claims. The Statements further provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders," payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

Subsequently, on December 3, 2020, the Debtors filed a motion [D.I. No. 195] seeking entry of an order establishing deadlines for submitting proofs of claim, approving the form and manner for submitting such proofs of claim and approving notice thereof. On January 11, 2021, the Bankruptcy Court entered an order (the "Bar Date Order") [D.I. No. 267] setting February 10, 2021 as the general bar date and April 12, 2021 as the governmental bar date (the "Governmental Bar Date"), as the bar date for Creditors that constitute governmental units (as defined by the Bankruptcy Code) to file proofs of claim against the Debtors. The Bar Date Order provides, in part, that any person or entity that is required to file a timely Proof of Claim and who fails to do so on or before the applicable Bar Date may be forever barred, estopped and enjoined from asserting such claim against the Debtors, and may not, with respect to such claim, be treated as a creditor of the Debtors for the purpose of voting on any plan in these Chapter 11 Cases.

H.   **Key Employee Retention Plan**

In order to maximize recoveries to creditors through a sale process, certain "essential" employees (the "Essential Employees") were called upon to perform services above and beyond their normal course job requirements. Each of the Essential Employees being key to the Debtors' efforts to administer and resolve these Cases, and crucial to the process of selling the Debtors' assets to maximize the benefit to all of the Debtors' creditors. In addition to performing their daily job functions, the Essential Employees were also responsible for maintaining the Debtors' books and records and assisting Debtors' counsel and financial advisors in the preparation of essential reporting and bankruptcy-related documents.

The Essential Employees were tasked to perform work vital to the success of the Chapter 11 Cases, despite the uncertainty surrounding their employment. As such, the Debtors believed that it was critical that the Essential Employees were not only compensated for their extraordinary efforts, but that they were also appropriately motivated to ensure that the value of the Debtors' estates was maximized, regardless of the uncertainty that surrounded their future employment prospects or other outside concerns.

To that end, on November 12, 2020, the Debtors filed their Motion for Entry of Order Approving Debtors' Non-Insider Key Employee Retention Plan [D.I. No. 148]. On November 24, 2020, the Bankruptcy Court entered an Order [D.I. No. 184] that approved said motion.

The retention plan, as approved by the Bankruptcy Court, provided for retention payments to the Essential Employees based upon the Essential Employees continuing to remain with the

Debtors through the sale of the Debtors' assets, with bonuses equal to no more than 6% of their annual compensation, with the maximum aggregate amount to be paid in retention bonuses being $60,000.

## I.    Settlement of Certain Alleged Preference and Other Claims

The Creditors' Committee, with its Professionals, reviewed various pre-petition transactions.  Upon such review, the Creditors' Committee discovered that as part of the Avidbank Facility transaction, GHP received the sum of approximately $5 million related to repayment of an unsecured convertible note in January 2020 ("Alleged Preference").

The Creditors' Committee asserted that the Alleged Preference was a preferential transfer pursuant to Bankruptcy Code section 547 and could be avoided and recovered for the Estates and the benefit of creditors.  GHP asserted, among other things, that it provided "new value" when it purchased the Avidbank Facility and also that the Debtors were not insolvent at the time of the Alleged Preference.  As such, GHP disputed any liability and asserted that the Alleged Preference could not be avoided and recovered.

The Creditors' Committee also alleged various claims against the Debtors' independent directors and other directors for breach of fiduciary duty and other claims in carrying out their duties as directors (the "D&O Allegations").

The Debtors, the Creditors' Committee, Serene, and GHP engaged in extensive negotiations regarding the Alleged Preference and the D&O Allegations and eventually reached the terms of a global settlement which are incorporated into the Plan.  The settlement includes, but is not limited to, the amount of Professional Compensation Claims to be allowed and paid, and GHP and Serene agreeing to provide additional monies to fund and implement the Plan, in exchange for a release of the Alleged Preference and the D&O Allegations and the other releases described in detail herein and in the Plan.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, potential Distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests, Causes of Action (where applicable), and controversies resolved pursuant to the Plan, including, without limitation, the Alleged Preference and the D&O Allegations.

## J.    Other Post Petition Activities

The Debtors' overarching goal in the Chapter 11 Cases has been to maximize the value of their assets while minimizing the expenses associated with maintaining such assets.  In addition to consummating the sale of the Assets, the Debtors have entered into various stipulations and related orders rejecting unexpired non-residential real property leases.

Moreover, the Debtors have filed the following:

(i)    *Motion of Debtors for Order Approving Debtors' Assumption of and Entry Into the Restructuring Support Agreement* [D.I. No. 59].  On November 9, 2020, the Bankruptcy Court entered an Order granting the motion [D.I. No. 134].

LEGAL\50997186\1

(ii)      *Motion for Entry of Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries; and (II) Authorizing Payment of Reimbursement to Employee* [D.I. No. 143].  On November 24, 2020, the Bankruptcy Court entered an Order granting the motion [D.I. No. 183].

(iii)      *Application for Entry of an Order Authorizing the Employment and Retention of BMC Group, Inc. as Administrative Agent Effective as of October 14, 2020* [D.I. No. 242].  On January 22, 2021, the Bankruptcy Court entered an Order granting the application [D.I. No. 316].

(iv)      *Motion to Extend the Time Period Within Which the Debtors May File Notices to Remove Actions Pursuant to 28 U.S.C. § 1452 and Rules 9027 and 9006 of the Federal Rules of Bankruptcy Procedure* [D.I. No. 253].  On January 20, 2021, the Bankruptcy Court entered an Order granting the motion [D.I. No. 299].

## IV.      OVERVIEW OF THE PLAN

### A.      General

The following is a summary intended as a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan, a copy of which is annexed hereto as **Exhibit A**. Holders of Claims are respectfully referred to the relevant provisions of the Bankruptcy Code and are encouraged to review the Plan and this Disclosure Statement with their counsel.

In general, a Chapter 11 liquidating plan must (i) divide claims and interests into separate categories and classes, (ii) specify the treatment that each category and class is to receive under such plan, and (iii) contain other provisions necessary to implement the liquidation of a debtor.  A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of claims or interests in certain classes are to remain unchanged by the liquidation effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan.  Accordingly, it is not necessary to solicit votes from holders of claims or interests in such "unimpaired" classes.  Pursuant to Section 1124(1) of the Bankruptcy Code, a class of claims or interests is "impaired," and entitled to vote on a plan, unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. §1124(1).

### B.      Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan shall classify the claims and interests of a debtor's creditors and equity interest holders.  In compliance with Section 1122 of the Bankruptcy Code, the Plan divides the holders of Claims into four unclassified categories and three Classes, and sets forth the treatment to be provided to each Class.[3]  These Classes take into account the differing nature and priority of Claims against the Debtors.

---

[3]      A plan proponent is required under Section 1122 of the Bankruptcy Code to classify the claims and interests of a debtor's creditors and interest holders into classes containing claims and interests that are substantially similar to the other claims or interests in such class.  While the Debtors believe that their classification of all

Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5). A "claim" against the Debtors also includes a claim against property of the Debtors, as provided in Section 102(2) of the Bankruptcy Code. 11 U.S.C. § 102(2). An "interest" is an equity interest in a debtor. For the holder of a Claim or Equity Interest to participate in a plan and receive the treatment offered to the class in which it is classified, its Claim must be "Allowed," which term is defined in the Plan

## C.    Treatment of Claims and Equity Interests Under the Plan

The Plan segregates the various Claims against and Equity Interests in the Debtors. These Classes take into account the different nature and priority of Claims against the Debtors. In addition, in accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan. Rather, all such Claims are treated separately as unclassified Claims.

The following summary is qualified in its entirety by the full text of the Plan. In the event of an inconsistency between the Plan and the description contained herein, the terms of the Plan shall govern.

### 1.    Unclassified Categories of Claims

Although the general rule under the Bankruptcy Code requires that Claims and Interest be divided into Classes, certain types of Claims are not required to be classified. In accordance with section 1123(a)(1) of the Bankruptcy Code, unclassified claims against the Debtors consists of (i) Administrative Claims; (ii) Priority Tax Claims; and (iii) Professional Fee Claims. Unclassified claims are not entitled to vote on the Plan.

#### (a)    Administrative Claims

*General Bar Date for Administrative Claims.* Requests for payment of Administrative Claims, other than Professional Fee Claims, claims for U.S. Trustee fees under 28 U.S.C. § 1930 and Priority Tax Claims, must be included within an application (setting forth the amount of, and basis for, such Administrative Claims, together with documentary evidence) and Filed and served on respective counsel

---

Claims is in compliance with the provisions of Section 1122 of the Bankruptcy Code, it is possible that a holder of a Claim may challenge the Debtors' classification scheme and the Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtors, to the extent permitted by the Court, to modify the Plan to provide for whatever reasonable classification might be required by the Court for Confirmation, and to use the acceptances received by the Debtors from any holder of a Claim pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder of a Claim is ultimately deemed to be a member.

for the Debtors and the Creditors' Committee, no later than the Administrative Claim Bar Date or by such earlier deadline governing a particular Administrative Claim contained in an order of the Bankruptcy Court entered before the Effective Date. The Debtors will serve all holders of Claims or Equity Interests with a notice of the Administrative Claim Bar Date upon the Effective Date of the Plan. Holders of Administrative Claims that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtors or any of their property, absent order of the Bankruptcy Court to the contrary.

*Treatment*.  Except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Claim within thirty (30) days after the later of (a) the Effective Date, (b) the Allowance Date, or (c) such other date as is mutually agreed upon by the Debtors and the holder of such Claim.

(b)      Priority Tax Claims

*Treatment*.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim, shall receive, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement and release of such Claim, Cash in an amount equal to the amount of such Allowed Priority Tax Claim; provided, however, that, in the event an Allowed Priority Tax Claim is also a Secured Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

(c)      Professional Fee Claims

*Professional Fee Claims Bar Date*.  All professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before the Effective Date (excluding, without limitation, any compensation or commission requested by any professional or any other entity for making a substantial contribution in the Chapter 11 Case, which requests must be filed by the Administrative Claims Bar Date) shall File and serve on counsel for the Debtors, counsel for the Creditors' Committee, and the U.S. Trustee an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.  Objections to applications of professionals for compensation or reimbursement of expenses must be filed and served on the Debtors, the Creditors' Committee, the U.S. Trustee, and the professionals to whose application the objections are addressed no later than twenty-one (21) days after the date the application is filed, or the Bankruptcy Court may enter an order authorizing the fees without a hearing.

*Treatment*.  Subject in all respects to the occurrence of the Effective Date, the following Professionals have agreed to the following aggregate fee and expense awards from the Petition Date through January 14, 2021: (i) Shulman Bastian Friedman & Bui LLP, general counsel to the Debtors, the sum of $235,839.22; (ii) Cozen O'Connor, Delaware counsel to the Debtors, the sum of $89,666.48; (iii) Force 10 Partners, LLC, financial advisors to the Debtors, the sum of $352,663.20; (iv) Kilpatrick Townsend & Stockton LLP, general counsel to the Creditors' Committee, the sum of $221,755,21; (v) Morris James LLP, Delaware counsel to the Creditors' Committee, the sum of $82,516.10; and (vi) Dundon Advisers, LLC, financial advisors to the Creditors' Committee, the sum of $128,940.00.  Subject to the occurrence of the Effective Date, in no event shall the aggregate professional fees from January 15, 2021 through and including confirmation of the Plan, wind-down and closure of the Chapter 11 Cases by the Final Decree exceed $133,300.00 (the "Future Fee Cap").  From the Future Fee Cap, the sum of $118,300.00 shall be allocated to the Debtors' professionals (Shulman Bastian Friedman & Bui LLP, Cozen O'Connor and Force 10 Partners) and $15,000.00 of which shall be allocated to the Creditors' Committee's professionals (Kilpatrick Townsend & Stockton LLP, Morris James LLP and Dundon Advisers, LLC).

Subject in all respects to the occurrence of the Effective Date, the fee allocations set forth above shall be the sole and exclusive compensation for the period from January 15, 2021 through and including the closure of the Chapter 11 Cases by the Final Decree.  Each allocation shall be considered segregated for each set of professionals (i.e., the Debtors' Professionals allocation shall be solely and exclusively for the Debtors' Professionals and the Creditors' Committee's Professionals allocation shall be solely and exclusively for the Creditors' Committee's Professionals).  To the extent there are any savings in either allocation after full and final payment of the allocated Professionals, the remainder will be applied as follows: (i) first, to any overage owed to the other Professionals; (ii) second, to any outstanding Priority Claims or Administrative Claims; and (iii) third, to the GUC Cash.

2.    Unimpaired Classes of Claims

A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of claims or interests in certain classes are to remain unchanged by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan.  Accordingly, it is not necessary to solicit votes from holders of claims or interests in such "unimpaired" classes.  Under the Plan, there are no unimpaired classes of claims.

3.    Impaired Classes of Claims Entitled to Vote

Pursuant to Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired unless the legal, equitable, and contractual rights of the holders of claims or interests in such class are not modified or altered by a plan.  Holders of allowed claims and equity interests in impaired classes entitled to vote on such plan. While Section 1126(g) of the Bankruptcy Code provides that a class of claims or interests is deemed not to have accepted a plan if such plan provides that claims

19

or interests of such class do not entitle the holders of such claims or interests to receive a distribution under the plan, the holders of claims in such an impaired class are still entitled to vote. Under the Plan, Classes 1 and 2 are impaired under the Plan and, therefore, are entitled to vote on the Plan.

    (a)    <u>Class 1 (General Unsecured Claims)</u>

*Treatment*.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each such Allowed General Unsecured Claim, each such Holder shall:

    1)   receive its Pro Rata share of the GUC Cash;

    2)   receive its Pro Rata share of the proceeds or property derived from the Retained Assets; and

    3)   if such Holder submits a Ballot and checks the opt-in box, such Holder shall be deemed a Released Party for all purposes hereunder.

    (b)    <u>Class 2 (Convenience Class Claims)</u>

*Treatment*.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each such Allowed General Unsecured Claim, each such Holder shall:

1) receive the sum of 3% of its Allowed General Unsecured Claim no later than forty-five (45) days after the Effective Date; and

2) if such Holder submits a Ballot and checks the opt-in box, such Holder shall be deemed a Released Party for all purposes hereunder.

    4.    <u>Impaired Classes of Claims Not Entitled to Vote</u>

Pursuant to Section 1126(g) of the Bankruptcy Code provides that a class of claims or interests is deemed not to have accepted a plan if such plan provides that claims or interests of such class do not entitle the holders of such claims or interests to receive a distribution under the plan.  Under the Plan, Class 3 is impaired under the Plan but is not entitled to vote on the Plan.

    (a)    <u>Class 3 (Equity Interests)</u>

*Treatment*.  In full and final satisfaction of each Allowed Equity Interest in the Debtors, each Allowed Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Allowed Equity Interests shall be entitled to any recovery or distribution under the Plan on account of such Equity Interests.

20

## D.  **Implementation of the Plan and Plan Administrator**

1.  <u>Implementation of the Plan</u>.  The Plan will be implemented by the Liquidating Debtors and the Plan Administrator in a manner consistent with the terms and conditions set forth in the Plan and the Confirmation Order.

2.  <u>Plan Funding</u>.  The Plan will be funded by the Cash and Cash equivalents held by the Debtors generated from the Sale, plus the Plan Funding Advance from GHP of $1,150,000.00 to be released to the Debtors within three (3) business days prior to the Effective Date, plus payment of the sum of $100,000.00 to be paid by Serene to the Debtors within three (3) business days prior to the Effective Date, plus an additional sum of $465,000.00 to be paid by GHP to the Debtors no later than three (3) business days prior to the Effective Date.  In the event there are insufficient funds to pay or otherwise satisfy Allowed Secured Claims, Allowed Priority Claims and Allowed Administrative Claims, such shortfall, if any, shall be funded (i) first, by available Cash other than the GUC Cash after payment of all Claims senior in priority including, but not limited to, Allowed Professional Compensation Claims (subject in all respects to Article 4.3 of the Plan); (ii) second, by GHP, in an amount not to exceed $50,000.00 (the "<u>GHP Backstop</u>"); and (iii) third, from the GUC Cash.  In the event that (i) GHP is not required to fund any portion of the GHP Backstop; and (ii) the Debtors' Cash on hand exceeds the GUC Cash following payment or satisfaction of all Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Claims, and Allowed Professional Compensation Claims, such excess Cash, if any, shall added to the GUC Cash.

3.  <u>Vesting of Assets in the Debtors</u>.  Except as expressly provided in the Plan or the Plan Supplement, on the Effective Date, all Retained Assets shall vest in the Liquidating Debtors free and clear of all Claims, liens, encumbrances, charges, and other rights of Creditors or Equity Interests holders arising on or before the Effective Date, but subject to the terms and conditions of the Plan and the Confirmation Order.

4.  <u>Continuing Existence</u>.  From and after the Effective Date, the Liquidating Debtors shall continue in existence for the purposes of (i) winding up their affairs as expeditiously as reasonably possible, (ii) liquidating, by conversion to Cash, or other methods, the Retained Assets, as expeditiously as reasonably possible, (iii) administering, reviewing, resolving and paying priority Claims and Administrative Claims, (iv) resolving Disputed Claims, (v) administering the Plan, (vi) filing appropriate tax returns; (vii) seeking and obtaining entry of a Final Decree, whether by motion or by certification of counsel, (viii) dissolving the Debtors' corporate entities, and (ix) performing all such other acts and conditions required by and consistent with consummation of the terms of the Plan and the Confirmation Order.  Further, the Liquidating Debtors or any Entity or person jointly selected by the Plan Proponents, shall have the exclusive right to pursue, prosecute, settle, compromise, or abandon the Non-Released Preference Claims, the net proceeds of which shall be distributed to Holders of Class 2 Allowed General Unsecured Claims.

5.  <u>Management of Debtors</u>.  On the Effective Date, the current members of the Debtors' boards of directors and/or managers shall be relieved of all further responsibilities and shall be deemed to have resigned their positions with the Debtors.  From and after the Effective Date, the Plan Administrator shall administer the affairs of the Liquidating Debtors as set forth in this Plan and the Conformation Order.

6.      Appointment of the Plan Administrator.  On or prior to the Confirmation Date, the Debtors and the Creditors' Committee shall jointly appoint the Plan Administrator.  The identity of the Plan Administrator shall be included in the Plan Supplement. Upon the Effective Date, the Plan Administrator shall be appointed to reconcile General Unsecured Claims, effectuate distributions on account thereof from the GUC Cash, and generally administer the post-Effective Date affairs of the Liquidating Debtors.  The Plan Administrator shall have all the rights and powers  to implement the provisions of the Plan pertaining to the Plan Administrator, including the right to (a) make distributions from the GUC Cash as contemplated in the Plan, (b) establish and administer any necessary reserves from the GUC Cash for Disputed Claims that may be required; and (c) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such Disputed Claims.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.  The Liquidating Debtors shall provide the Plan Administrator with reasonable access to all relevant books and records so as to enable the Plan Administrator to carry out its duties.

7.      Funding of the Plan Administrator.  The Confirmation Order shall authorize the appointment and compensation of the Plan Administrator. The Plan Administrator shall be entitled to compensation equal to no more than $20,000 per month without the need for further Court authorization. The Plan Administrator shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code.  For the avoidance of doubt, in no event shall the GUC Cash be utilized to pay for the fees and expenses of the Plan Administrator and in no event shall GHP be required to pay the fees and expenses of the Plan Administrator.

8.      Powers and Rights of the Plan Administrator.  On the Effective Date, the Plan Administrator shall also have all authority to make all distributions pursuant to the terms of the Plan.  Subject to Article 8, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final and indefeasible.

9.      Disbanding of Creditors' Committee.  On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including, without limitation, the Creditors' Committee, shall automatically dissolve, and its Professionals and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to (i) any applications for Professional Compensation Claims, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (ii) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein or in the Plan, the compensation for services rendered in connection with the matters in clauses (i) and (ii) shall be subject to the Creditors' Committee allocable portion of the Future Fee Cap ($15,000).

10.     Cancellation of Equity Interests.  On the Effective Date, all outstanding prepetition Claims against and Equity Interests in the Debtors shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors relating to, arising under, in respect of, or in connection with such securities, instruments, or agreements shall be deemed discharged, released and/or satisfied as to the Debtors.  As of the Effective Date, the Liquidating Debtors will be authorized to execute and file on behalf of creditors

22

Form UCC-3 termination statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of Article VI of the Plan.

11.    <u>Substantive Consolidation of the Debtors</u>.  On the Effective Date:  (a) all Assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of the other Debtor, (b) no distributions shall be made under the Plan on account of Intercompany Claims among the Debtors and all such Claims shall be eliminated, (c) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed in any of the Cases shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of set-off under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set-off against the debts of the other Debtors.  Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors.

12.    <u>Final Decree</u>.  At any time following the Effective Date, the Liquidating Debtors shall be authorized to file a motion for the entry of a final decree closing the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code.  The Liquidating Debtors are further authorized, but not required, to close one of the Chapter 11 Cases by obtaining a Final Decree by filing a certification of counsel immediately following the Effective Date.

13.    <u>Retention of Records</u>. For the period that is the later of (i) six (6) months following the Effective Date; and (ii) the date final distributions to Holders of Allowed Claims are made pursuant to the terms of the Plan (such period, the "<u>Retention Period</u>"), the Liquidating Debtors shall preserve and maintain their documents and records in the ordinary course of business and according to practices and terms that they deem reasonable and appropriate.  Following the Retention Period, the Liquidating Debtors may, from time to time upon ten (10) days' written notice to the Document Destruction Notice Parties, and without approval of the Bankruptcy Court, destroy any documents and records of the Debtors.  The notice shall provide a reasonable description of the documents and records proposed to be destroyed.  In the event a Document Destruction Notice Party objects to the destruction, it shall provide the Liquidating Debtors with a written agreement and assurance, each of which is reasonably acceptable to the Liquidating Debtors, providing for the reimbursement and payment of all costs and expenses associated with the continued maintenance of such documents and records by the Liquidating Debtors.  Such costs and expenses shall include, but not be limited to, payroll related expenses, third party fees and expenses, storage device costs, copying fees, the fees and expenses of counsel to address any subpoenas or document production demands, and, if such extended maintenance precludes entry of the Final Decree, any fees (including U.S. Trustee fees) associated with such delay.

14.    <u>Full and Final Satisfaction</u>.  All payments and all distributions under the Plan shall be in full and final satisfaction, release and settlement of the Debtors' obligations with respect to all Claims and Equity Interests, except as otherwise provided in the Plan.

15.     Settlements.  With respect to any and all settlements incorporated into, or otherwise implemented pursuant to or in connection with the Plan, in each case to the extent such settlements have not been approved by prior Court Order, including but not limited to the settlement of the Alleged Preference and the D&O Allegations, the Plan and Disclosure Statement shall be deemed to constitute a motion of approval of such settlements pursuant to Bankruptcy Rule 9019 and any other applicable provisions of the Bankruptcy Rules and Bankruptcy Code.

16.     Defenses and Setoffs.  Nothing contained in the Plan shall constitute a waiver or release by the Debtors, the Liquidating Debtors, or the Plan Administrator of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment.  To the extent permitted by applicable law, the Debtors, the Liquidating Debtors, or the Plan Administrator may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estates, the Debtors, or the Liquidating Debtors may have against the Holder of such Claim.

17.     Distributions on Account of Disputed Claims.  Except as otherwise provided in a Final Order or as agreed by the relevant parties, distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Plan Administrator at such periodic intervals as the Plan Administrator determines to be reasonably prudent.

18.     No Distributions Pending Allowance.  Notwithstanding anything herein to the contrary: (a) no distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Debtors, no distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

19.     Distributions Reserve.  On and after the Effective Date, the Plan Administrator shall maintain in reserve such Cash from the applicable distributable assets as the Debtors or the Plan Administrator, as applicable, deem reasonably necessary to satisfy Disputed Claims relating to the Class at issue.

20.     Distributions in Cash.  Any required Cash payments to the Holders of Allowed Claims or Equity Interests shall be made by the Plan Administrator, as applicable: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by first-class mail (or by other equivalent or superior means as determined by the Plan Administrator).

23.     Timing of Distributions.  Except as specifically set forth in the Plan, the Plan Administrator may determine, in its discretion, the appropriate timing, amount, and cadence for distributions.

24.     Unclaimed Distributions.  Any entity which fails to claim any Cash within ninety (90) days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan, and the Plan Administrator shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the source of such

24

distribution (i.e., the Distribution Reserve) free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, (i) the claim of any Creditor or Equity Interest Holder with respect to such funds shall be irrevocably waived and forever barred against the Debtors and the Estates, notwithstanding any federal or state escheat laws to the contrary; (ii) such distribution shall revert to the source of such distribution (i.e., the Distribution Reserve) for distribution on account of other Allowed Claims.

> (i)      Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Plan Administrator as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtors after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtors have not received a written notice of a change of address prior to the Effective Date.

> (ii)     The Plan Administrator shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth in the Plan.  The Plan Administrator, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions.   Any distributions returned to the Plan Administrator as undeliverable or otherwise, shall remain in the possession of the Plan Administrator, until such time as a distribution becomes deliverable, and no further distributions shall be made to such Holder unless such Holder notifies the Plan Administrator of its then current address. Any Holder of an Allowed Claim or Interest entitled to a distribution of property under the Plan that does not assert a claim pursuant to the Plan for an undeliverable distribution, or notify the Plan Administrator of such Holder's then current address, within 30 days of such distribution shall have its claim for such undeliverable distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors or their respective property, and such distribution shall be deemed unclaimed property under Article 8.02(h) pf the Plan.

> (iii)    After final Distributions have been made in accordance with the terms of the Plan, if the aggregate amount of Unclaimed Distributions and Undeliverable Distributions is less than $26,000, the Plan Administrator may donate such amount to Delaware Consumer Bankruptcy Pro Se Foundation.

25.    <u>Distribution Record Date</u>.  As of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date, the transfer registers for Claims shall be closed.  The Plan Administrator shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date shall be treated

as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

26.     <u>De Minimis Distributions</u>.  If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $50.00, the Plan Administrator may hold such distribution until the time of a subsequent or final distribution.  If the final distribution under the Plan to the Holder of an Allowed Claim would be less than $50.00, the Plan Administrator may cancel such distribution.  Any cancelled distributions pursuant to this Section shall be treated as unclaimed property under Article 8.02(h) of the Plan.

27.     <u>Abandoned Retained Assets</u>.  The Plan Administrator may, in its reasonable discretion, abandon any Retained Assets without the need for additional approval of the Court, and upon such abandonment, such Assets shall cease to be Retained Assets.

28.     <u>Indefeasibility of Distributions</u>.  All distributions provided for under the Plan shall be indefeasible.

29.     <u>Saturday, Sunday, or Legal Holiday</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day.

30.     <u>Final Order</u>.  Any requirement in the Plan for a Final Order may be waived by the Debtors and the Creditors' Committee.

## E.     <u>Voting</u>

1.     <u>Voting of Claims</u>.  Each holder of an Allowed Claim in an Impaired Class shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other controlling order or orders of the Court.

2.     <u>Nonconsensual Confirmation</u>.  If any Impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any Impaired Class is deemed to have rejected the Plan, the Debtors reserve the right (a) to undertake to have the Court confirm the Plan under Section 1129(b) of the Bankruptcy Code and (b) subject to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, to modify the Plan to the extent necessary to obtain entry of the Confirmation Order, provided such modifications are consistent with Article XII of the Plan.  At the Confirmation Hearing, the Debtors will seek a ruling that if no holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the holders of such Claims in such Class for the purposes of Section 1129(b) of the Bankruptcy Code.

## F.     <u>Substantive Consolidation</u>

The Debtors are separate legal entities and, while management of the various studio locations were coordinated and they shared certain aspects of their cash management system, the

Debtors generally observed corporate formalities. Nonetheless, the Plan shall serve as a motion seeking entry of an order (which order may be the Confirmation Order) substantively consolidating the Debtors and proposes to treat the Debtors as a single, consolidated estate for purposes of voting and distributions. This treatment is permitted where observing the separate legal status of distinct entities could result in inequitable treatment of creditors. In this case, Serene had a lien on all of the Debtors' assets. Since the commencement of these cases, the Debtors have satisfied their obligations under both the Prepetition Credit Facility and the DIP Facility. The funds used to satisfy these facilities were ultimately derived from the proceeds of the Sale. It would be an expensive and time consuming task to attempt to retroactively allocate such amounts between the Debtors. In the case of substantive consolidation, this process would not be needed.

Accordingly, pursuant to the Plan, on the Effective Date: (a) all Assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of the other Debtor, (b) no distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (c) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed in any of the Cases shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of set-off under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set-off against the debts of the other Debtors. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors.

## G.    Remaining Executory Contracts and Unexpired Leases

1.    Executory Contracts and Unexpired Leases Deemed Rejected. On the Effective Date, all of the Debtors' Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except with respect to any Executory Contract that: (a) the Debtors previously assumed, assumed and assigned or rejected, or (b) for which, prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject on which the Bankruptcy Court has not ruled. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts and unexpired leases pursuant to the terms of the Plan and sections 365(a) and 1123 of the Bankruptcy Code. Nothing in the Plan is intended to affect the validity of contracts and leases entered into by the Debtors on or after the Petition Date, or the rights of the Debtors thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms.

2.    Approval of Rejection of Executory Contracts. Entry of the Confirmation Order by the Clerk of the Court, but subject to the condition that the Effective Date occur, shall constitute the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Executory Contracts pursuant to Article VII of the Plan.

3.    Bar Date for Rejection Damages.  If the rejection by the Debtors of an Executory Contract or an unexpired lease pursuant to section Article 7.01 of the Plan results in damages to the other party or parties to such Executory Contract or unexpired lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their properties or agents, successors, or assigns, unless a Proof of Claim is filed with the Claims Agent so as to actually be received on or before the date that is thirty (30) days after the Effective Date.  For the avoidance of doubt, the Plan shall not serve to extend the deadline to submit any Rejection Claim to the extent that the party asserting such Rejection Claim was subject to an earlier Rejection Damages Bar Date.

**H.    Provisions for Resolving and Treating Claims and Equity Interests**

1.    Prosecution of Disputed Claims and Equity Interests.  Except as otherwise provided for by a provision of the Plan, the Liquidating Debtors will have the authority, but not the obligation, to do any of the following with respect to any Claims or Equity Interests: (1) file, withdraw or litigate to judgment objections to Claims including, without limitation, any Customer Obligation  Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.  The Liquidating Debtors shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim.

2.    Claim Objection Deadline.  Objections to Claims must be filed with the Bankruptcy Court, and a copy of the objection must be served on the subject Creditor before the expiration of the Claim Objection Deadline; otherwise such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code.  The objection shall notify the Creditor of the deadline for responding to such objection

3.    No Distributions Pending Allowance.  Notwithstanding any provision in the Plan to the contrary, (a) no distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Plan Administrator no distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

4.    Claim Estimation.  Pursuant to section 502(c) of the Bankruptcy Code, the Debtors or the Liquidating Debtors may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

**I.    Conditions Precedent**

1.    Conditions to Confirmation.  The following conditions are conditions precedent to Confirmation of the Plan unless such have been satisfied or waived pursuant to Article 10.3 of the Plan:

(a)     The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Debtors and the Creditors' Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)     The Plan, the Confirmation Order, and documents in the Plan Supplement shall be in a form and substance reasonably acceptable to the Debtors and the Creditors' Committee.

2.     <u>Conditions to Effective Date</u>.  The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Article 10.3 of the Plan:

(a)     All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtors, the Creditors' Committee, and GHP.

(b)     The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtors, the Creditors' Committee, and GHP confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(c)     All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(d)     No order of a court shall have been entered and remain in effect restraining the Debtors from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(e)     All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance acceptable to the Debtors.

(f)     The Plan Funding Advance of $1,150,000 (less any amounts previously released pursuant to agreement by and among the Debtors, the Creditors' Committee,  and GHP) shall have been released to the Debtors and the sum of $100,000 by Serene and the additional sum of $465,000 by GHP shall have been funded to the Debtors.

(g)     The amount of Priority Claims to be paid under the Plan shall be no more than $925,000.

3.     <u>Waiver of Conditions</u>.  The conditions to Confirmation of the Plan and to the occurrence of the Effective Date may be waived at any time by the Debtors, with the prior written consent of the Creditors' Committee and GHP.

4.     <u>Filing of Notice of Effective Date</u>.  On the Effective Date or as shortly thereafter as reasonably practicable, the Debtors shall file a notice of the Effective Date with the Bankruptcy Court.

**J.**     **Modification, Revocation or Withdrawal of the Plan**

1.     <u>Modification of Plan: Generally</u>.  The Plan Proponents may alter, amend, or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Plan, provided, however, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Equity Interests under the Plan. Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

2.     <u>Modification of Plan: Ancillary Documents</u>.  Notwithstanding any reference in the Plan to documents in the forms annexed to the Plan, the Plan Proponents may revise those forms by filing such revised forms with the Court on or prior to the Confirmation Date.

3.     <u>Revocation or Withdrawal of Plan</u>.  The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If the Plan Proponents revoke or withdraw the Plan prior to the Effective Date, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

**K.**     **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over the Chapter 11 Cases to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

(a)     To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b)     To ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)     To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)     To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(e)     To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any Plan Documents or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the

LEGAL\50997186\1

rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

      (f)     To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtors and their Estates;

      (g)     To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtors, or the Estates that may be pending on the Effective Date or that may be brought by the Debtors, or any other related proceedings by the Debtors, and to enter and enforce any default judgment on any of the foregoing;

      (h)     To decide or resolve any and all applications for compensation;

      (i)     To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

      (j)     To decide issues concerning the federal or state tax liability of the Debtors which may arise in connection with the confirmation or consummation of the Plan or any Plan Documents;

      (k)     To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

      (l)     To enter an order closing these Chapter 11 Cases when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

## L.    Discharge, Injunction and Releases

### 1.    Releases by Debtors

**As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties in facilitating the administration of the Chapter 11 Cases and other actions contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, and except as otherwise provided in the Plan or the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors and Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, Avoidance Actions, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure Statement, or related agreements, instruments or other documents, including any rights or remedies under**

section 506 of the Bankruptcy Code, other than Claims or liabilities to the extent arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, actual fraud or willful misconduct, as determined by a Final Order.

2.      Releases by Third Parties

To the extent allowed by applicable law, and only if such holder of a Claim checks the opt-in box on his/her/its Ballot, as of the Effective Date and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, and except as otherwise provided in the Plan or the Confirmation Order, each holder of a Claim that check the opt-in box is deemed to have forever released, waived, and discharged each of the Debtors, Liquidating Debtors, and each other Released Party (as defined in the Disclosure Statement), from any and all claims, obligations, actions, suits, rights, debts, accounts, Causes of Action, Avoidance Actions, remedies, agreements, promises, damages, judgments, demands, defenses, and liabilities (other than their respective rights to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents executed and/or delivered in connection therewith) arising from or relating to the Released Parties' interaction with, work for, service to, or association with the Debtors (whether prior to or after the Petition Date), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, provided, however, that the release provided in this Section shall not extend to any claims by any Governmental Unit with respect to criminal liability under applicable law, willful misconduct or bad faith under applicable law, or ultra vires acts under applicable law.  For the avoidance of doubt, notwithstanding anything to the contrary contained in this Article 9.02 of the Plan, no holder of a Claim, whether such claim is allowed either prior to or after the Effective Date, shall be deemed to release its rights under Article 5.06 of the Plan, including any rights to receive Plan Distributions, rights or other treatment on account of such Allowed Claim.  For avoidance of doubt, notwithstanding anything to the contrary contained in this Section 9.02, no holder of a Professional Compensation Claim, whether such claim is allowed either prior to or after the Effective Date of the Plan, shall be deemed to release its Professional Compensation Claim under this Section 9.02 of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third-party release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to implementing the Plan; (4) good faith settlement and compromise of the claims released by the third-party release; (5) in the best interests of the Debtors and their respective Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim, obligations, rights, suits, damages, remedies, Cause of Action, or liabilities whatsoever released pursuant to the third-party release

### 3.    Exculpation and Limitation of Liability

(a)    The Exculpated Parties will neither have nor incur any liability to any entity for any claims or causes of action arising immediately prior to, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) preparation for the filing of the Chapter 11 Cases; (ii) the Chapter 11 Cases or in connection with the administration of the Chapter 11 Cases, (iii) the negotiation or approval of any agreements or pleadings that were either filed with the Bankruptcy Court or incident to the Chapter 11 Cases (including but not limited to approval of the Sale and/or the DIP Credit Agreement), (iv) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, (v) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, or (vi) the approval of the Disclosure Statement or confirmation or consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties will each be entitled to rely upon the advice of counsel concerning their duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

(b)    The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 4.    Injunction

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLES 9.02 THROUGH 9.04 (INCLUSIVE) OF THE PLAN, THE APPLICABLE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED UNDER THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT

LEGAL\50997186\1

TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN OR THAT ARE SUBJECT TO THE EXCULPATORY PROVISIONS OF ARTICLE 9.04 OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS RELEASED, OR SETTLED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL SUCH CLAIMS AND EQUITY INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL EQUITY INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

5.      **Releases Set Forth in the Final DIP Order**.  **Notwithstanding anything to the contrary in the Plan, the entry of the Confirmation Order and the occurrence of the Effective Date, nothing shall  in any way alter or limit the releases set forth in the Final DIP Order, which are reaffirmed in their entirety.**

6**.**      Preservation and Application of Insurance.  The provisions of the Plan shall not diminish or impair in any manner the enforceability and/or coverage of any insurance policies (and any agreements, documents, or instruments relating thereto) that may cover Claims (including Personal Injury/Workers' Compensation Claims) against the Debtors, any directors, trustees or officers of the Debtors, or any other Person, other than as expressly as set forth in the Plan.  For the avoidance of doubt, and as set forth in the Plan, all of the Debtors' insurance policies, or third party policies naming the Debtors as an additional insured party, and the proceeds thereof shall be available to satisfy Personal Injury/Workers' Compensation Claims to the extent such insurance policies cover such Personal Injury/Workers' Compensation Claims.  In addition, such insurance policies and proceeds thereof shall be available to satisfy Personal Injury/Workers' Compensation Claims estimated pursuant to Section 502(c) of the Bankruptcy Code or in accordance with the Plan.

## M.      Miscellaneous Provisions

1.      Payment of Statutory Fees.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid in Cash no later than the Effective Date.  Post-petition U.S. Trustee fees shall be paid and post-confirmation reports shall be filed as required by 28 U.S.C. § 1930 until the Chapter 11 Cases are closed, converted or dismissed. After confirmation, the Debtors will pay post-confirmation quarterly fees to the U.S. Trustee until a final decree is entered or the case is converted or dismissed as provided in 28 U.S.C. § 1930(a)(6).

2.      Reports.  Until a final decree closing the Cases is entered, the Debtors shall comply with any requisite reporting requirements established pursuant to the guidelines of the U.S. Trustee.

3.      Governing Law.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

4.      Withholding and Reporting Requirements.  In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Debtors  shall comply with all withholding, reporting, certification and information requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification and information requirements. Persons entitled to receive distributions hereunder shall, as a condition to receiving such distributions, provide such information and take such steps as the Plan Administrator may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Debtors to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

5.      Section 1146 Exemption.  Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan; or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan; or the vesting, transfer, or sale of any real property of the Debtors pursuant to, in implementation of or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

6.      Plan Supplement.  The Plan Supplement and all documents contained therein shall be filed in substantially final form with the Bankruptcy Code no later than seven (7) calendar days prior to the Voting Deadline, provided, however, that the Debtors may, with the consent of the Creditors' Committee, amend any such documents through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement.  .  In addition, a link to the Plan Supplement, as filed with the Court, shall be prominently displayed on the website of the Debtors' claims, noticing and balloting agent.

7.      Severability.  In the event that any provision of the Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provisions of the Plan.  To the extent that any provision of the Plan would, by its inclusion in the Plan, prevent or preclude the Court from entering the Confirmation Order, the Court, on the request of the Debtors, may modify or amend such provision, in whole or in part, as necessary to cure any defect or remove any impediment to the Confirmation of the Plan existing by reason of such provision; provided, however, that such modification shall not be effected except in compliance with Sections 11.1 and 11.2 of the Plan.

8.      Section 1125(e) Good Faith Compliance.  The Plan Proponents and each of their respective Representatives, shall be deemed to have acted in "good faith" under Section 1125(e) of the Bankruptcy Code, and the Confirmation Order shall include a finding of fact to that effect.

9.      Reservation of Rights.  If the Plan is not confirmed for any reason, the rights of all parties in interest in the Cases are and shall be reserved in full.  Any concession or settlement reflected or provision contained in the Plan, if any, is made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Cases shall be bound or deemed prejudiced by such concession.

10.     Binding Effect; Counterparts.  The provisions of the Plan shall bind all holders of Claims against the Debtors, whether or not they have accepted the Plan.  The Plan may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Plan.

11.     Notices.  All notices, requests, and demands to or upon the Debtors or the Creditors' Committee must be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually

delivered or, in the case of notice by facsimile transmission or by electronic mail, when received and telephonically confirmed, addressed as follows:

If to the Debtors:

Thomas Francella, Esq.
Cozen O'Connor
1201 North Market Street, Suite 1001
Wilmington, DE  19801
Email:  tfrancella@cozen.com

Alan J. Friedman, Esq.
Melissa Davis Lowe, Esq.
Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com

If to the Creditors' Committee:

Brya M. Keilson, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
E-mail: bkeilson@morrisjames.com

Gianfranco Finizio, Esq.
Kilpatrick Townsend & Stockton LLP
The Grace Building
1114 Avenue of the Americas
New York, NY  10036-7703
E-mail: gfinizio@kilpatricktownsend.com

12.    Plan Controls.  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

## V.    ACCEPTANCE AND CONFIRMATION OF THE PLAN

The following is a brief summary of the provisions of the Bankruptcy Code respecting acceptance and confirmation of a plan.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

## A.    Acceptance of the Plan

This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan.  The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the allowed claims of that class that have actually voted to accept or reject a plan.

If one or more impaired Classes rejects the Plan, the Plan Proponents may, in their discretion, nevertheless seek confirmation of the Plan if the Plan Proponents believe that they will be able to meet the requirements of Section 1129(b) of the Bankruptcy Code for Confirmation of the Plan (which are set forth below), despite lack of acceptance by all impaired Classes.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT AT (212) 310-5910 or bdaniel@bmcgroup.com.  THE SOLICITATION AND CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

## B.    Confirmation

### 1.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan.  Notice of the Confirmation Hearing respecting the Plan has been provided to all known holders of Claims or their representatives, along with this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan.  Any objection to the confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on the following parties so as to be actually received on _____, 2021, at _____ _.m. (prevailing Eastern time) (the "Plan Objection Deadline"):  (a) counsel to the Debtors, Shulman Bastian Friedman & Bui LLP, 100 Spectrum Center Drive, Suite 600, Irvine, California 92618, Attn: Alan J. Friedman, afriedman@shulmanbastian.com and mlowe@shulmanbastian.com and Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801, Attn: Thomas Francella, tfrancella@cozen.com; (b) counsel to the Creditors' Committee, Kilpatrick Townsend & Stockton LLP, 1114 Avenue of the Americas, New York, NY 10036, Attn: David M. Posner, Esq. and Gianfranco Finizio, Esq., and Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801, Attn: Eric J. Monzo, Esq. and

Brya M. Keilson, Esq.; and (c) the Office of the United States Trustee, Attn: Benjamin Hackman. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

2.  Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Debtors will request that the Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code.  If so, the Court shall enter an order confirming the Plan.  The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

(a)  The Plan must comply with the applicable provisions of the Bankruptcy Code;

(b)  The Debtors must have complied with the applicable provisions of the Bankruptcy Code;

(c)  The Plan has been proposed in good faith and not by any means forbidden by law;

(d)  Any payment made or promised to be made by the Debtors under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Court, and any such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Court as reasonable;

(e)  The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or administrator of each of the Debtors under the Plan.  Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and with public policy;

(f)  Best Interests of Creditors Test and Liquidation Analysis.

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was  converted to a chapter 7 case under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the

debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Plan Proponents believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Plan Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimately distribution of the Retained Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Case (such as compensation for professionals) that are allowed in the chapter 7 case. Ultimately, a conversion to chapter 7 would serve only to increase the amount of claims against the Debtors that would not be paid—both in terms of currently incurred and unpaid administrative and priority claims, as well as any costs incurred in administering the chapter 7 case. Moreover, in the event of conversion to chapter 7, neither GHP nor Serene would pay the additional sums set forth in the Plan and there would be substantially less funds available for creditors.

**Accordingly, the Plan Proponents believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Equity Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.**

(g)    <u>Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' assets have principally been liquidated and the additional sums to be paid by GHP and Serene are to be paid prior to the Effective Date, and the Plan provides for the distribution of all of the Cash proceeds of the Debtors' assets to holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability to meet its obligations under the Plan. Based on the Debtors' analysis as set forth in **<u>Exhibit C</u>** attached hereto, the Debtors will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Plan Proponents believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code

3.    <u>Confirmation Without Acceptance by All Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class. If any impaired classes reject or are deemed to have rejected the Plan, the Plan Proponents reserve their right to seek the application of the statutory requirements set forth in Section 1129(b) of the Bankruptcy Code for Confirmation of the Plan despite the lack of acceptance by all impaired classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured claim in the class receive deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such claim, or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a distribution under the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of interests includes the requirements that either (a) the plan provides that each holder of an equity interest in such class receive or retain under the plan, on account of such equity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such equity interest, or (b) if the class does not receive such amount, no class of interests junior to the non-accepting class will receive a distribution under the plan. The Debtors believe that, if necessary, they will be able to confirm the Plan even if all impaired classes do not vote in favor of the Plan because the terms of the Plan are "fair and equitable" to all Classes of creditors.

41

## VI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain of the material U.S. federal income tax consequences expected to result from the implementation of the Plan.  The following summary does not address the U.S. federal income tax consequences to holders whose claims are entitled to payment in full in Cash under the Plan.  This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS").  There can be no assurance that the IRS will not take a contrary view, and no ruling from the IRS has been or will be sought.  Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to, among others, the Debtors and the holders of Claims.

The following summary is for general information only.  The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all of the U.S. federal income tax consequences of the Plan.  This summary also does not purport to address the U.S. federal income tax consequences of the Plan to taxpayers subject to special treatment under the U.S. federal income tax laws, such as broker-dealers, tax exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual funds, regulated investment companies, foreign corporations, and non-resident alien individuals.

**EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POTENTIAL U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**IRS Circular 230 Notice:  To ensure compliance with requirements imposed by the IRS in Circular 230, you are hereby informed that (i) any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the IRC, (ii) the advice is written to support the promotion or marketing of the transactions or matters addressed in the Disclosure Statement, and (iii) each Holder of a Claim should seek advice based on its particular circumstances from an independent tax advisor.**

### A.    U.S. Federal Income Tax Consequences to Holders of Interests.

Holders of Interests will not receive any property or interest in exchange for their Interests and such Interests will be cancelled pursuant to the Plan.  A Person holding such Interests as a capital asset will be able to take a worthless stock deduction.  Section 165(g) of the IRC provides that if a security that is held as a capital asset becomes wholly worthless during the taxable year, the holder is entitled to a capital loss, which is treated as recognized from the sale or exchange of such security on the last day of such taxable year.  The definition of securities includes (i) shares of stock in a corporation and (ii) the rights to subscribe for or to receive shares of stock in a corporation.  The amount of loss deductible is limited to the holder's basis in the Interests.

42

B.    **Withholding and Reporting**.

The Debtors and the Liquidating Debtors will withhold all amounts required by law to be withheld from payments to holders of Allowed Claims.  For example, under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding at the then applicable rate.  Backup withholding generally applies only if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in overpayment of tax.  Certain persons are exempt from backup withholding, including corporations and financial institutions.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  The types of transactions that require disclosure are very broad; however, there are numerous exceptions.  Holders are urged to consult their advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of claims are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences applicable under the Plan.*

## VII.    RISK FACTORS

**HOLDERS OF ALL CLASSES OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

A.    **Certain Bankruptcy Related Considerations**

1.    Risk of Non-Confirmation of the Plan

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for Confirmation by the Court, there can be no assurance that the Court will reach the same conclusion.  There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

43

2.      Nonconsensual Confirmation

In the event any impaired class of claims or interests does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan of reorganization (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.  In the event that any impaired Class of Claims fails to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to request nonconsensual Confirmation of the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

3.      Risk that Conditions to Effectiveness Will Not Be Satisfied

Article X of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article X of the Plan will be satisfied.

4.      Claims Objection/Reconciliation Process

The potential recovery to holders of all impaired Claims to an extent depends on the outcome of the claims reconciliation and objection process.  Thus, there is no guarantee that the actual recovery to holders of impaired Claims, in particular with respect to the estimated recovery to Allowed General Unsecured Claims, will approximate the Debtors' estimates.  Specifically, a motion to certify a class claim was filed by Sarah Green and Cari Gilbert.  Whether the class will be certified, and the amount of the potential class, is unknown.  If a class is allowed, it will increase the amount of Claims to be paid, either as Priority Claims or General Unsecured Claims, which will reduce the amount of funds available to Allowed General Unsecured Claims.

## VIII.    ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION

Among the possible consequences if the Plan is rejected or if the Court refuses to confirm the Plan are the following:  (1) an alternative plan could be proposed or confirmed; or (2) the Chapter 11 Cases could be converted to liquidation cases under Chapter 7 of the Bankruptcy Code.

## A.      Alternative Plans

As previously mentioned, with respect to an alternative plan, the Debtors, the Creditors' Committee and their respective professional advisors believe that the Plan enables the holders of Claims to realize the maximum recovery under the circumstances.  The Debtors and the Creditors' Committee believe the Plan is the best plan that can be proposed and serves the best interests of the Debtors and other parties-in-interest.

## B.      Chapter 7 Liquidation

As discussed above, with respect to each Class of impaired Claims, either each holder of a Claim of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter

7 of the Bankruptcy Code.  The Debtors believe that significant costs would be incurred by the Debtors as a result of the delay that would be caused by conversion of the Chapter 11 Cases to cases under Chapter 7 resulting in a reduced distribution to holders of Claims.

## IX.    RECOMMENDATION AND CONCLUSION

The Debtors, the Creditors' Committee, and their respective Professionals believe that the Plan will provide for a more favorable distribution to holders of Allowed Claims than would otherwise result if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller distributions to the Holders of Allowed Claims.  **Accordingly, the Debtors and the Creditors' Committee recommend Confirmation of the Plan and urge the holders of Claims entitled to vote to accept the Plan, and to evidence such acceptance by returning their Ballots so that they will be received by no later than the Voting Deadline.**

[SIGNATURE PAGE FOLLOWS]

LEGAL\50997186\1

Dated:  February 16, 2021

YOGAWORKS, INC., et al.,
Debtors and Debtors-in-Possession

Lance Miller
Member of the Board of Directors

Peter Elkin
Member of the Board of Directors

**COZEN O'CONNOR**

*/s/ Thomas J. Francella, Jr.*
Thomas J. Francella, Jr., Esq. (DE Bar No. 3835)
Thomas M. Horan, Esq. (DE Bar No. 4641)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2000
Facsimile:  (302) 250-4495
E-mail: tfrancella@cozen.com
E-mail: thoran@cozen.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman, Esq.
Melissa Davis Lowe, Esq.
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com

*Counsel to the Debtors and Debtors in Possession*

**MORRIS JAMES LLP**

*/s/ Eric J. Monzo*
Eric J. Monzo, Esq. (DE Bar No. 5214)
Brya M. Keilson, Esq. (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

and

**KILPATRICK TOWNSEND & STOCKTON LLP**
David M. Posner, Esq. (admitted *pro hac vice*)
Gianfranco Finizio, Esq. (admitted *pro hac vice*)
1114 Avenue of the Americas
New York, NY  10036-7703
Telephone: (212) 775-8840
Facsimile: (646) 786-4442
E-mail: gfinizio@kilpatricktownsend.com
E-mail: dposner@kilpatricktownsend.com

*Counsel to the Official Committee of Unsecured Creditors*

46